IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| LSC WIND DOWN, LLC, *et al.,* | ) | |
| | ) | Case No. 17-10124 (KBO) |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| UMB BANK, N.A., as Plan Trustee of | ) | |
| The Limited Creditors' Liquidating Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 19-50272 (KBO) |
| | ) | |
| SUN CAPITAL PARTNERS V, LP, | ) | |
| SUN MOD FASHIONS IV, LLC, | ) | |
| SUN MOD FASHIONS V, LLC, and | ) | |
| H.I.G. SUN PARTNERS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' ANSWER TO COMPLAINT AND AFFIRMATIVE DEFENSES

Defendants Sun Capital Partners V, LP ("Sun Capital Partners V"); Sun Mod Fashions IV, LLC ("Sun Mod IV"); Sun Mod Fashions V, LLC ("Sun Mod V"); and H.I.G. Sun Partners, Inc. ("HIG") (collectively, "defendants"), hereby answer UMB Bank, N.A.'s ("plaintiff") Complaint as follows:

## PRELIMINARY STATEMENT

1.     This action seeks to avoid and recover a $42 million fraudulent transfer made by the Debtors to affiliates of their former private equity sponsor, Sun Capital Partners, Inc. (collectively with its affiliates, "Sun Capital").

**ANSWER**:     **The allegations set forth in paragraph 1 of the Complaint consist of plaintiff's characterization of its Complaint, to which no response is required.  To the**

**extent any response is required to the allegations in paragraph 1, defendants deny the allegations.**

2.    The Debtors operated a women's apparel and accessory retail company known as "The Limited," a brick-and-mortar business tethered to shopping malls. "The Limited" was a relic of a bygone era, having peaked in the late 1980s. From the early 1990s through mid-2000s, the company endured a nearly fifteen-year loss streak and saw over two-thirds of its stores shuttered.

**ANSWER**:    **Defendants admit that The Limited was a women's retail apparel store but deny all remaining allegations in paragraph 2 of the Complaint.**

3.    In 2007, Sun Capital jumped aboard the sinking ship by making a capital contribution to purchase a majority ownership interest in the holding company for "The Limited" business. Sun Capital, however, recouped that capital contribution in full in early 2010. Soon thereafter, Sun Capital obtained 100% of the ownership interests of the holding company without putting up any additional capital.

**ANSWER**:    **Defendants deny the allegations in paragraph 3 of the Complaint.**

4.    Acquiring the Debtors for effectively nothing did not satisfy Sun Capital. It wanted to extract as much value from the Debtors as it possibly could. To that end, Sun Capital caused the Debtors—which were managed by Sun Capital pawns—to borrow as much money as possible and exhaust most of their remaining cash to pay a $42 million "special distribution" to Sun Capital. This $42 million transfer, combined with the significant debt that the Debtors took on to fund the transfer, rendered the Debtors insolvent. In essence, Sun Capital siphoned whatever value it could from a company that was already struggling for survival, thereby hastening its demise at the expense of unsecured creditors.

**ANSWER**:    **Defendants deny the allegations in paragraph 4 of the Complaint.**

5.      The Trustee, as the duly authorized successor-in-interest to the Debtors, now seeks to avoid and recover the $42 million fraudulent transfer for the benefit of creditors.

**ANSWER**:    **The allegations set forth in paragraph 5 of the Complaint consist of plaintiff's characterization of its Complaint, to which no response is required.  To the extent any response is required to the allegations in paragraph 5, defendants deny the allegations.**

## PARTIES

### A.      The Plaintiff

6.      The Trustee is a national bank with its headquarters located in Kansas City, Missouri.  The Liquidating Trust was created, and the Trustee was appointed, pursuant to the order confirming the chapter 11 plan of liquidation (the "Plan") in the Debtors' bankruptcy cases.[1] Pursuant to the Plan, the Debtors retained certain causes of action, including the claims asserted in this action, for prosecution by the Trustee as a post-confirmation representative of the bankruptcy estate under 11 U.S.C. §1123(b)(3) of the Bankruptcy Code. The Trustee, therefore, has standing to prosecute the claims asserted in this action.

**ANSWER**:    **Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 6 of the Complaint.**

7.      The Trustee is the post-confirmation representative for each the following Debtors: (a) LSC Wind Down, LLC (f/k/a Limited Stores Company, LLC); (b) LS Wind Down, LLC (f/k/a Limited Stores, LLC); and (c) TLSGC Wind Down, LLC (f/k/a The Limited Stores GC, LLC).

**ANSWER**:    **The allegations set forth in the paragraph 7 of the Complaint are legal conclusions, to which no response is required.  To the extent there are any remaining allegations contained in paragraph 7 of the Complaint, defendants deny knowledge or**

---

[1] *See In re LSC Wind Down, LLC, et al.*, Case No. 17-10124 (KJC) (Bankr. D. Del.).

information sufficient to form a belief as to the truth of these allegations.

8.      Debtor LSC Wind Down, LLC ("HoldCo") was a Delaware limited liability company. It was managed by a board of managers. Its members were Defendants Sun Mod IV, Sun Mod V, and HIG, each of which are affiliates of Sun Capital.  HoldCo was a holding company owning 100% of the membership interests in Limited Stores (defined below).

