# **EXHIBIT D**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LIMITED STORES COMPANY, LLC, *et al.*,[1] | ) | Case No. 17-10124 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DECLARATION OF TIMOTHY D. BOATES OF
## LIMITED STORES COMPANY, LLC, IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Timothy D. Boates, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Limited Stores Company, LLC ("The Limited"), a limited liability company organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  In this capacity, I am familiar with the Debtors' day-to-day operations, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), The Limited and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      I submit this declaration (this "First Day Declaration") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Limited Stores Company, LLC (6463); Limited Stores, LLC (0165); and The Limited Stores GC, LLC (6094).  The location of the Debtors' service address is:  7775 Walton Parkway, Suite 400, New Albany, Ohio 43054.

day" motions (each, a "First Day Motion," and collectively, the "First Day Motions").[2]  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based on my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Preliminary Statement

4.      The Debtors comprise a multi-channel retailing company operating under the name "The Limited," which specializes in the sale of women's clothing.  Founded in 1963 as a single store, the Debtors expanded over the past five decades to become a household name throughout the United States for women's apparel.   At its peak, the Debtors operated approximately 750 retail brick and mortar store locations in the United States, but in recent years the Debtors' operations comprised approximately 250 retail locations across 42 states—primarily in leased mall-based locations—as well as an e-commerce channel, which was accessible through the Debtors' website at www.TheLimited.com.  Despite years of popularity, the Debtors, like many other retailers, recently faced significant operational challenges—including declining mall traffic and lower-than-projected sales—resulting in a precipitous drop in EBITDA over the course of the last several years through 2016.

---

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

A064

5. The Debtors are not alone in their struggles. In recent years, numerous retailers have filed for Chapter 11 protection—some more than once—including American Apparel, Aeropostale, DEB Stores, Vestis Retail Group, Pacific Sunwear of California, Sports Authority, Quicksilver, and RadioShack. It is not unlikely that other retailers may commence chapter 11 cases in the near term. The Debtors have faced the same challenges concerning the retail industry as a whole, including declining mall traffic, decreased sales, changing trends, expensive leases, and an increased consumer emphasis on internet-based retail.

6. The Debtors have at all times been mindful to their commitments to their stakeholders and their obligation to preserve and maximize value. To this end, and faced with this challenging backdrop, the Debtors retained experienced investment banking, financial, and restructuring advisors to facilitate their review, analysis, and development of strategic alternatives. As described in greater detail in the declaration of Durc Savini (the "Savini Declaration")[3], filed contemporaneously herewith, the Debtors and their advisors renewed marketing efforts in September 2016—which had originally begun in mid-2015—with respect to the Debtors' assets, including the exploration of transactions centered on the Debtors' intellectual property and e-commerce business, as well as going concern transactions involving the Debtors' brick and mortar business. In addition, as the Debtors' financial challenges continued, the Debtors took steps to limit creditor exposure, minimize operating costs, and preserve liquidity so as to allow for a longer marketing process, including, among other things, cancelling orders of new inventory and undertaking a significant reduction in force at their corporate headquarters during the fourth quarter of 2016.

---

[3] *Declaration of Durc Savini in Support of the Debtors' Sale Motion* (the "Savini Declaration") filed contemporaneously with this First Day Declaration.

7.      As the Debtors' marketing process continued, it became apparent that despite several parties expressing initial interest in a potential going concern transaction involving the Debtors' brick and mortar business, none of those parties were willing to submit a written indication of interest—even a non-binding one—for such a transaction.  Thus, in December 2016, with no new inventory arriving and a fixed liquidity runway, the Debtors began an orderly and efficient liquidation process focused on the twin goals of winding down their brick and mortar operations and selling their intellectual property (the "<u>Intellectual Property</u>") and certain related e-commerce assets, while still entertaining any interest expressed in the remaining brick and mortar business.

8.      As described in greater detail below, the first of these goals is complete.  On December 14, 2016, with the assistance of Hilco Merchant Resources, LLC ("<u>Hilco</u>"), the Debtors commenced inventory liquidation sales in their brick and mortar stores.  These sales exceeded expectations, and by January 8, 2017, the Debtors had sold through substantially all of their brick and mortar inventory, and had ceased operations at and vacated the premises of all of their approximately 250 stores and delivered possession of each store to the respective landlord shortly thereafter, and in each case prior to the Petition Date.  In addition, prior to the Petition Date, the Debtors ceased operating their e-commerce business.

9.      The Debtors also made substantial prepetition progress on their second goal.  Over the course of the Debtors' prepetition marketing process, and as described in greater detail below and in the Savini Declaration, the Debtors received several written, non-binding indications of interest in transactions centered on the Debtors' intellectual property and certain related e-commerce assets.  The field of potential suitors was eventually narrowed to two parties that entered into formal asset purchase agreement negotiations with the Debtors.  After several

weeks of negotiations and further due diligence by the parties, the process culminated in a bidding contest between those parties. Limited IP Acquisition LLC (the "Purchaser") ultimately prevailed as the successful bidder after more than two dozen rounds of bidding, during which the cash portion of the purchase price increased by approximately 72%.  On January 12, 2017, the Purchaser entered into an asset purchase agreement (the "Purchaser APA") to purchase the Debtors' Intellectual Property and certain related e-commerce assets (the "Sale Assets"), subject to higher or better bids though a bankruptcy court sale process.