**ANSWER**:      **The allegations set forth in the paragraph 8 of the Complaint are legal conclusions, to which no response is required.  To the extent there are any remaining allegations contained in paragraph 8 of the Complaint, defendants deny knowledge or information sufficient to form a belief as to the truth of these allegations.**

9.      Debtor LS Wind Down, LLC ("Limited Stores") was a Delaware limited liability company. It was member-managed by its sole member, Limited Company. Limited Stores, in turn, owned 100% of the membership interests in Limited GC (defined below).

**ANSWER**:      **The allegations set forth in the paragraph 9 of the Complaint are legal conclusions, to which no response is required.  To the extent there are any remaining allegations contained in paragraph 9 of the Complaint, defendants deny knowledge or information sufficient to form a belief as to the truth of these allegations.**

10.     Debtor TLSGC Wind Down, LLC ("Limited GC") was an Ohio limited liability company.  Limited GC was member-managed by its sole member, Limited Stores.

**ANSWER**:      **The allegations set forth in the paragraph 10 of the Complaint are legal conclusions, to which no response is required.  To the extent there are any remaining allegations contained in paragraph 10 of the Complaint, defendants deny knowledge or information sufficient to form a belief as to the truth of these allegations.**

11.     Limited Stores and Limited GC (collectively, "OpCo") were the primary operating

entities for "The Limited" branded retail stores.

**ANSWER**:    **Admitted.**

B.    **The Defendants**

12.    Defendant Sun Mod Fashions IV, LLC ("Sun Mod IV") is a Delaware limited liability company with its principal place of business in Boca Raton, Florida. It is affiliated with and/or controlled by Sun Capital. Sun Mod IV is registered to do business in Florida and may be served with process through its registered agent, CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**ANSWER**:    **Defendants admit Sun Mod Fashions IV, LLC is a Delaware limited liability company with its principal place of business in Boca Raton, Florida and deny any remaining allegations in paragraph 12 of the Complaint.**

13.    Defendant Sun Mod Fashions V, LLC ("Sun Mod V") is a Delaware limited liability company with its principal place of business in Boca Raton, Florida. It is affiliated with and/or controlled by Sun Capital. Sun Mod V is registered to do business in Florida and may be served with process through its registered agent, CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**ANSWER**:    **Defendants admit Sun Mod Fashions V, LLC is a Delaware limited liability company with its principal place of business in Boca Raton, Florida and deny any remaining allegations in paragraph 13 of the Complaint.**

14.    Defendant H.I.G. Sun Partners, Inc. ("HIG") is a Delaware limited liability company with its principal place of business in Boca Raton, Florida. It is affiliated with and/or controlled by Sun Capital. HIG may be served with process through its registered agent, The Corporation Trust Company, which is located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**ANSWER**:    **Defendants deny the allegations in paragraph 14 of the Complaint.**

15.    Defendant Sun Capital Partners V, LP ("Sun Capital Partners V") is a Cayman limited partnership with its principal place of business in Boca Raton, Florida. It is affiliated with and/or controlled by Sun Capital. Sun Capital Partners V is registered as a foreign limited partnership in Florida and may be served with process through its registered agent, CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**ANSWER**:    **Defendants admit Sun Capital Partners V is a Cayman limited partnership with its principal place of business in Boca Raton, Florida and deny any and all remaining allegations in paragraph 15 of the Complaint.**

## JURISDICTION AND VENUE

16.    The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it includes claims under federal law. The Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1334 because it arises under the Bankruptcy Code and/or relates to the Debtors' bankruptcy cases.  On January 17, 2017 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.[2]

**ANSWER**:    **Defendants admit that on January 17, 2017, Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Any remaining allegations set forth in the paragraph 16 of the Complaint are legal conclusions, to which no response is required.  To the extent there are any remaining allegations contained in paragraph 16 of the Complaint, defendants deny these allegations.**

17.    The Court has personal jurisdiction over Defendants in this action because: (a) each

---

[2] *See In re LSC Wind Down, LLC, et al.*, Case No. 17-10124 (KJC) (Bankr. D. Del.).

of them has their principal place of business in Florida; (b) each of them had their principal place

of business in Florida at the time of the events giving rise to the Trustee's claims in this action;

and (c) each of them, through their continuous and systematic contacts with Florida, have

purposefully availed themselves of the benefits and protections of Florida's laws and should

reasonably anticipate being haled into court in Florida.

**ANSWER**:    **The allegations set forth in the paragraph 17 of the Complaint are**
**legal conclusions, to which no response is required. To the extent there are any remaining**
**allegations contained in paragraph 17 of the Complaint, defendants deny these allegations.**

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all

Defendants have their principal place of business located in Boca Raton, Florida. Venue is also

proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events

giving rise to the Trustee's claims occurred in Boca Raton, Florida.

**ANSWER**:    **The allegations set forth in the paragraph 18 of the Complaint are**
**legal conclusions, to which no response is required.  To the extent there are any remaining**
**allegations contained in paragraph 18 of the Complaint, defendants deny these allegations.**

## BACKGROUND

A.    **"The Limited" Evolves from a Single Retail Store into a Large Public**
**Company.**

19.    Limited Stores and Limited GC collectively operated a women's apparel and

accessories retail business known as "The Limited."  Originally, the business was founded in 1963

as a single store in Ohio. By 1969, this business had six stores and went public as The Limited,

Inc. (later renamed Limited Brands, Inc., and now known as L Brands, Inc.). By 1976, the

company had over 100 stores.