10.     Having fully marketed the Sale Assets through a lengthy and competitive process, the Debtors commenced these cases to efficiently execute on the Purchaser APA, followed by an orderly wind down of the Debtors' estates.  To this end, the Debtors filed a motion (the "Sale Motion")[4] contemporaneously herewith seeking, among other things, approval of the sale (the "Sale") of the Sale Assets to the Purchaser, or a higher or better bidder in accordance with the timeline mandated under the Purchaser APA.

11.     I believe that time is of the essence if the Debtors are to fully capitalize on the Purchaser APA and their prepetition marketing efforts.  The Debtors have approximately $13.4 million of secured funded debt and less than $250,000 of cash on hand.  Additionally, I anticipate, based on projections prepared by the Debtors' management team, that the administrative expense of these chapter 11 cases will be approximately $3.4 million per month

---

[4]  *Debtors' Motion for Entry of (I) An Order (A) Approving Form and Manner of Notices, (B) Scheduling A Bid Protections Hearing, an Auction, A Sale Hearing, and Establishing Dates and Deadlines Related Thereto, (C) Approving Procedures for the Assumption and Assignment of Executory Contracts, and (D) Granting Related Relief; (II) An Order (A) Approving Certain Bid Protections in Connection with the Sale of Certain of the Debtors' Assets and (B) Granting Related Relief, and (III) An Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief*

prior to the closing of the Sale.  Further, the Purchaser APA requires that the Debtors' bankruptcy case proceed swiftly to a closing if the Debtors are to avoid a default under the Purchaser APA.  As set forth in the Savini Declaration, consummation of the Sale in accordance with the timeframe contemplated in the Sale Motion is reasonable and will maximize the value of the Assets and otherwise inure to the benefit of their estates and that in light of the extensive prepetition marketing process, a longer sale process is unlikely to yield a material, if any, increase in the Debtors' prospects of receiving a higher or better offer. Materially extending the sale process, however, will increase the costs associated with these cases that either is not supported by the proposed DIP Facility or will diminish the potential value available for creditors of the Debtors' estates. Thus, the Debtors' ability to return any value to their unsecured creditors is dependent on their ability to efficiently proceed on the timeline described herein and proposed in the Sale Motion.  Specifically, in accordance with the terms of the Purchaser APA the Debtors are seeking to implement a process that culminates in approval of the Sale 30 days after the Petition Date.

12.     Consummating the Sale is an important step to resolving these chapter 11 cases and maximizing value to the Debtors' creditors.  Upon closing of the Sale in accordance with the process described in the Sale Motion, the Debtors may proceed with the orderly, efficient distribution of assets that will preserve and maximize the value of the Debtors' estates for the benefit of their stakeholders.

13.     To familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, this declaration is organized as follows:  part one provides a general overview of the Debtors' corporate history and capital structure;  part two describes the circumstances leading to these

chapter 11 cases; and part three sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

## I.     General Background.

### A.     Debtors' Corporate History.

14.     In 1963, The Limited was founded as a single store in Upper Arlington, Ohio. The store focused on selling women's sportswear at moderate prices, and it enjoyed quick success.

15.     In its early days, The Limited marketed to the baby-boomer generation, offering casual sportswear and adding career clothing when the baby-boomers entered the workforce.  In 1969, The Limited business, then comprising six stores, went public as The Limited, Inc. (now L Brands, Inc. - "L Brands").  By 1976, there were 100 The Limited stores.

16.     Over the next several decades, The Limited pioneered vertically integrated specialty retailing, where it controlled every element of the process, including design, production, marketing, selling, and customer service.  Through this strategy, The Limited was able to inexpensively produce goods and quickly respond to fashion trends by utilizing rapid response inventory and distribution strategies.  The Limited grew in the 1980s by identifying popular fashion trends that it could then deliver at lower prices.  By 1985, The Limited had carved out a 5 percent market share of the women's apparel market in the United States.

17.     In 1980, L Brands expanded by launching Limited Express, a younger, more fashion-forward store. Over the next decade, L Brands expanded by acquiring or launching a number of other companies, including Victoria's Secret (a brand specializing in intimate apparel), Lane Bryant (a retailer specializing in plus-size women's clothing), Lerner New York (a budget women's clothing chain), Henri Bendel (an upscale women's department store), Limited Too (a "tween" young women's retailer), and Abercrombie & Fitch (a casual sportswear

7

retailer). This continued in the 1990s with Structure, later branded as Express Men (a store specializing in contemporary clothing for younger men at a moderate price) and Cacique (a women's intimates brand).  In addition, L Brands acquired a majority interest in Galyan's Trading Company, a sporting goods and outdoor apparel company, and also launched White Barn Candle Company and Bath & Body Works.