**ANSWER**:    **Defendants deny possessing knowledge or information sufficient to**

**form a belief as to the truth of the allegations set forth in paragraph 19 of the Complaint, which predate their ownership interest in the Debtors and therefore demand strict proof at trial.**

20.    Over the ensuing decades, the company grew both by: (a) opening additional stores in "The Limited" brand business; and (b) developing and acquiring additional brands and businesses, such as Express, Structure, Lane Bryant, Victoria's Secret, and Bath & Body Works. In recognition of its expanding brands and of its evolving business, the company changed its name to Limited Brands, Inc. ("<u>Limited Brands</u>").

**<u>ANSWER</u>:    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 20 of the Complaint, which predate their ownership interest in the Debtors and therefore demand strict proof at trial.**

21.    "The Limited" brand business peaked in the late 1980s, and the vast majority of the company's growth during the 1990s and 2000s stemmed from its other brands.  By the mid-2000s, "The Limited" brand business accounted for only 4.6% of the total sales of Limited Brands, which had grown into a multi-billion dollar publicly-traded company dominated by its Victoria's Secret and Bath & Body Works brands.

**<u>ANSWER</u>:    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21 of the Complaint, which predate their ownership interest in the Debtors and therefore demand strict proof at trial.**

**B.    "The Limited" Suffers a Steep Decline and Is Divested to Sun Capital.**

22.    In the early 1990s, "The Limited" brand business's financial performance began a steep decline.  In 1994, this business suffered $20 million in operating losses. The losses got worse as the decade progressed, with "The Limited" brand sustaining $95 million in operating losses in

1998. The brand sustained losses each year from 1994 to 2008, an almost unfathomably dismal stretch of ***nearly 15 straight years of continuous losses***. "The Limited" brand only managed to survive as a result of being subsumed within the same corporate enterprise that owned Victoria's Secret and Bath & Body Works, two wildly successful and profitable brands.

**ANSWER**:    **Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 22 of the Complaint, which predate their ownership interest in the Debtors and therefore demand strict proof at trial.**

23.    "The Limited" brand's continuous losses over this period coincided with declining sales and the shuttering of many stores. Indeed, the brand ***closed stores every single year for 14 straight years***.  Its total number of stores at fiscal year-end were as follows:



**ANSWER**:    **Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 23 of the Complaint, which predate their ownership interest in the Debtors and therefore demand strict proof at trial.**

24.    The total number of "The Limited" brand stores declined by a whopping 65.7%, from 759 stores at the end of fiscal year 1992 to 260 stores as of February 3, 2007. The company closed additional stores during the first half of 2007. By July 2007, the 251 remaining stores represented less than one-third of the brand's peak of 759 stores. Shuttering two-thirds of its stores, however, did little to stop the bleeding. Indeed, the business continued to suffer losses and declining sales volumes even in the stores that had survived the cuts. In 2006, for example, the business saw same-store sales volumes decline by 4% from the previous year.

**ANSWER**:    **Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 24 of the Complaint, which predate their ownership interest in the Debtors and therefore demand strict proof at trial.**

25.    By mid-2007, it was obvious that the successful days of "The Limited" brand apparel business were squarely in the past. The brand had not turned a profit in 15 years and had closed two-thirds of its stores. The brand couldn't even turn a profit during the boom years of the late 1990s during the tech bubble or as the U.S. economy began over-heating again from 2004 to 2007 in the lead-up to the financial crisis. Not only was the brand stale and in decline, but competition faced by brick-and-mortar retailers such as "The Limited" brand was becoming increasingly fierce with the rapid emergence of online retailers.

**ANSWER**:    **Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 25 of the Complaint, which predate their ownership interest in the Debtors and therefore demand strict proof at trial.**

26.    After more than a decade of sustained losses and decline, Limited Brands decided to cut its deadweight by divesting "The Limited" brand business. On July 9, 2007, Limited Brands announced that it had entered into an agreement by which it would give up 75% of its ownership

interests in HoldCo to certain affiliates of Sun Capital.  Limited Brands was so desperate to unload the unprofitable business—which hadn't turned a profit in nearly 15 years—that it gave up 75% of its ownership interest in HoldCo *without receiving any cash consideration in exchange*, reporting a $72 million loss on the divestiture in its public securities filings. In other words, Limited Brands was willing to give up a 75% share of the business without receiving anything in exchange, as long as the new member would take responsibility for it.

**ANSWER**:    **Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations relating to reporting of a $72 million loss claimed by Limited Brands.  Defendants deny any remaining allegations set forth in paragraph 26 of the Complaint.**

27.    Sun Capital's acquisition of a 75% interest in HoldCo closed on August 3, 2007, with Sun Capital affiliates, Sun Mod IV and Sun Mod V, each receiving a 37.5% interest (collectively 750,000 units in HoldCo). Sun Capital provided $50 million in equity capital to HoldCo and/or the operating subsidiary, Limited Stores, but did not pay any consideration to Limited Brands. Instead, the transaction was structured as a purchase of newly issued HoldCo units that equated to a 75% membership interest in the company.