18.     In 2007, certain affiliates of Sun Capital Partners, Inc. ("Sun Capital") acquired a 75 percent interest in The Limited from L Brands (and purchased the remaining 25 percent from L Brands in 2010), leaving the majority of the other brands acquired by L Brands over the years behind in operations wholly separate from those of The Limited. Sun Capital subsequently invested $50 million into the business and the Debtors also arranged a $75 million credit facility to, among other things, provide capital to reenergize their brand and build a long-term platform for growth.  Under Sun Capital's ownership, the Debtors expanded their e-commerce business, increased their use of email, and developed a social media presence.

19.     Shortly before the commencement of these cases, the Debtors operated approximately 250 brick and mortar stores across 42 states.  As of the Petition Date, however, the Debtors have ceased operations at, and vacated the premises of all of their brick and mortar stores. In addition, prior to the Petition Date, the Debtors ceased operating their e-commerce business.  As of the Petition Date, the Debtors continue to employ approximately 50 employees to facilitate efforts required to ensure an orderly closing of the proposed sale transaction and manage the Debtors' wind down process.  The efforts of these employees are essential to the maximization of the value of the Debtors' estates for the benefit of all stakeholders.

**B.     The Debtors' Prepetition Corporate and Capital Structure.**

20.     The chart attached hereto as **Exhibit A** depicts the Debtors' prepetition corporate structure.  As set forth on **Exhibit A** and as discussed above, the Debtors' top corporate entity,

8

Limited Stores Company, LLC, remains wholly owned by certain affiliates of Sun Capital. All of Limited Stores Company, LLC's direct and indirect subsidiaries are also Debtors in these chapter 11 cases.

21.     As of the Petition Date, the Debtors have consolidated outstanding debt obligations in the aggregate principal amount of approximately $13.4 million, primarily consisting of the Term Loan (as defined below). Historically, the Debtors also had outstanding obligations pursuant to a Revolving Facility (as defined below), which were satisfied shortly before commencing these chapter 11 cases.

### 1.     Revolving Credit Facility.

22.     Limited Stores, LLC, as lead borrower, The Limited Stores GC, LLC, as borrower, Limited Stores Company, LLC as facility guarantor, Bank of America, N.A. ("Bank of America") as administrative agent and collateral agent, certain lenders from time to time, and Banc of America Securities LLC, as lead arranger and bookrunner, are parties to that certain Credit Agreement, dated as of August 24, 2007 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition Secured Credit Agreement"). The Prepetition Secured Credit Agreement provided for a senior secured revolving credit facility (the "Revolving Facility") in an amount of up to $50 million, subject to certain terms and conditions. Obligations under the Revolving Facility were secured by a first priority lien on substantially all of the Debtors' assets. Pursuant to the terms of that certain Payoff Letter, dated as of January 4, 2017 (the "Payoff Letter"), all prepetition obligations owed by the Debtors under the Prepetition Secured Credit Agreement were repaid in full as set forth therein. Thus, as of the Petition Date, no amounts remained outstanding under the Revolving Facility.

9

23.     Incidental to the satisfaction of all other prepetition obligations owed by the Debtors under the Prepetition Secured Credit Agreement, and in connection with the execution of the Payoff Letter, the Debtors cash collateralized outstanding letters of credit issued pursuant to the Prepetition Secured Credit Agreement and funded an indemnity reserve required under the Prepetition Secured Credit Agreement by depositing approximately $1,127,560 (the "BofA Cash") in that certain bank account ending in –0010 maintained with Bank of America, N.A., and subject to a security interest granted to Bank of America, N.A.  As a result, Bank of America retains a first priority lien on the BofA Cash in connection with any obligations that may arise on account of such outstanding letters of credit, including any draws thereon.

### 2.     Term Loan Agreement.

24.     Limited Stores, LLC, as lead borrower, The Limited Stores GC, LLC, as borrower, Limited Stores Company, LLC as facility guarantor, Cerberus Business Finance, LLC, as administrative agent and collateral agent (in such capacity, the "Term Loan Agent"), and certain lenders from time to time are parties to that certain Term Loan Agreement (the "Term Loan Lenders"), dated as of December 20, 2011, (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Term Loan Agreement"). The aggregate Term Loan Agreement commitment was $35 million, subject to certain terms and conditions.  Obligations under the Term Loan Agreement are secured by a first priority lien (formerly a second priority lien prior to execution of the Payoff Letter) on substantially all of the Debtors' assets (other than the BofA Cash, which lien is junior to Bank of America's lien), including cash collateral and the assets that are the subject of the Sale.  As of the Petition Date, approximately $13.4 million in principal amount remained outstanding under the Term Loan Agreement.

10

## II.     Events Leading to these Chapter 11 Cases.

25.     A series of factors contributed to the Debtors' need to commence these chapter 11 cases, including, most notably, the Debtors' significant debt obligations and the Debtors' declining sales and increasing operating losses resulting from the downturn in the retail industry as a whole.   These events placed significant strain on the Debtors' business and liquidity, ultimately necessitating these chapter 11 cases to effectuate an orderly and efficient liquidation and wind down process.