**ANSWER**:    **Defendants deny plaintiff's characterization of the terms of a certain July 6, 2007 Unit Purchase Agreement, and refer to that document for its terms, which speak for themselves.  Defendants deny any remaining allegations set forth in paragraph 27 of the Complaint.**

28.    In February 2010, Sun Capital's affiliates recouped the $50 million capital contribution—which had simply been parked on the balance sheet in the interim—through significant cash distributions.  Specifically, Sun Mod IV and Sun Mod V each received $25 million

in distributions (collectively, the "2010 Distribution"). After the 2010 Distribution, Sun Mod IV and Sun Mod V still owned 75% of a business for which they, in effect, had made no net capital contributions (*i.e.*, Sun Mod IV and Sun Mod V got back the $50 million they had contributed in August 2007 through the 2010 Distribution).

**ANSWER**: **Defendants deny plaintiff's characterization of the 2010 Distribution, as plaintiffs have defined that term, and refer to the board resolutions and supporting documentation for that transaction, which speak for themselves. Defendants deny any remaining allegations set forth in paragraph 28 of the Complaint.**

29.     Later that year, on June 10, 2010, Sun Capital, through its affiliates, Sun Mod IV, Sun Mod V, and HIG, obtained 100% ownership of HoldCo. Sun Capital did not part with any of its own cash to acquire that ownership interest. Rather, HoldCo first obtained a $32 million distribution from OpCo (Limited Stores and its subsidiary, Limited GC). HoldCo then used those proceeds to redeem all of the 250,000 membership units held by Limited Brands in HoldCo. As a result of these transactions, Limited Brands no longer held any membership interest in HoldCo, and Sun Capital, through its affiliates, now held 100% of the membership interests in HoldCo. In essence, Sun Capital's affiliates were able to pick up the remaining 25% membership interest by merely agreeing to allow Limited Brands to cash out of HoldCo for $32 million (as to which Limited Brands recorded a $20 million gain).

**ANSWER**: **Defendants admit that Sun Mod IV, Sun Mod V, and HIG acquired 100% ownership Holdco as part of a June 10, 2010 Unit Redemption Agreement, but dispute any other characterization of the Unit Redemption Agreement, and refer to that document, the terms of which speak for themselves. Defendants deny any remaining allegations set forth in paragraph 29 of the Complaint.**

30.    In the aggregate, from August 2007 through June 2010, Limited Brands divested itself of 100% of its interest in HoldCo (and thus, "The Limited" brand apparel business) in exchange for a grand total of $38.7 million of distributions and redemptions. During that same period, Sun Capital's affiliates acquired 100% of HoldCo without having to part with any of cash other than a $50 million contribution that was promptly repaid in full in February 2010. Thus, by the time that Sun Capital's affiliates had obtained 100% of HoldCo in June 2010, Sun Capital effectively had no skin in the game.

**ANSWER**:    **Defendants deny the allegations in paragraph 30 of the Complaint.**

31.    Following the June 2010 redemption, Sun Mod IV and Sun Mod V collectively owned 99.9% of HoldCo, and HIG owned the remaining 0.1% of HoldCo. The organizational structure was as follows:



**ANSWER**: **Defendants admit that after the June 10, 2010 Unit Redemption Agreement, Sun Mod IV and Sun Mod V collectively owned 99.9% of HoldCo, and HIG owned the remaining 0.1% of HoldCo, but deny all remaining allegations in paragraph 31 of the Complaint and its accompanying illustration.**

32.    HoldCo remained a holding company.  Limited Stores and Limited GC collectively served as the operating company, or OpCo.

**ANSWER**:    **Admitted.**

33.    After its affiliates acquired 100% ownership of HoldCo, Sun Capital installed its own people as the managers of HoldCo, and, as a result, maintained control over the operations

and finances for both HoldCo and OpCo.

> **ANSWER**:    **Defendants deny the allegations in paragraph 33 of the Complaint.**

34.    The circumstances surrounding Sun Capital's acquisition of HoldCo indicate that "The Limited" brand was a dying business. Sun Capital obtained a 100% interest in the business merely by parking $50 million from the time of its so-called "investment" in August 2007 until those funds were returned in full in February 2010 through a distribution.  In reality, Sun  Capital *never actually paid a dime* to the "seller," Limited Brands, to acquire ownership of HoldCo and, in turn, "The Limited" brand and its business.

> **ANSWER**:    **Defendants deny the allegations in paragraph 34 of the Complaint.**

35.    At the same time, Sun Capital knew that the brick-and-mortar retail industry was dying. Retail companies, particularly those heavily dependent on consumer foot traffic such as stores in shopping malls, were struggling as online shopping increased in popularity.

> **ANSWER**:    **Defendants deny the allegations in paragraph 35 of the Complaint.**

36.    Not surprisingly, an increase in retailers filing for bankruptcy corresponded with the growth of e-commerce. In 2010, 42 retailers filed for bankruptcy. Another 41 retailers filed for bankruptcy during 2011, as the retail industry continued to suffer declining sales as consumers accelerated the trend toward online shopping.