### A.     Challenging Operating Environment.

26.     The Debtors, like the rest of the retail industry, have faced a challenging commercial environment over the last several years, brought on by increased competition, particularly with regard to large fast fashion retailers, and the shift away from shopping at brick and mortar stores.   The increase in online shopping and decrease in mall traffic has particularly affected mall-based retailers, such as the Debtors, who maintained significant rent and payroll obligations to operate their brick and mortar stores, despite the decreasing sales in those locations.   Given the Debtors' substantial brick and mortar presence, and the accompanying expenses associated therewith, the Debtors' business was heavily dependent on consumer traffic at its mall-based locations, and resulting sales conversion, to meet their sales and profitability targets.  The combination of the above factors, and others plaguing the retail industry as a whole, contributed to the Debtors falling short of their targeted sales and profitability performance, and contributed to increasing operational losses.

27.     Specifically, and stemming from an 8.3% decrease in mall traffic from 2015 through November 2016, the Debtors' sales dropped 15.6% in stores and 8.1% overall,, 7.9% below the company's 2016 projections.   As a direct result, the company's EBITDA declined approximately 93% from 2015 to 2016, 95% below the company's 2016 projections.

11

A073

**B.      Prepetition Covenant Defaults and Amendments.**

28.      As a result of the decreased operating performance described above, the Debtors were unable to comply with various covenants in their debt documents, including the Term Loan Agreement and Prepetition Secured Credit Agreement.   As a result, the Debtors entered into various amendments to the Term Loan Agreement over the course of 2015 and 2016, including the fourth, fifth, sixth, and seventh amendments to the Term Loan Agreement, dated March 11, 2015, February 24, 2016, August 25, 2016, and November 11, 2016, respectively.   The Debtors also entered into amendments to the Prepetition Secured Credit Agreement during 2015 and 2016, including the fourth and fifth amendments to the Credit Agreement, dated May 27, 2015, and August, 26, 2016, respectively.

**C.      The Debtors' Prepetition Marketing Efforts.**

29.      As described in greater detail in the Savini Declaration, in light of the broader market downturn and the Debtors' declining financial performance, in September 2016 the Debtors elected to revisit the potential to monetize their intellectual property—a concept they had first explored in mid-2015.   In a marketing process led by Guggenheim Securities, LLC ("Guggenheim"), the Debtors thoroughly marketed all of their assets, including their intellectual property, over the ensuing nearly five months.   Although the Debtors believed at the time, and continue to believe now, that selling or otherwise monetizing the Intellectual Property was the most likely path to maximizing the value of the Debtors' assets for the benefit of their stakeholders, the Debtors also solicited proposals from potentially interested parties for the sale of the Debtors' entire business.   Despite such efforts, however, no party was willing to submit a written indication of interest—even a non-binding one—for a going concern transaction involving the Debtors' brick and mortar business.   Instead, the written indications of interest the

12

Debtors did receive generally contemplated the liquidation of the Debtors' existing inventory coupled with a separate sale of their Intellectual Property and e-commerce assets.

30.     As a result, the Debtors, in consultation with their advisors, determined that a pre-filing liquidation of the Debtors' inventory, coupled with a separate sale of the Debtors' Intellectual Property and e-commerce assets, was the best and most efficient alternative to maximize the value of the Debtors' estates.

31.     With respect to the inventory liquidation, the Debtors solicited proposals in early-December from various entities that specialize in conducting liquidation sales of retail inventory, some of whom had previously partnered with parties interested in the Debtors' intellectual property assets.  After reviewing the proposals they received, on December 12, 2016, the Debtors engaged Hilco to assist with the liquidation of their existing brick and mortar store inventory.  With Hilco's assistance, the Debtors commenced liquidation sales in their brick and mortar stores on December 14, 2016.  The pace of these sales exceeded the Debtors' expectations, and by January 8, 2017, the Debtors had sold through substantially all of their brick and mortar inventory, and had ceased operations at, and vacated the premises of all stores shortly thereafter.  In addition, prior to the Petition Date, the Debtors ceased operating their e-commerce business.

32.     Contemporaneously therewith, and as described in greater detail in the Savini Declaration, the Debtors continued their marketing process with respect to their intellectual property and e-commerce assets.  The Debtors received several written, non-binding indications of interest for their intellectual property and related e-commerce assets.  Of those, two parties entered into formal asset purchase agreement negotiations with the Debtors.  After several weeks of negotiations and extensive due diligence by the parties, the process culminated in a bidding

contest between those parties, and Limited IP Acquisition LLC ultimately prevailed as the successful bidder and entered into an asset purchase agreement prepetition for the Sale Assets.

33.     Shortly thereafter, the Debtors commenced these chapter 11 cases. The Debtors now seek authority to consummate the Sale and proceed with the orderly distribution of estate assets. The terms of the Sale are the result of arm's-length negotiations with a third-party, unaffiliated Purchaser, and are customary for this type of transaction in the retail industry.  In light of the prepetition, competitive marketing process and Sale negotiations described above— including a prepetition auction process that resulted in more than two dozen rounds of bidding and an approximately 72% increase in the cash portion of the purchase price—the Debtors believe that proceeding with the Sale is in the best interest of the Debtors, their estates, and all parties in interest.