> **ANSWER**:    **Defendants admit that the Limited and other retailers operated in a difficult market due to the rise in e-commerce, but deny any remaining allegations in paragraph 36 of the Complaint.**

37.    At that time, "The Limited" brand business was already showing signs that it too would suffer a similar fate.  This business was especially vulnerable to the adverse effects of online shopping because the vast majority of its stores were located in shopping malls. Moreover, this

business began its downward spiral in the first half of the 1990s, even before the internet age and the rise of online shopping.

> **ANSWER**:    **Defendants deny the allegations in paragraph 37 of the Complaint.**

C.    **Sun Capital Orchestrates a Scheme to Extract Any Remaining Value from "The Limited" at the Expense of Its Creditors.**

38.    By 2011, Sun Capital and its installed management knew that "The Limited" had no real future.  That was evident from both its history and the evolving marketplace, including: (a) e-commerce was continuing its stratospheric rise, further weakening this business's already feeble ability to compete in the marketplace; (b) the business had a dismal track record—including a nearly 15-year losing streak—even during historic economic booms; (c) the brand was stale with a decade-plus streak of store closings; and (d) Limited Brands' willingness to wash its hands of the entire operation for a paltry sum. Even though Sun Capital had no skin in the game (with its lone capital contribution having been returned in full), it did not want to wait around for the inevitable to happen. Instead, Sun Capital and its appointed managers devised a scheme to extract whatever value they could out of the company before its inevitable demise.

> **ANSWER**:    **Defendants deny the allegations in paragraph 38 of the Complaint.**

39.    The scheme was simple: Scrounge up as much of the company's available cash as possible, draw down on the company's line of credit, borrow an additional $35 million, and then transfer most of that cash to Sun Capital's affiliates, with the rest going to pay transaction fees and bonuses for Sun Capital's appointed managers.

> **ANSWER**:    **Defendants deny the allegations in paragraph 39 of the Complaint.**

40.    To that end, on December 20, 2011, Sun Capital and its appointed managers caused Limited Stores to enter into a Term Loan Agreement with Cerberus Business Finance, LLC ("Cerberus").  Pursuant to this term loan, Limited Stores was to make a "special distribution" to

Sun Capital or one or more of its affiliated entities.

**ANSWER**:    **Defendants admit that on December 20, 2011, the Limited entered into a certain Term Loan Agreement with Cerberus, but refer to the loan documents for their terms, which speak for themselves.  Defendants deny all remaining allegations in paragraph 40 of the Complaint.**

41.    On December 20, 2010, upon closing the term loan with Cerberus, Limited Stores transferred $42,158,299.47 (the "Transfer") to an account held in the name of Sun Capital's affiliate, Sun Capital Partners V, at Wachovia Bank in Boca Raton, Florida. Notably, Sun Capital Partners V is not a member of HoldCo or OpCo and provided no discernable value to the company (or to its creditors) in exchange for the Transfer.

**ANSWER**:    **Defendants deny the allegations in paragraph 41 of the Complaint.**

42.    To fund the Transfer, pay the transaction fees, and award bonuses to management for their help in stripping the value out of the company, Limited Stores used the $35 million that it borrowed from Cerberus, $6 million of its $7 million in available cash, and $5 million that it borrowed from its revolving line of credit. In total, the $42 million "special distribution" to Sun Capital's affiliates cost the company approximately $46 million and saddled the company with over $40 million of unnecessary and debilitating debt that Sun Capital, its affiliates, and its appointed management of the Debtors knew could never be repaid.

**ANSWER**:    **Defendants deny the allegations in paragraph 42 of the Complaint.**

43.    Yet Sun Capital's efforts to extract value from "The Limited" did not stop there. In addition to taking over $92 million from the failing company in less than two years, Sun Capital—adding insult to injury—continued to suck money from the company through excessive management fees totaling nearly $10 million from 2010 through 2015.

**ANSWER**:    **Defendants deny the allegations of paragraph 43 of the Complaint.**

**D.      "The Limited" Made the Transfer with Substantial Certainty that Creditors Would Be Left Holding an Empty Bag After Its Inevitable Collapse.**

44.      At the time that Limited Stores made the Transfer, it was little more than a zombie company that was doomed to fail.  The company had a stale brand with an obsolete business model whose best days were in the distant past.

**ANSWER**:    **Defendants deny the allegations of paragraph 44 of the Complaint.**

45.      As alleged above, the company had sustained a 15-year stretch of continuous losses and store closures. At the time of the Transfer, "The Limited" brand had only 244 stores remaining, down almost 68% from 759 stores at the end of fiscal year 1992, before the company's nose-dive commenced.

**ANSWER**:    **Defendants deny the allegations of paragraph 45 of the Complaint.**

46.      Not only was "The Limited" a stale and stagnant brand, its business model was stuck in the past. The business primarily operated brick-and-mortar stores located in shopping malls—a business model that was becoming increasingly obsolete in the digital age.  Although the business tried to develop an online sales presence, there was no escaping the onerous financial obligations associated with hundreds of pre-existing physical storefronts.  For example, OpCo paid $42.6 million and $44.3 million in rental expenses in fiscal years 2010 and 2011, respectively. In addition to those amounts, OpCo's store leases required additional payments covering taxes, common area costs, and other expenses. OpCo's significant overhead ate into its operating margins and was a major contributing factor to its 15-year losing streak. And there was no way to sidestep that substantial overhead, as OpCo had massive minimum non-cancelable future lease payment obligations. Indeed, such payments totaled $243.7 million as of January 28, 2012, just one month after the Transfer.