**D.     Proposed Timeline.**

34.     As described in the Sale Motion, the Debtors propose that these chapter 11 cases proceed in accordance with the following general timeline:

- setting the hearing to consider approval of the Bid Protections (as defined in the Sale Motion) to occur no later than (10) ten days after the Petition Date;

- setting the hearing to consider approval of the Sale (the "Sale Hearing") to occur no later than (30) thirty days after the Petition Date;

- setting the objection deadline and the deadline to submit competing binding offers with respect to the Sale to be no later than (7) seven days prior to the Sale Hearing; and

- setting the auction, if any, to occur no later than (5) five days prior to the Sale Hearing.

35.     Upon consummation of the Sale, the Debtors will promptly proceed with the orderly, efficient distribution of estate assets for the benefit of their stakeholders.

14

III.    **Evidentiary Support for First Day Motions.**[5]

36.    Concurrent with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during the liquidation process described herein.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

A.    **Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Their Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

37.    The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of Limited Stores Company, LLC and also request that an entry be made on the docket of each of the Debtors' chapter 11 cases, other than Limited Stores Company, LLC, to reflect the joint administration of these chapter 11 cases.

38.    Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect Limited Stores Company, LLC and each of its

---

[5]    Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

affiliates that also have filed chapter 11 cases. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

39.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "DIP Motion").**

40.     By the DIP Motion, the Debtors seek approval of, among other things, (a) the Debtors' senior-secured, postpetition financing (the "DIP Facility") as set forth in that certain Senior Secured and Superpriority Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement"), under which revolving loans may be advanced and made available to the Debtors by the lenders party to the DIP Credit Agreement in the aggregate maximum principal amount of $4.6 million (on an interim basis) and $6.0 million (on a final basis) and (b) the consensual use of cash collateral (the "Cash Collateral"). The relief requested in the DIP Motion is critical to ensuring the certainty that the Debtors' will have sufficient liquidity throughout the duration of these chapter 11 cases and through consummation of the Sale.

16

A078

**1.    The Debtors' Need to Use Cash Collateral and Access Financing.**

41.    The Debtors, in consultation with myself as their proposed Chief Restructuring Officer, and additional staff from RAS Management Advisors, LLC, reviewed and analyzed the Debtors' projected cash needs and prepared a 13-week projection (as updated from time to time in accordance with the terms of the DIP Agreement (as defined in the DIP Motion), the "Budget") outlining the Debtors' postpetition cash needs in the initial 13 weeks of these chapter 11 cases.    The Debtors believe that the Budget is an accurate reflection of their funding requirements over the identified period, will allow them to meet their obligations—including the administrative expenses of the chapter 11 cases—and is reasonable and appropriate under the circumstances.

42.    Based on this forecast, the Debtors' determined that they would require access to both Cash Collateral and postpetition financing to provide sufficient liquidity to efficiently administer the Debtors' estates during these chapter 11 cases.    Among other things, the Debtors need such liquidity to satisfy payroll, pay their taxes, and make other payments that are essential or appropriate for the efficient administration of the Debtors' estates.    The Debtors' ability to continue making such payments during these chapter 11 cases is essential to the preservation of their assets during the pendency of these cases.

43.    The Debtors require interim approval of the DIP Facility.    Although the Debtors are confident in the assumptions and projections underlying the Budget, the Debtors face considerable uncertainty due to their financial condition, the commencement of these chapter 11 cases, and weakness in the retail industry as a whole.    Given this uncertainty, there is a material risk that the Debtors do not achieve their anticipated cash flows.    Indeed, as of the Petition Date, the Debtors' total cash balance is less than $250,000, leaving little cushion for the Debtors'

projections.  In the face of this uncertainty, the DIP Facility provides an immediate and essential liquidity cushion that the Debtors will use when the need arises.

44.     Additionally, approval of the DIP Facility provides certainty around the Debtors' Sale of the Sale Assets.  The backdrop of the DIP Facility provides comfort to all parties— including not only the Purchaser, but also any potential bidder for the Sale Assets—that the Debtors will have sufficient liquidity to bridge from the Petition Date through the consummation of the Sale.  Thus, the Debtors' believe that failure to obtain interim approval of the DIP Facility could negatively affect the Debtors' proposed Sale and hinder their ability to obtain the highest or otherwise best offer for the Sale Assets.

45.     Accordingly, without the immediate relief requested in the DIP Motion, I believe that the Debtors face a material risk of substantial, irreparable, and ongoing harm.  Access to Cash Collateral and the DIP Facility will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, and responsibly administer these chapter 11 cases throughout the period that the Debtors expect will be necessary to consummate the Sale.

> **2.     The Debtors Do Not Have Readily Available Sources of Alternative Financing.**

46.     The Debtors do not have alternative sources of financing readily available.  The Debtors' Pre-Petition Lenders assert that all of the Debtors' assets are encumbered under their existing capital structure, which, along with the Debtors' uncertain financial condition and overall weakness in the retail industry, restricts the availability of, and options for, postpetition financing.  The Pre-Petition Lenders also made it clear that they would not consent to "priming" debtor-in-possession financing provided by a third party.  As a result, the Debtors do not believe third party debtor in possession financing would be reasonably obtainable.