**ANSWER**:    **Defendants deny the allegations of paragraph 46 of the Complaint.**

47.    In short, there was no reasonable basis to expect that "The Limited" would somehow recapture its 1980s shopping mall glory days. The company could not afford to take on meaningful debt and still have any hope of surviving in the long-term. Nevertheless, its management, all of whom were Sun Capital pawns, caused the company to cobble together cash from every nook and cranny to make the Transfer. Management and other employees received option bonus agreements at the same time, with Sun Capital's blessing.

**ANSWER**:    **Defendants deny the allegations of paragraph 47 of the Complaint.**

48.    The $42.2 million "special distribution" to Sun Capital's affiliates effectively sucked all value out of the company.  The amount paid was more than Limited Brands had received in connection with divesting its entire interest in the brand in August 2007 and June 2010. Moreover, immediately following the Transfer, OpCo's audited financial statements reflected that its liabilities exceeded its assets (*i.e.,* that there was a member's deficit and that it was insolvent). Predictably, the deficit reflected on the audited financial statements increased every single year thereafter, until the company was no longer able to obtain audited financial statements because it had collapsed into bankruptcy to liquidate its remaining assets. The audited financial statements reflected the following member deficits at the end of each fiscal year:

| Fiscal Year | Deficit |
|:---:|:---:|
| 2011 | ($27,533,000) |
| 2012 | ($28,165,000) |
| 2013 | ($31,125,000) |
| 2014 | ($35,160,000) |
| 2015 | ($43,048,000) |

**ANSWER**:    **Defendants deny the allegations of paragraph 48 of the Complaint.**

49.    The amount of those deficits was material, as the deficit for fiscal year 2011 equaled

approximately 26.8% of reported total assets. And the deficits increased thereafter until they
equaled 38.1% of reported total assets for fiscal year 2015.

**ANSWER**:    **Defendants deny the allegations of paragraph 49 of the Complaint.**

50.    The increase in OpCo's reported member deficits primarily stemmed from ongoing
losses following the Transfer. For fiscal years 2012 through 2015, OpCo reported a pre-tax loss
every single year. Sales remained stagnant, with a slight decline from $468.4 million in sales in
fiscal year 2012 to $460.8 million in fiscal year 2015. Sales never came any closer to the $493
million in total sales from nearly a decade before in fiscal year 2006, let alone the more than $1
billion in sales at "The Limited" brand's peak in the late 1980s.

**ANSWER**:    **Defendants deny the allegations of paragraph 50 of the Complaint.**

51.    Although OpCo's audited financial statements reflected increasing member deficits
and consistent losses for every year after the Transfer, those financial statements still presented an
overly rosy picture.  Sun Capital's appointed managers deployed several accounting tricks to boost
OpCo's financial results.  For example:

- In fiscal year 2010, OpCo decreased its valuation allowance for
  its deferred tax asset by $14.7 million based on management's
  dubious assumption that the company would somehow become
  profitable going forward, despite its 15-year losing streak, its
  stale brand and outdated business model, and the predicable and
  inevitable losses that occurred from 2012 onward. This entirely
  non-sensical change in assumptions resulted in a recorded "tax
  benefit" that nearly doubled OpCo's reported net income and
  inflated its balance sheet equity (which was still a deficit of
  $1.2 million) through dubious deferred tax and other assets;

- In fiscal year 2011, OpCo suddenly recorded "gift card
  breakage"—for the first time in its history—in the amount of
  $3.8 million, which was included in net sales; and

- In fiscal year 2010 and 2011, OpCo reported materially higher
  gross profits than in prior and subsequent years due to highly
  unusual, short-term blips in reported cost of goods sold.

**ANSWER**:    **Defendants deny the allegations in paragraph 51 of the Complaint.**

52.    Despite this window dressing of the financial statements, the sad reality for both the company and its many creditors was that Limited Stores (and, as a result, HoldCo) were rendered insolvent by the Transfer. The fair value of its assets did not exceed the book value by nearly enough to make up the overwhelming book value deficits that existed from the time of the Transfer onward.

**ANSWER**:    **Defendants deny the allegations of paragraph 52 of the Complaint.**

53.    First, the fair value of all but one of the assets reported on OpCo's balance sheet could not have been worth materially more than book value.  Specifically:

- The fair value of cash and cash equivalents and receivables were worth no more than book value;

- Balance sheet assets that are accounting artifices and are not transferrable (*e.g.*, deferred income taxes and certain prepaid and other assets) had no saleable value, and hence the fair value of such assets was less than book value;

- Construction allowances and other prepaid items, even if transferrable, had no value in excess of the amount of such allowances or prepayments (and thus fair value was less than or equal to book value for such assets); and

- The fair value of property and equipment, such as leasehold improvements and furniture, in a dying, mall-based retail chain was not worth materially more than book value (and was likely worth less).