18

47.     Additionally, the Debtors could not provide strong enough evidence or certainty of a sufficient equity cushion to allow for debtor-in-possession financing that would prime existing lenders' liens over their objections.  And for the same reason, few if any lenders would be willing to provide debtor-in-possession financing junior to the Debtors' existing lenders. These indicators did not portend the development of a feasible third-party financing option.

48.     Nevertheless, the Debtors, with the assistance of their advisors, solicited proposals for alternative debtor in possession financing.  I am informed that Guggenheim Securities, LLC reached out to seven potential sources of financing outside of the Pre-Petition Lenders to gauge their interest in providing such financing to the Debtors.  I am further informed that no party provided a proposal for independent postpetition financing.  Accordingly, the Debtors were unable to develop an alternative source of financing with terms better than those of the DIP Facility, and for all of the foregoing reasons, I believe that the DIP Facility is reasonable, appropriate, and provides the best terms presently available to the Debtors.

### 3.     The Fees in Connection With the DIP Facility are Reasonable.

49.     The Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and DIP Lenders pursuant to the DIP Loan Documents (as defined in the DIP Motion). Specifically, I understand that the Debtors have agreed to pay:

> a.  to the DIP Agent, for the account of each of the DIP Lenders, a closing fee equal to 1.00% percent on the Total Commitment (as defined in the DIP Agreement), due and payable on the Interim Effective Date; and
>
> b.  all reasonable out-of-pocket expenses incurred by the DIP Agent and DIP Lenders, including the reasonable fees, charges, and disbursements of counsel for the DIP Agent and DIP Lenders, in connection with the DIP Loan Documents, due and payable on the Final Effective Date.

50.     I believe that it is understood and agreed by all parties, including the Debtors, that these fees are an integral component of the overall terms of the DIP Facility, and were required by the DIP Agent and the DIP Lenders as consideration for the extension of the postpetition financing.

51.     For the foregoing reasons, I believe that the relief requested in the DIP Motion is in the Debtors' best interest and will enable the Debtors to preserve and maximize the value of their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

**C.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing  Business Forms, and (II)  Granting Related Relief (the "Cash Management Motion").**

52.     The Debtors request the authority to:  (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor-in-possession accounts, if needed; and (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.

53.     In addition, the Debtors further request that the Court authorize the Banks to: (a) continue to maintain, service, and administer the Bank Accounts; and (b) debit the Bank Accounts in the ordinary course on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the

20

same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

54.     In the ordinary course, the Debtors utilize an integrated Cash Management System to transfer and disburse funds and maintain current and accurate accounting records of all daily cash transactions.   If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, redirecting payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would cause disruption at this critical time.  The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

55.     The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of these chapter 11 cases.

56.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to efficiently administer their estates in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**D.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "<u>Wages and Benefits Motion</u>").**

57.    The Debtors request authority to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

58.    As of the Petition Date, the Debtors employ approximately 50 employees.  The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates.  In many instances, the Employees include personnel who are intimately familiar with the Debtors' processes and systems, and who cannot be easily replaced.  Without the continued, uninterrupted services of the Employees, the ability of the Debtors to maximize creditor recoveries through an orderly accounts receivable collection, the sale or other disposal of assets, and the general administration of the Debtors' estates will be materially impaired.

59.    Additionally, many of the Employees rely on their compensation and benefits to pay their daily living expenses.  Thus, the Employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying the Employees' compensation and providing the Employees with health and other benefits.  Consequently, the Debtors respectfully submit that the relief requested in the Wages and Benefits Motion is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

60.    To minimize the personal hardship the Employees could suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain stability in the Debtors' workforce during the administration of the Debtors' chapter 11 cases, the Debtors

22

seek authority, but not direction, to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, health insurance, retirement health and related benefits, workers' compensation benefits, life insurance, short- and long-term disability coverage, and certain other benefits that the Debtors have historically provided in the ordinary course; and (b) pay all costs incident to the Employee Compensation and Benefits. Subject to approval from the Court, the Debtors intend to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course.

61.     Pursuant to the Wages and Benefits Motion, the Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits:

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| Employee Compensation | $50,000 | $50,000 |
| Withholding Obligations | $25,000 | $25,000 |
| Payroll Processing Fees | $5,500 | $5,500 |
| Reimbursable Expenses | $20,000 | $20,000 |
| Employee Benefits Programs | $465,000 | $935,000 |
| **Total** | **$565,500** | **$1,035,500** |

62.     For the avoidance of doubt, by this motion the Debtors do not seek to pay any amounts to any single Employee in excess of the $12,850 priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code. I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, and will enable the Debtors to efficiently administer their chapter 11 estates without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

**E.    Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, But Not Directing, the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Honor the Terms of the Financing Agreement and Pay Premiums Thereunder, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

63.    The Debtors request authority to (a) continue paying obligations under insurance policies entered into prepetition, (b) continue paying certain brokerage fees, (c) renew, supplement, modify, or purchase insurance coverage in the ordinary course, and (d) honor the terms of the Financing Agreements and pay the premiums thereunder.