**ANSWER**:    **Defendants deny the allegations in paragraph 53 of the Complaint.**

54.    Second, although the fair value of inventory conceivably could have been worth more than book value (recorded at cost), the fair value of OpCo's inventory did not exceed book value by nearly enough to make up for the equity deficit for OpCo. Even under the optimistic assumption that the fair value of the inventory as of the time of the transfer was the price at which it could be sold at the company's average full markup, that figure would still not be adequate to

render the company solvent given its gross margin percentages. OpCo had a book deficit of more than $27.5 million shortly after the Transfer, meaning that the fair value of its inventory would need to be worth at least 60.9% more than book value to make up the equity shortfall.  But OpCo's gross margin percentage was only 30.9% in the ensuing year, consistent with the historical average.

**ANSWER**:    **Defendants deny the allegations of paragraph 54 of the Complaint.**

55.    Although OpCo was able to limp along while insolvent even after the Transfer, the debt incurred at the time of the Transfer set the company on the path to inevitable bankruptcy and left the company's creditors with little hope of receiving payment for the services they provide. From August 2007 through December 2011, OpCo had very little debt, which was part of the reason the company was able to continue to survive for so long while losing money. The debt incurred in December 2011 dramatically changed that.  OpCo's annual interest expense from 2012 onward was over 2.5 times all the interest it paid from August 2007 through December 2011 combined. The annual interest expense burden worsened OpCo's losses and compounded its financial woes over time, as OpCo's total liabilities nearly doubled from $82.3 million in fiscal year 2010 to $156.1 million in fiscal year 2015, despite no meaningful growth for the company.

**ANSWER**:    **Defendants deny the allegations of paragraph 55 of the Complaint.**

56.    OpCo had no reasonable hope of repaying those debts as they matured, including the balloon payment due to Cerberus in December 2016. From March 2015 through November 2016, OpCo and the other Debtors entered into seven different amendments to the Cerberus term loan to relax financial covenants and to extend the maturity date. Ultimately, OpCo and the other Debtors collapsed under the weight of their liabilities and debt obligations and, predictably, filed for bankruptcy on January 17, 2017.

**ANSWER**:    **Defendants admit that the Limited renegotiated the terms of its term**

loan with Cerberus after executing it, but deny any remaining allegations of paragraph 56 of the Complaint.

57.     As of January 17, 2017, the Debtors had hundreds of creditors who collectively had over $150 million in general unsecured claims against the Debtors.  These creditors included, *inter alia*, service providers and vendors, clothing manufacturers, shopping malls, local municipalities and state taxing authorities—all of whom were harmed by the Transfer. These creditors provided services, products, and storefronts to the Debtors and have yet to be paid for the value they gave. In contrast, Sun Capital gave nothing to acquire the company, walked away with over $42 million in cash, and left the company cash-poor, overleveraged, and with a long list of unpaid creditors.

**ANSWER**:    **Defendants admit that the Debtors had creditors after its petition date of January 17, 2017, but deny all remaining allegations of paragraph 57 of the Complaint.**

## CAUSES OF ACTION

### Count 1
### Avoidance as an Actual Fraudulent Transfer Pursuant to
### 11 U.S.C. § 544(b) and Other Applicable Law

58.     The Trustee re-alleges the allegations set forth in the above paragraphs.

**ANSWER**:    **Defendants repeat and restate their answers to paragraph 1 through paragraph 57 of the Complaint as if fully set forth herein.**

59.     On December 20, 2011, Limited Stores transferred $42,158,299.47 to Sun Capital Partners V (the "Transfer").

**ANSWER**:    **Admitted.**

60.     The Transfer was made with the actual intent to hinder, delay, or defraud creditors of Limited Stores.  Indeed, the Transfer exhibited numerous badges of fraud.

**ANSWER**:    **Defendants deny the allegations of paragraph 60 of the Complaint.**

61.     First, the Transfer was made to an insider. Limited Stores was wholly-owned by HoldCo, which in turn was wholly-owned by Sun Capital's affiliates.

**ANSWER**:     **The allegations set forth in the paragraph 61 of the Complaint are legal conclusions, to which no response is required.  To the extent any other response is required, defendants deny the allegations in paragraph 61 of the Complaint.**

62.     Second, the Transfer was made shortly after Limited Stores incurred substantial debt. On December 20, 2011, the same day that the Transfer was made, Limited Stores incurred a $35 million obligation to Cerberus and another $5 million obligation by drawing down on its revolving credit line.

**ANSWER**:     **Defendants admit the Cerberus term loan was executed on the same day as the dividend transaction, but deny any remaining allegations in paragraph 62 of the Complaint.**

63.     Third, Limited Stores was rendered insolvent as a result of the Transfer.

**ANSWER**:     **Defendants deny the allegations of paragraph 63 of the Complaint.**

64.     Fourth, Limited Stores did not receive reasonably equivalent value in exchange for the Transfer. Indeed, Limited Stores did not receive any property, services, or other value in exchange for the Transfer.

**ANSWER**:     **Defendants deny the allegations of paragraph 64 of the Complaint.**

65.     In addition to such badges of fraud, the requisite actual intent surrounding the Transfer is further established by the fact that Limited Stores and its management knew that the Transfer was substantially certain to hinder, delay, or defraud present or future creditors of the company. Limited Stores (and its wholly-owned subsidiary, Limited GC) operated a failed business that had consistently lost money.  By making the Transfer after incurring substantial debt,

it became inevitable that Limited Stores would need to file bankruptcy and would be unable to pay its creditors.