64.    The Debtors' insurance policies are essential to the preservation of the value of the Debtors' business, properties, and assets.  I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by the diverse regulations, laws, and contracts.  Failure to make the payments required by the Debtors' Insurance Policies, including the Financing Agreement, could have a significant negative impact on the Debtors' ability to efficiently wind down their operations.  I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**F.    Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, but Not Directing, the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes and Fees Motion</u>").**

65.    The Debtors request authority, in their sole discretion, to remit and pay certain accrued and outstanding prepetition taxes, including sales and use taxes, franchise taxes, and similar taxes and fees in an amount up to $3,000,000 on an interim basis and up to $5,000,000 on a final basis, absent further order of the Court.

66.     In the ordinary course, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various governmental authorities.  The Debtors must continue to pay the Taxes and Fees to avoid potential costly distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estates because the governmental authorities could file liens or seek to lift the automatic stay.  I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

**G.      Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "Utilities Motion").**

67.     The Debtors request the entry of interim and final orders: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order; and (d) determining the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order.

68.     In the ordinary course, the Debtors incur expenses for telecommunications provided by a single utility provider.  Since I understand that there is only one direct utility provider and the Debtors commenced these cases to wind down remaining operations, I believe

that the Debtors' proposed procedures governing the Utility Providers' requests for adequate assurance are appropriate in these chapter 11 cases. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to efficiently administer their chapter 11 cases without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

> **H.   Debtors' Motion For Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (II) Granting Related Relief (the "Matrix Motion").**

69.    I am told that the Local Rules require each debtor, or its duly retained agent, in jointly administered cases to maintain a separate creditor mailing matrix. However, the Local Rules also permit modification by the Court "in the interest of justice." The Debtors submit that permitting them to maintain a single consolidated list of creditors (the "Creditor Matrix"), in lieu of filing a separate creditor matrix for each Debtor, is warranted. Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings. Accordingly, on behalf of the Debtors, I respectfully submit that the Matrix Motion should be approved.

> **I.   Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Approving the Appointment and Retention of Donlin, Recano & Company, Inc. as the Claims and Noticing Agent to the Debtors, Effective Nunc Pro Tunc to the Petition Date (the "Claims Agent Retention Motion").**

70.    The Debtors request entry of an order pursuant to section 156(c) of title 28 of the United States Code, section 503(b) of the Bankruptcy Code, and Rule 2002-1(f) and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware authorizing the employment and retention of Donlin, Recano & Company, Inc. ("Donlin Recano") as notice, claims, and balloting agent in connection with these

26
PHIL1 5927703v.1
A088

chapter 11 cases, in accordance with the terms and conditions set forth in the Services Agreement.

71.     I believe that the relief requested in the Claims Agent Retention Motion is in the best interests of the Debtors estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Retention Motion should be approved.

**J.      Debtors' First, Second, and Third Omnibus Motions for Entry of an Order (I) Authorizing the Rejection of Certain Unexpired Leases, (II) Authorizing Abandonment of Certain Personal Property, Each Effective *Nunc Pro Tunc* to the Petition Date, and (III) Granting Related Relief (the "<u>Omnibus Rejection Motions</u>").**

72.     The Debtors request entry of orders, (a) authorizing the rejection of certain unexpired leases, including any guaranties thereof and any amendments, modifications, or subleases thereto (each, a "<u>Lease</u>," and collectively, the "<u>Leases</u>") for nonresidential real property located at certain premises (collectively, the "<u>Premises</u>") identified in the Omnibus Rejection Motions, (b) authorizing the abandonment of certain equipment, fixtures, furniture, or other personal property (the "<u>Personal Property</u>") that may be located at the Premises, each effective *nunc pro tunc* to the Petition Date; and (c) granting related relief.

73.     I believe that the relief requested in the Omnibus Rejection Motions is in the best interests of the Debtors estates, their creditors, and all other parties in interest.  During 2016, the Debtors operated in approximately 250 locations.   Prior to the Petition Date, however, the Debtors ceased operations at all of their brick and mortar retail locations, vacated the Premises, and delivered possession and the keys to the respective landlords of the Premises.  In addition, on or before January 10, 2017, the Debtors notified each respective landlord in writing of their (i) unequivocal and irrevocable decision to surrender the Premises and abandon possession to each

applicable landlord and to reject each applicable Lease and (ii) unequivocal and irrevocable decision to surrender, abandon and forfeit to the applicable landlord any and all Personal Property in the Premises.. And by the Omnibus Rejection Motions, the Debtors waive their right to withdraw the Omnibus Rejection Motions. The Debtors do not own the real property on which their stores were operated, but instead lease their store locations from numerous lessors and other counterparties. Thus, the Debtors are seeking to reject the Leases—which are comprised of all of the nonresidential real property leases for the stores in which the Debtors formerly operated—to preserve value for their estates by avoiding unnecessary rent costs.