**ANSWER**:    **Defendants deny the allegations of paragraph 65 of the Complaint.**

66.    There was at least one unsecured creditor of Limited Stores who could have avoided the Transfer as of the Petition Date. Such creditors include, but are not limited to, the creditors identified in the attached Exhibit "A" (collectively, the "Predicate Creditors").

**ANSWER**:    **Defendants deny the allegations of paragraph 66 of the Complaint.**

67.    The Predicate Creditors had not discovered and could not have reasonably discovered the existence or the fraudulent nature of the Transfer prior to one-year before the Petition Date. Specifically, there were no public announcements regarding the Transfer prior to the filing of the Petition Date, and the Predicate Creditors had no access to the company's books and records or any other information that would have disclosed either the existence or the fraudulent nature of the Transfer before January 17, 2016.

**ANSWER**:    **Defendants deny the allegations of paragraph 67 of the Complaint.**

68.    Accordingly, the Transfer is avoidable pursuant to 11 U.S.C. § 544(b) and other applicable law, including the Uniform Fraudulent Transfer Act as adopted by Ohio (including Ohio Rev. Code § 1336.04(A)(1)) and/or by Florida (including Fla. Stat. § 726.105(1)(a)).

**ANSWER**:    **Defendants deny the allegations of paragraph 68 of the Complaint.**

**Count 2**
**Recovery of Avoidable Transfer**
**Pursuant to 11 U.S.C. § 550(a)**

69.    The Trustee re-alleges the allegations set forth in the above paragraphs.

**ANSWER**:    **Defendants repeat and restate their answers to paragraph 1 through paragraph 68 of the Complaint as if fully set forth herein.**

70.     The Transfer is avoidable as an actual fraudulent transfer under 11 U.S.C. § 544(b) and applicable law, as alleged above.

**ANSWER**:     **Defendants deny the allegations of paragraph 70 of the Complaint.**

71.     The Transfer was made to Sun Capital Partners V. Thus, Sun Capital Partners V was the initial transferee of the Transfer under 11 U.S.C. § 550(a)(1).

**ANSWER**:     **Defendants deny the allegations of paragraph 71 of the Complaint.**

72.     The Transfer was made for the benefit of: (a) Sun Mod Fashions IV; (b) Sun Mod Fashions V; and (c) HIG.  These entities were members of HoldCo, which in turn was the sole member of Limited Stores. The Transfer was made due to the ownership interest held by these entities directly in HoldCo and indirectly in Limited Stores.

**ANSWER**:     **Defendants deny the allegations of paragraph 72 of the Complaint.**

73.     Accordingly, the Trustee is entitled to recover the Transfer (or the value thereof) pursuant to 11 U.S.C. § 550(a) from: (a) Sun Capital Partners V, as the initial transferee of the Transfer; and (b) Sun Mod Fashions IV; Sun Mod Fashions V; and HIG as entities for whose benefit the Transfer was made.

**ANSWER**:     **Defendants deny the allegations of paragraph 73 of the Complaint.**

## JURY DEMAND

74.     The Trustee demands a trial by jury for all issues.

**ANSWER**:     **The allegations set forth in paragraph 74 of the Complaint consist of a jury demand for which no response is presently required.**

## **AFFIRMATIVE DEFENSES**

Without assuming the burden of proof where such burden is otherwise on plaintiff as a matter of applicable substantive or procedural law, defendants assert the following affirmative defenses and reserve the right to assert additional defenses as information becomes available:

1. Plaintiff fails to state a claim upon which relief can be granted.

2. Plaintiff's claims are barred by reason of waiver, estoppel, or laches.

3. Plaintiff's claims are barred by the statute of limitations.

WHEREFORE, defendants request: (i) judgment dismissing the Complaint with prejudice; (ii) upon trial of this matter, judgment denying all relief requested by plaintiff and granting Defendants attorney's fees and costs in defending against plaintiff's Complaint; and (iii) such other and further relief as this Court deems just and equitable.

*(Signature page follows)*

Date: February 20, 2020                     Respectfully submitted,

                                         **MORRIS NICHOLS ARSHT & TUNNELL LLP**

                                         */s/ Robert J. Dehney*
                                         Robert J. Dehney (#3578)
                                         John DiTomo (#4850)
                                         Matthew O. Talmo (#6333)
                                         1201 North Market Street, Suite 1600
                                         Wilmington, DE 19801
                                         Telephone: (302) 658-9200
                                         Facsimile: (302) 658-3989
                                         Email: gwerkheiser@mnat.com
                                                   jditimo@mnat.com
                                                   mtalmo@mnat.com

                                             -and-

                                         Michael A. Duffy
                                         Michael C. McCutcheon
                                         **BAKER MCKENZIE, LLP**
                                         300 East Randolph Street, Suite 5000
                                         Chicago, Illinois 60601
                                         Telephone: (312) 861-8000
                                         Facsimile:  (312) 698-
                                         Email: michael.duffy@bakermckenzie.com
                                                   michael.mccutcheon@bakermckenzie.com