74.     I believe that the Leases to be rejected are no longer being used by the Debtors and provide no benefit to the Debtors' estates or these chapter 11 cases. By rejecting the Leases, I believe that the Debtors will save approximately $6.2 million per month in rent and associated costs. And I understand that absent rejection, the Debtors would be obligated to pay rent under the Leases even though they have ceased operations at, and are no longer in possession of, all former store locations. Moreover, in addition to their obligations to pay rent under the Leases, it is my understanding that the Debtors would be obligated to pay certain real property taxes, utilities, insurance, and other related charges associated with certain of the Leases. Thus, the Debtors determined in their business judgment that such costs constitute a wasteful drain of estate assets. Additionally, I believe that the costs of the Leases exceed any marginal benefits that could potentially be achieved from assignments or subleases of the Leases. Accordingly, on behalf of the Debtors, I respectfully submit that the Omnibus Rejection Motions should be approved.

75.     The Debtors have evaluated the Personal Property that may be located at the Premises and determined that (a) the Personal Property is of inconsequential value or (b) the cost

of removing and storing the Personal Property for future use, marketing, or sale exceeds its value to the Debtors' estates. Further, the Debtors' use of much of the personal Property was for location-specific purposes. Since the Debtors have closed the store locations at the Premises, the Personal Property is no longer necessary for the administration of the Debtors' estates. I therefore believe that the abandonment of the Personal Property is appropriate and in the best interests of the Debtors, their estates, and their creditors. In addition, I understand that the agent and lenders under the Debtors' prepetition term loan credit facility have waived any rights they may have had in the Personal Property located at the Premises in favor of the landlords with respect to Leases subject to the Omnibus Rejection Motions..

> **K.** **Debtors Motion For Entry Of An Order (A) Approving Form And Manner Of Notices, (B) Scheduling A Bid Protections Hearing, An Auction, A Sale Hearing, And Establishing Dates And Deadlines Related Thereto, (C) Approving Procedures For The Assumption And Assignment Of Executory Contracts, And (D) Granting Related Relief; An Order (A) Approving Certain Bid Protections In Connection With The Sale Of Certain Of The Debtors' Assets And (B) Granting Related Relief, And An Order (A) Approving The Asset Purchase Agreement Between The Debtors And The Purchaser, (B) Authorizing The Sale Of Certain Of The Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances, And Interests, (C) Authorizing The Assumption And Assignment Of Contracts, And (D) Granting Related Relief (the, "<u>Sale Motion</u>") (Notice and Scheduling Relief Only)**

76.     At the "First Day" Hearing, the Debtors are seeking the approval of the form of notice and the setting of the dates for the hearings on approval of the Bidding Protections and the Sale.

77.     As described in the Sale Motion, the Debtors propose that these chapter 11 cases proceed in accordance with the following general timeline:

- setting the hearing to consider approval of the Bid Protections (as defined in the Sale Motion) to occur no later than ten (10) days after the Petition Date;

29

- setting the hearing to consider approval of the Sale (the "Sale Hearing") to occur no later than thirty (30) days after the Petition Date;

- setting the objection deadline and the deadline to submit competing binding offers with respect to the Sale to be no later than seven (7) days prior to the Sale Hearing; and

- setting the auction, if any, to occur no later than five (5) days prior to the Sale Hearing.

78.     In light of the extensive and competitive prepetition marketing process as outlined above, and in consultation with Guggenheim, I do not believe that a longer sale process would materially increase, if at all, the Debtors' prospects of receiving a higher or better offer.  In addition, I understand that the Purchaser's value proposition is dependent on the Debtors proceeding swiftly to consummation of the Sale and minimizing the effects of the Debtors' chapter 11 cases on the value of the Debtors' "brand"—a critical component of the intellectual property that is the subject to of the Sale.

79.     As set forth in the Savini Declaration, consummation of the Sale in accordance with the timeframe contemplated in the Sale Motion is reasonable and will maximize the value of the Assets and otherwise inure to the benefit of their estates.  Further, in light of the extensive prepetition marketing process, a longer process would not materially increase, if at all, the Debtors' prospects of receiving a higher or better offer. Materially extending the sale process, however, will increase the costs associated with these cases that either is not supported by the proposed DIP Facility or will diminish the potential value available for creditors of the Debtors' estates. Thus, the Debtors' ability to return any value to their unsecured creditors is dependent on their ability to efficiently proceed on the timeline described herein and proposed in the Sale Motion.

80.     Ultimately, the Sale process under the timeline proposed and the broader liquidation process to occur in these chapter 11 cases will maximize value for creditors and

represents the best alternative available to the Debtors.  Accordingly, on behalf of the Debtors, I respectfully submit that the notice and scheduling relief requested in the Sale Motion should be approved.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true correct.

Dated: January 17, 2017
Wilmington, Delaware

Name: Timothy D. Boates
Title:   Chief Restructuring Officer
Limited Stores Company, LLC

A094

## EXHIBIT A

**Prepetition Organization Structure**

Corporate Structure Chart

