# **EXHIBIT F**

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF DELAWARE
 2
      In re:                      )
 3                                ) Chapter 11
      LSC WIND DOWN, LLC, et al   )
 4                                ) Case No. 17-10124 (KBO)
         Debtors                  )
 5    _____    ) (Jointly Administered)
                                  )
 6    UMB BANK, N.A., as Plan     )
      Trustee of The Limited      )
 7    Creditors Liquidating       ) Adversary Proceeding
      Trust                       ) No. 19-50272 (KBO)
 8                                )
         Plaintiff,               )
 9                                )
      v.                          )
10                                )
      SUN CAPITAL PARTNERS V,     )
11    LP,                         )
      SUN MOD FASHIONS IV, LLC,   )
12    SUN MOD FASHIONS V, LLC,    )
      AND                         )
13    H.I.G. SUN PARTNERS, LLC    )
                                  )
14       Defendants.              )
15
16
17    ********************************************************
18                    ORAL DEPOSITION OF
19                  STEVEN MICHAEL ABRAMS
20                    January 28, 2021
21                       Volume 1
22    ********************************************************
23
24
25
                                                    Page 1
```

1          ORAL DEPOSITION OF STEVEN MICHAEL ABRAMS,

2    produced as a witness at the instance of the Plaintiff,

3    and duly sworn, was taken in the above-styled and

4    numbered cause on the 28th day of January, 2021, from

5    9:22 a.m. to 10:38 a.m., via videoconference, before

6    Abigail Guerra, CSR, in and for the State of Texas,

7    reported by machine shorthand, via Zoom where all

8    attendees appeared at their respective locations,

9    pursuant to the Federal Rules of Civil Procedure and the

10   provisions stated on the record or attached hereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  2

A186

```
 1                 A P P E A R A N C E S
 2
     FOR THE PLAINTIFF:
 3
     Mr. Eric D. Madden (Via Videoconference)
 4   Mr. Leo Oppenheimer (Via Videoconference)
     REID COLLINS & TSAI LLP
 5   1601 Elm Street
     Suite 4200
 6   Dallas, Texas 75201
     Phone:  (214) 420-8900
 7   Email:  Emadden@reidcollins.com
             Loppenheimer@reidcollins.com
 8
 9   FOR THE DEFENDANTS:
10   Mr. Michael C. McCutcheon (Via Videoconference)
     Mr. Michael Lehrman (Via Videoconference)
11   BAKER MCKENZIE LLP
     300 East Randolph Street
12   Suite 5000
     Chicago, Illinois 60601
13   Phone:  (312) 861-8000
     Email:  Michael.mccutcheon@bakermckenzie.com
14           Michael.lehrman@bakermckenzie.com
15
     ALSO PRESENT:
16       Mr. Neil Martin, Veritext Host
17
18
19
20
21
22
23
24
25
```

Page 3

A187

1                              INDEX

2

3    STEVEN MICHAEL ABRAMS

4         Examination by Mr. Madden...................... 5

5         Examination by Mr. McCutcheon................. 27

6         Examination by Mr. Madden..................... 50

7         Examination by Mr. McCutcheon ............... 53

8    Signature and Changes............................ 57

9    Reporter's Certificate........................... 59

10

11

12                           EXHIBITS

13   NO.              DESCRIPTION                    PAGE

14   Exhibit 1        Subpoena                         7

15   Exhibit 2        Master Sourcing Agreement       11

16   Exhibit 3        Email to Mary Morrow            14

17   Exhibit 4        Proof of Claim                  18

18

19

20

21

22

23

24

25

                                                  Page 4

```
 1                    DIRECT EXAMINATION
 2   BY MR. MADDEN:
 3        Q.  Please state your full name for the record.
 4        A.  Steven Michael Abrams.
 5        Q.  Okay.  Mr. Abrams, my name is Eric Madden.  We
 6   just met a few moments ago here on the video; is that
 7   correct?
 8        A.  Yes.
 9        Q.  I represent UMB Bank.  It's the plan trustee
10   for The Limited Creditors Liquidating Trust.
11               Do you understand that?
12        A.  Yes.
13        Q.  Okay.
14               And the liquidating trust is the successor
15   to Limited Stores, LLC.
16               Do you understand that?
17        A.  Yes.
18        Q.  Okay.
19               And you're here today on behalf of Arden
20   Jewelry Manufacturing company, right?
21        A.  Yes.
22        Q.  Okay.  What is your position with Arden?
23        A.  President and owner.
24        Q.  Okay.  How long have you held that position?
25        A.  Thirty-five years.
```

Page 5

1       Q.   Okay.

2                 Have you ever been deposed before?

3       A.   Yes.

4       Q.   Okay.

5                 How many times?

6       A.   Once.

7       Q.   All right.

8                 So you generally understand the process,

9    but let me review a few ground rules.

10      A.   Okay.

11      Q.   I'll ask questions or Michael McCutcheon or his

12   colleague, Michael Lehrman, will ask you a question and

13   pause for you to give an answer.

14                Do you understand that?

15      A.   Yes.

16      Q.   And especially since we're on video here and

17   we're taking this deposition remotely, it's important

18   that we have those pauses before you answer.

19                Do you understand that?

20      A.   Yes.

21      Q.   We want to make sure the court reporter gets a

22   complete record of your testimony.

23                Do you understand?

24      A.   Yes.

25      Q.   Okay.  I want to start by looking at the

                                                  Page 6

1    subpoena, which I'll mark as Exhibit 1 for your

2    deposition.

3                   (Exhibit 1 marked.)

4       A.  Okay.

5       Q.  (BY MR. MADDEN)  Give me just a moment.

6    Sometimes it takes a minute to --

7                   (Interruption.)

8                   MR. MADDEN:  Okay.  I'm sorry.  I don't

9    know what that was.

10      A.  Okay.

11      Q.  (BY MR. MADDEN)  Okay.

12                  Are you able to see it?

13      A.  Would it be coming up under marked exhibits?

14   Yeah, all I can see is you, Eric.

15                  MR. MADDEN:  Okay.  Leo, are you able to

16   show the exhibit?

17                  MR. OPPENHEIMER:  Yes.  It should be under

18   the marked exhibits folder.

19                  THE WITNESS:  Okay.  I just clicked on it

20   and open -- hang on one second.  I'm a little slow with

21   this, guys.  So click download or open in?

22                  MR. MADDEN:  Just click Exhibit 1 there on

23   the marked exhibits folder.

24                  THE WITNESS:  Yes, okay.

25                  MR. MADDEN:  Okay.  Do you have it on your

                                              Page 7

1    screen now?

2         A.   It just says "exhibit options at stamped" --

3    oh, here.  Okay.  At the bottom, yes.  Yes, I'm looking

4    at the subpoena right here.

5         Q.   (BY MR. MADDEN)  Okay.  All right.  And do you

6    -- so you're looking at Exhibit 1?

7         A.   Uh-huh.

8         Q.   Okay.  Do you recognize that document?

9         A.   Yes.

10        Q.   What is it?

11        A.   It's testifying in a deposition about this

12   case.

13        Q.   Right.

14        A.   The subpoena.

15        Q.   Is this the subpoena that was issued to Arden

16   Jewelry?

17        A.   Yes.

18        Q.   You've seen this document before today?

19        A.   Yes.

20        Q.   Okay.

21             And you're here to testify as Arden's

22   designated representative; is that right?

23        A.   Correct.

24        Q.   Okay.  I'd like you to scroll down this

25   Exhibit 1 to the fourth page where it says "Exhibit A"

                                              Page 8

1  at the top.

2      A.  Yes.

3      Q.  Okay.

4          Do you see where it says "Exhibit A" at the

5  top?

6      A.  Yes.

7      Q.  Okay.  It lists two matters here.

8          Do you see those?

9      A.  Yes, one and two, yes.

10     Q.  Right.  These are the two matters that we'd

11  like you to testify to today as Arden's designated

12  representative.

13          Do you understand that?

14     A.  Yes.

15     Q.  And are you prepared to testify under these two

16  matters?

17     A.  Yes.

18     Q.  Okay.

19          Before we dive into this first matter, I'd

20  like to start by just learning a little more about

21  Arden.

22     A.  Uh-huh.

23     Q.  Tell us more.  What -- what kind of company is

24  it?

25     A.  We're an 83-year-old costume jewelry

Page 9

1    manufacturer/importer now.  Yeah, three generations.  My

2    grandfather started the business.  We design jewelry

3    mostly for the specialty store trade and, hopefully,

4    they buy it.  Then we end up producing it and ship it to

5    them, and on to the next thing.

6         Q.  Okay.

7              And who are Arden's customers?

8         A.  A lot of specialty stores.  Chico's, Express,

9    Anthropologie; Kohl's, we've done recently.  It's about

10   20 people.

11        Q.  Okay.  And where is Arden located?

12        A.  Johnston, Rhode Island.

13        Q.  How many employees does it have?

14        A.  About 30 right now.

15        Q.  All right.

16              So Arden sells, I think, you described it

17   as costume jewelry and other -- other types of jewelry

18   to retail customers around the country; is that a fair -

19        A.  Yes, yes.

20        Q.  And one of Arden's customers at one point was

21   Limited Stores, LLC; is that right?

22        A.  Yes.

23        Q.  Okay.  I'd like to refer to "Limited Stores,

24   LLC" as just Limited Stores.

25              Would that be okay?

Veritext Legal Solutions
800-336-4000

1        A.   Yes.

2        Q.   All right.  Did Arden have a contract or

3   written agreement with Limited Stores?

4        A.   We had the Master Sourcing Agreement that we

5   had signed.

6        Q.   Okay.  Let's take a look at that.

7             MR. MADDEN:  Leo, if you could put that in

8   marked exhibits, please, as Exhibit 2.

9             (Exhibit 2 marked.)

10            THE WITNESS:  Guys, excuse me for one

11   second.  I'm just going to go get my charger.  Because

12   my phone, I'm worried -- is not real low, but I just

13   wanted to not run out.  Give me one second.

14            MR. MADDEN:  Okay.

15            THE WITNESS:  Bear with me, guys.  Bear

16   with me.  Okay.  Let me just hook it up.

17            MR. MADDEN:  Hello?

18            THE WITNESS:  Can you guys hear me?

19            MR. MADDEN:  Yeah, we can hear you.  We

20   can't see you.

21            THE WITNESS:  Yeah.

22            There you go.  How about that?

23            MR. MADDEN:  We can see you now.

24            THE WITNESS:  Okay.  I apologize.  Go

25   ahead.

                                        Page 11

1        Q.  (BY MR. MADDEN)  Okay.  I'd like you to go back

2    to the marked exhibits folder.

3        A.  Yep.

4        Q.  And click on Exhibit 2.

5        A.  Go to Exhibit 2.  Hang on one second here.

6    Come on.  Slide down here.  Exhibit 2.  Hang on one

7    second.  Here it goes.  Just running real slow.  Come

8    on.  The wheel is turning.

9            Okay.  Exhibit 2, yep.  I just clicked on

10   it.  Open.  Okay.  Scroll down.  Yes, yes.

11       Q.  You have it open on your screen --

12       A.  Yeah.  It's right here, yes.

13       Q.  What does it say at the top?  What's the title

14   say?

15       A.  "Non-apparel Master Sourcing Agreement."

16       Q.  Okay.

17            And do you recognize this document?

18       A.  Yes.

19       Q.  Is this the written contract between Arden and

20   Limited Stores?

21       A.  Hello?

22       Q.  Did you hear my question?

23       A.  I said -- "do you recognize the document" --

24   yes.

25       Q.  And is this the written contract between Arden

Page 12

A196

1    and Limited Stores?

2         A.   Yes.

3         Q.   Who signed for Arden?

4         A.   Anthony Marino.

5         Q.   Okay.

6         A.   He was the -- the CEO at the time.

7         Q.   Okay.  Are you familiar with Mr. Marino's

8    signature?

9         A.   Yes.

10        Q.   And do you recognize this as his signature?

11        A.   Yes.

12        Q.   Okay.  If you turn to the -- or scroll down to

13   the second page.

14        A.   Uh-huh.

15        Q.   Who signed for Limited Stores?

16        A.   It says "John Buell."

17        Q.   Okay.  Was he the CFO of Limited Stores, to

18   your knowledge?

19        A.   To the best of my knowledge, yes.

20        Q.   Okay.

21             Are you familiar with his signature?

22        A.   No.

23        Q.   Okay.  Is this the only written agreement that

24   you know of between Arden and Limited Stores?

25        A.   Yes.

                                            Page 13

1      Q.   Okay.

2           When did Arden sign this MSA or Master

3  Sourcing Agreement?

4      A.   Oh, God.  It says -- it says it here.  Had to

5  be about six, seven years ago.  There must be a date

6  somewhere.  I don't remember exactly.  I'm going to say

7  somewhere.

8      Q.   Okay.  Let's look at -- I have another exhibit

9  that may refresh your recollection on the other.

10     A.   Uh-huh.

11     Q.   We have -- we've put Exhibit 3 into the marked

12  exhibits folder.

13          (Exhibit 3 marked.)

14     A.   Just spinning here.  Come on.  Okay.

15  Exhibit 3.  Okay.  Got it.

16     Q.   (BY MR. MADDEN)  Exhibit 3 up on your screen?

17     A.   It looks like an email.

18     Q.   The email appears to be to someone named

19  Mary Morrow.

20     A.   About -- I guess about this.  The...

21     Q.   Who is Mary Morrow?

22     A.   On our -- on our end.

23     Q.   Do you know who Mary Morrow is?

24     A.   Yes, yes.

25     Q.   Who is she?

                                        Page 14

1        A.   She still works here.

2        Q.   At Arden?

3        A.   She does sourcing and -- yes.

4        Q.   Okay.

5             Does this email refresh your recollection

6    about when Arden signed this MSA with Limited Stores?

7        A.   I have to believe it.  I don't remember

8    exactly, but, yes.

9        Q.   Okay.

10       A.   I'll take that, yes.

11       Q.   And when do you believe the MSA was signed with

12   Limited Stores?

13       A.   Right here, I guess.

14       Q.   What is that?

15       A.   Sorry to be vague but...

16            Well, I'm looking at the email date, and it

17   just says "November -- "November 21st, 2013," was when

18   Mary sent it back.

19       Q.   And the email says (as read):  "Here is the

20   fully executed MSA."

21            Do you see that?

22       A.   Yes.

23       Q.   Okay.  So is it your recollection that the MSA

24   was signed in about November 2013?

25       A.   Correct.

                                              Page 15

1        Q.   Okay.  Now, if we could go back to Exhibit 2,

2   the MSA, itself?

3        A.   Okay.  Hang on one second as I bring it back

4   up.  Come on.  Exhibit 2.  Okay.  Yeah.

5        Q.   Okay.

6        A.   It's coming up.

7        Q.   The MSA contains a number of pages and

8   provisions, but I'm wondering if just in layman's terms

9   you could summarize how this agreement worked with

10  Limited Stores?

11       A.   Basically, I guess, it's just how they work

12  with us, and we work with them depending on, I guess,

13  situations, you know, orders things like that.

14       Q.   Okay.

15       A.   I'll be honest, I never -- I never read it.

16       Q.   Okay.  Let me ask then:  Are you generally

17  familiar with how the relationship worked with Limited

18  Stores?

19       A.   Yes, yes.

20       Q.   Okay.  So would Limited Stores issue a purchase

21  order to Arden, for example?

22       A.   Yes.

23       Q.   Okay.  And would Arden then ship goods to

24  Limited Stores?

25       A.   Yes.

                                              Page 16

1    Q.  And would Arden then issue an invoice for the

2    goods that had been shipped to Limited Stores?

3    A.  Correct.

4    Q.  Okay.  And would Limited Stores then pay that

5    invoice?

6    A.  Yes.

7    Q.  Okay.  So that's generally how the relationship

8    worked?

9    A.  Yes.

10   Q.  Okay.

11          Now, you're aware that Limited Stores filed

12   bankruptcy; is that correct?

13   A.  Oh, yes.  Yes.

14   Q.  And that bankruptcy was filed in January 2017.

15          Do you understand that?

16   A.  Yes, I do remember.

17   Q.  And when Limited Stores filed bankruptcy, did

18   it owe any amounts to Arden?

19   A.  Yes, it did.

20   Q.  And these were amounts owed on outstanding

21   invoices to Arden; is that correct?

22   A.  Yes.

23          And also canceled goods too that were never

24   invoiced.

25   Q.  Did Arden file a claim in Limited Stores

1  bankruptcy regarding those amounts?

2      A.  Yes.

3      Q.  Okay.

4          MR. MADDEN:  Leo, let's put Exhibit 4 into

5  the marked exhibits folder.

6          (Exhibit 4 marked.)

7      Q.  (BY MR. MADDEN)  Okay.  And, Mr. Abrams, just

8  let us know when you have Exhibit 4 pulled up on your

9  screen.

10     A.  Yes.  Waiting for it to come up here.  It's

11 still spinning.  Hang on.  Okay.  It's coming up.  Come

12 on.  Wait.  Now, it's -- it's blank.  I just clicked on

13 Exhibit 4, and it's -- the Veritext part is blank.  So

14 try it again?

15     Q.  Yeah.  Try -- go back to the marked folder and

16 try it again.

17     A.  Okay.  Wi-Fi is running slow today.  Okay.

18 Exhibit 4.  Open.  Introduce.  Oh, it says loading file.

19 It says (as read):  "Large files might take longer to

20 introduce."

21     Q.  Okay.

22     A.  Please wait, so -- oh, it is coming up.

23     Q.  Yes.

24     A.  Oh, here it goes.  Okay.

25     Q.  Do you have it up on the screen?

1       A.   Yes, I do.

2       Q.   Okay.

3              What does it say just kind of on the first

4   page if we can...

5       A.   "Proof of claim."

6       Q.   That's right.

7              So do you recognize this document that's

8   Exhibit 4?

9       A.   Yes.

10      Q.   Okay.

11             What is it?

12      A.   Basically saying how much money Limited Stores

13  owed us at the time of filing for bankruptcy.

14      Q.   Is this the claim that Arden filed in The

15  Limited Stores bankruptcy case?

16      A.   Yes.

17      Q.   And did Arden file this claim through its

18  attorney Stephen Rosenbaum?

19      A.   Yes, we did.

20      Q.   And if you scroll down to Page 2.

21      A.   Uh-huh.

22             Yes.

23      Q.   You recognize Mr. Rosenbaum's signature here?

24      A.   Yes, I do.

25      Q.   Was Mr. Rosenbaum authorized to file this on

                                            Page 19

1   Arden's behalf?

2        A.  Yes.

3        Q.  And is the information in this proof of claim

4   true and correct, to the best of your knowledge?

5        A.  The amount is definitely correct.

6        Q.  Okay.

7            And is the other information in the

8   document true and correct, to the best of your

9   knowledge?

10       A.  Yes, it is.

11       Q.  Okay.

12           So you mentioned the amount.  If you scroll

13  down to the bottom of Page 1 --

14       A.  Uh-huh, yes.

15       Q.  -- you'll see the question (as read):  "How

16  much is this claim?"

17           Do you see that?

18       A.  Yes.

19       Q.  And it indicates --

20       A.  Yes, I do.

21       Q.  -- an amount here of $361,386.

22           Do you see that?

23       A.  Yes, I do.

24       Q.  Okay.

25           And is that the amount of Arden's claim, to

                                    Page 20

1    the best of your knowledge?

2         A.  Yes, it is.

3         Q.  And that is true and correct?

4         A.  Yes, it is.

5         Q.  All right.

6              And it also indicates here -- at the bottom

7    of Page 1, it asks the question (as read):  "What is the

8    basis for the claim?"  And it says "goods sold."

9              Do you see that?

10        A.  Yes.

11        Q.  And is that true and correct, to the best of

12   your knowledge?

13        A.  Yes.

14        Q.  That Arden had sold goods to Limited Stores?

15        A.  Yes.

16        Q.  Now, there are a bunch of invoices attached to

17   this proof of claim.  If you scroll down to Page 3 and

18   the pages that follow.

19        A.  Yep.

20        Q.  Do you see those?

21        A.  Yes, those are our invoices, yes.

22        Q.  Okay.  And are these invoices true and correct,

23   to the best of your knowledge?

24        A.  Yes, they are.

25        Q.  These are unpaid invoices?

Veritext Legal Solutions
800-336-4000

1      A.  Yes.

2      Q.  And are these unpaid invoices the basis for

3  Arden's claim against Limited Stores?

4      A.  Yes.

5      Q.  The claim of $361,000 -- $361,386?

6      A.  Yes.

7      Q.  A lot of digits there?

8      A.  Yeah, I'm sorry to say.

9      Q.  Okay.  So on January 17, 2017, when Limited

10  Stores filed bankruptcy, Arden had a right to payment of

11  $361,386; is that correct?

12      A.  Yes.

13      Q.  Has Arden received any payment on this claim?

14      A.  No.

15      Q.  Okay.

16          Let's go back to the marked exhibits folder

17  and look at Exhibit 1 again.

18      A.  Okay.  Hang on one second.  Come on.

19  Exhibit 1.  Okay.  Yes, sir, I have it.

20      Q.  Okay.

21          And I'd like you to scroll down to the

22  fourth page.  That's the one that says "Exhibit A" at

23  the top?

24      A.  Yes.

25      Q.  Okay.

Page 22

1              And I want to shift gears now and talk

2    about this second matter.

3         A.  Okay.

4         Q.  This second matter that's listed here.  It

5    reads (as read):  "The facts relevant to whether Arden

6    have discovered or could reasonably have discovered the

7    existence or fraudulent nature of the transfer prior to

8    one year before the petition date."

9              Do you see that?

10        A.  Yes.

11        Q.  Okay.  And the petition date you'll see is

12   defined here in Exhibit 1 as January 17th, 2017.

13             Do you see that right above?

14        A.  Yes.

15        Q.  Okay.  So one year prior to that would be

16   January 17, 2016.

17             Do you understand that?

18        A.  Yes.

19        Q.  Okay.  And the transfer that we're talking

20   about here in matter two is also defined above.

21             Do you see where it says (as read):

22   "Transfer means the transfer of $42,158,299.47 by

23   Limited Stores, LLC to an account held in the name of

24   Sun Capital Partners V on or about December 20, 2011."

25             Do you see that?

                                              Page 23

1    A.   Yes.

2    Q.   Okay.  So just to summarize, matter two is

3    asking about whether Arden had discovered or could have

4    discovered the existence or fraudulent nature of that

5    transfer we just discussed by January 16 or 17, 2016.

6              Do you understand?

7    A.   Yes.

8    Q.   Okay.

9              A lot of words -- a lot of definitions

10   there, but I just want to make it clear what the matter

11   is that we're talking about.

12   A.   This is the heart of the matter, yes.

13   Q.   You got it.  Okay.

14             So let me ask then:  Prior to January 17th

15   of 2016, had Arden discovered The Limited Stores

16   transferred $42 million to Sun Capital Partner V?

17   A.   No.

18   Q.   Okay.  Had Arden discovered The Limited Stores

19   transferred that amount to any Sun Capital entity?

20   A.   No.

21   Q.   Had Arden discovered The Limited Stores

22   transferred that amount to anyone at all?

23   A.   No.

24   Q.   Had Arden discovered The Limited Stores had

25   transferred anything close to $42 million to anyone at

Page 24

1 | all?

2 |     A.  No.

3 |     Q.  Okay.

4 |         Now, internal documents at The Limited

5 | Stores refer to this transfer as either a dividend or

6 | distribution.  So let me ask about that.

7 |         Prior to January 17, 2016, had Arden

8 | discovered The Limited Stores had paid any distribution

9 | or dividend to Sun Capital Partners V?

10 |     A.  No.

11 |     Q.  Okay.

12 |         And prior to January 17, 2016, had Arden

13 | discovered The Limited Stores paid any distribution or

14 | dividend to any Sun Capital entity?

15 |     A.  No.

16 |     Q.  Okay.

17 |         Prior to January 17, 2016, had Arden

18 | discovered The Limited Stores paid any distribution or

19 | dividend to anyone at all?

20 |     A.  No.

21 |     Q.  Okay.

22 |         We just talked about whether Arden had

23 | actually discovered any of these transfers about a

24 | dividend or a distribution, whether they had actually

25 | discovered, and I want to talk now about whether Arden

Page 25

1  reasonably could have discovered any dividend or

2  distribution.

3            Do you understand?

4  A.  Yes.

5  Q.  Okay.

6            So did Arden have any access to Limited

7  Stores bank records?

8  A.  No.

9  Q.  Did Arden have any access to Limited Stores

10  board meetings?

11  A.  No.

12  Q.  What about board minutes?

13  A.  No.

14  Q.  What about board presentations?

15  A.  No.

16  Q.  What about written consent signed by Limited

17  Stores ownership group?

18  A.  No.

19  Q.  What about telephone calls with The Limited

20  Stores ownership group?

21  A.  No.

22  Q.  Did Arden have any access to Limited Stores

23  emails or other communications with its ownership group?

24  A.  No.

25  Q.  Did Arden have access to any information about

Page 26

1    dividends paid by Limited Stores?

2         A.   No.

3         Q.   Or distributions paid by Limited Stores?

4         A.   No.

5         Q.   Then how could Arden have possibly known The

6    Limited Stores paid a $42 million dividend or

7    distribution at any point in time?

8         A.   I never knew.

9         Q.   Could you have reasonably known?

10        A.   No.

11        Q.   And the same question as to Arden.  Could Arden

12   have reasonably known?

13        A.   No.

14        Q.   All right.

15             MR. MADDEN:  I'll pass the witness.  Thank

16   you, Mr. Abrams.

17             THE WITNESS:  Thank you.

18                  FURTHER EXAMINATION

19   BY MR. MCCUTCHEON:

20        Q.   Mr. Abrams?

21        A.   Yes, sir.

22        Q.   Can you hear me okay?

23        A.   Very, very well.

24        Q.   Okay.  Excellent.

25             My name is Michael McCutcheon.  I'm an

                                          Page 27

1   attorney for Sun Capital Partners.  We spoke briefly

2   before we went on the record.

3       A.  Yes.

4       Q.  I'm going to have some follow-up questions for

5   you related to some of the same documents --

6       A.  Please.

7       Q.  -- that Mr. Madden had shown.

8       A.  Okay.

9       Q.  And then I might show you some additional ones,

10  as well.  But before I do that, let me ask you a couple

11  of preliminary questions.

12      A.  Sure.

13      Q.  What -- what did you do, if anything, to

14  prepare for this deposition?

15      A.  I just quickly scanned the Master Sourcing

16  Agreement, and that's about it.

17      Q.  Okay.

18      A.  And made sure that the invoices were all

19  represented.

20      Q.  And when you talk about the Master Services

21  {sic} Agreement, you're referring to the exhibit that

22  was introduced as --

23      A.  2?  Was it 2?

24      Q.  -- No. 2, therein?

25      A.  Yes.

1      Q.   Is -- is that the only document you reviewed in

2   preparing for this deposition?

3      A.   Yeah.   And I just -- again, I scanned it.

4   Scanned it quickly.

5      Q.   Okay.   Did you review any of -- did you review

6   the claim form of the bankruptcy that was marked as

7   Exhibit 4 --

8      A.   No, I didn't.

9      Q.   -- prior to this deposition?

10      A.   No, I didn't.

11      Q.   Did you --

12      A.   No, I didn't.

13      Q.   Okay.

14           Did you -- any other documents that you

15   prepared at all in preparation for this deposition?

16      A.   No.   I -- no, I -- I trust my attorney.

17      Q.   Okay.

18           Did you review the complaint that was

19   filed, in this case, in preparation for your deposition?

20      A.   Nope.   Nope.

21      Q.   Did you meet with anyone at the Reid Collins

22   law firm prior to giving this deposition?

23      A.   I spoke with Leo Oppenheimer regarding the time

24   and stuff.

25      Q.   Okay.   And who is Mr. Oppenheimer?

Page 29

1       A.   He's one of the attorneys for the plaintiff.

2       Q.   Okay.

3            And what was the substance of that

4  discussion?

5       A.   I'm sorry.  You just broke up a little bit,

6  Michael.

7       Q.   What was the substance of the discussion with

8  Mr. Oppenheimer?

9       A.   It was -- it was just the time.

10      Q.   Okay.

11           Did he share any documents with you?

12      A.   No.

13      Q.   Did you talk about the substance of -- of

14  Arden's claim, in this case, with Mr. Oppenheimer, or

15  anybody else at the Reid Collins firm?

16      A.   No.

17      Q.   All right.

18           Let me -- let me direct your attention

19  to -- Exhibit 2 was the -- was the Master Sourcing

20  Agreement and it seems to have been executed in

21  November --

22      A.   The MSA, yes.

23      Q.   -- of 2013.

24           Yeah.  And that -- I think we've

25  established it was executed sometime in November of

Page 30

1    2013, correct?

2         A.  Yes.

3         Q.  When I ask a question, you've got to let me

4    finish it.  I know it's a little awkward with this video

5    system, and then I take pauses in between.

6         A.  Oh, I -- I apologize.

7         Q.  Yeah.  It's just easier for the court reporter

8    to write.

9         A.  Got you.

10        Q.  Was there a master services -- I'm sorry --

11   Master Sourcing Agreement in place prior to November of

12   2013?

13        A.  I have to say probably all of our customers.

14   It's sort of a standard operating procedure.

15        Q.  But you don't know for sure?

16        A.  I can't -- I can't say 100 percent one way or

17   the other.  Sorry.

18        Q.  All right.

19             Were you doing business with The Limited --

20   Arden -- was Arden doing business with The Limited prior

21   to 2013?

22        A.  I hate to say it.  I'm not sure.  Might not

23   have.

24        Q.  Do you know if Arden was doing business with

25   The Limited, in any way, in let's say 2010?

                                              Page 31

1        A.   I'm -- I'm not sure.  Again, I -- I apologize.

2        Q.   Is there anything that you could refer to that

3   would refresh your recollection as to whether or not

4   Arden was doing business with The Limited on or before

5   December 20th of 2011?

6        A.   Yes.

7             I can ask my salesperson.

8        Q.   Okay.

9             And who would that be?

10       A.   Can you hold on one second?

11            I'm sorry.  Renae Greg.

12            MR. MCCUTCHEON:  Okay.  Let's go off the

13   record for a moment.

14            THE WITNESS:  Yeah.

15            MR. MCCUTCHEON:  Eric?

16            THE WITNESS:  Yes.

17            MR. MADDEN:  Yeah, that's fine.  That's

18   fine.

19            MR. MCCUTCHEON:  Okay.

20            MR. MADDEN:  Yeah.  We can go off the

21   record.  And I think Michael is asking if you could

22   check with her on that issue.

23            THE WITNESS:  Yes, I'll do it right now.

24            (A break was taken from 9:55 a.m. to

25   9:56 a.m.)

Page 32

1           THE CERTIFIED STENOGRAPHER:  We're back on

2    the record.

3           Q.  (BY MR. MCCUTCHEON)  Mr. Abrams, I asked you

4    before we went off the record if you knew when exactly

5    Arden first began doing business with The Limited.

6           A.  Yes.

7           Q.  And you went off the record to check with one

8    of your sales associates.

9           A.  Uh-huh.

10          Q.  Do you have the -- do you have the answer to

11   that question within a reasonable degree of certainty

12   now?

13          A.  Yes.

14          Q.  And when was that -- and when was that?

15          A.  Can you hear me, guys?

16          Q.  Yes, we can hear you now.

17          A.  2013.

18          Q.  Okay.

19               So around about the time that the Master

20   Sourcing Agreement was executed?

21               Yeah, Mr. Abrams?

22          A.  Yes, I'm sorry.

23          Q.  Can you hear me?

24               Okay.  Okay.  Let me ask you the

25   following -- just -- just to be clear, Arden had not

                                          Page 33

1  done any business with The Limited whatsoever prior to

2  2013; is that right?

3       A.  Yes, we started in 2013.

4       Q.  Okay.

5            From that point in 2013 forward, I think

6  you testified that you were doing business on a purchase

7  order and invoice basis; is that correct?

8       A.  Yes.

9       Q.  Okay.

10           And -- and since you were doing business

11  with The Limited on an unsecured basis --

12      A.  Yes.

13      Q.  -- relying -- relying solely on those invoices,

14  did you have access to any of The Limited's financial

15  information to determine its ability to pay those

16  invoices as they came due?

17      A.  No.

18      Q.  Did you ever ask for any financial information

19  to determine The Limited's financial wherewithal in

20  order to do business with Arden?

21      A.  No.

22      Q.  Why not?

23      A.  Because at the time, especially source business

24  was very healthy across all of our customers, and the

25  action to sell Limited was sort of a feather in our cap.

1      Q.  And when you say "especially source business

2   was healthy," does that include The Limited?

3      A.  Yes.

4      Q.  And --

5      A.  To the best of my knowledge.

6      Q.  Yeah.  And -- and when you say "healthy," what

7   do you mean by that?

8      A.  That they were paying their bills on time.

9      Q.  Okay.

10          And was that the case throughout 2013?

11     A.  Yes.

12     Q.  And was The Limited paying its bills on time

13   throughout 2014?

14     A.  Agreed to the agreed-upon times, yes.

15     Q.  And agreed-upon times were roughly every

16   30 days?

17          You broke up there, Mr. Adams {sic}.  Were

18   the standard --

19     A.  Yeah, I'm sorry.

20     Q.  -- payment terms that the invoices were due

21   within 30 days of issuance?

22     A.  Forty-five to sixty days.

23     Q.  Okay.  And throughout 2013, The Limited paid

24   within that parameter; is that right?

25     A.  Yes.

Page 35

1      Q.   Okay.  And is that -- did they also pay within

2    that parameter in 2014?

3      A.   Yes.

4      Q.   And did they pay within that parameter time

5    within 2015?

6      A.   Yes.

7      Q.   Okay.

8             Now, in 2016, we've seen some invoices that

9    were not paid, correct?

10     A.   Correct.

11     Q.   Are those invoices that are attached to the

12   proof of claim, which is Exhibit -- sorry -- 4 in this

13   deposition.  Do those represent the only invoices, to

14   the best of your knowledge, that Arden was not -- did

15   not receive payment from The Limited Store throughout

16   its relationship with The Limited?

17     A.   Correct.

18     Q.   Okay.

19             And so those invoices, I looked -- I looked

20   at the proof of claim closely, and those invoices span

21   between August and sometime in October of 2016.

22             Does that make sense to you?

23     A.   Yes.

24     Q.   All right.

25             And that is the sum total of Arden's claim

1    against the -- against The Limited in bankruptcy,

2    correct?

3        A.  Yes.

4        Q.  Is it then fair to say that any invoices that

5    were issued by Arden between 2013 and August of 2016

6    were actually paid on time by The Limited?

7        A.  Yes.

8        Q.  And were you ever concerned about the financial

9    wherewithal of The Limited and its ability to pay your

10   invoices prior to the summer of 2016?

11       A.  No.

12       Q.  And why was that?

13       A.  Again, they were pretty much paying to -- as

14   agreed to terms.

15       Q.  Okay.

16              And you said earlier that The Limited was a

17   feather in Arden's cap.

18              What did you mean by that?

19       A.  The Limited was a -- a great user of goods.

20   They could use good quantities, and they had -- had a

21   good name.

22       Q.  But was Arden proud to have them amongst their

23   customers?

24              Mr. Abrams?

25              MR. MARTIN:  He looks frozen.

                                        Page 37

```
1                    MR. MCCUTCHEON:  Yeah.

2                    THE CERTIFIED STENOGRAPHER:  Do we want to

3    go off the record until he logs back in or do --

4                    MR. MADDEN:  Yes.

5                    THE CERTIFIED STENOGRAPHER:  Okay.

6                    MR. MADDEN:  Let's do that if it's okay

7    with Michael.

8                    MR. MCCUTCHEON:  Yes, that's quite all

9    right.

10                   THE CERTIFIED STENOGRAPHER:  Okay.

11                   (A break was taken from 10:04 a.m. to

12   10:04 a.m.)

13                   THE WITNESS:  We're back.

14                   MR. MCCUTCHEON:  All right.  Can you hear

15   me?

16                   THE WITNESS:  Yes, now it's fine.

17                   MR. MCCUTCHEON:  Okay.  Could the court

18   reporter read back the -- I'm sorry -- the last

19   question, please?

20                   (Requested portion read back.)

21       Q.  (BY MR. MCCUTCHEON)  Do you understand the

22   question, Mr. Abrams?

23       A.  Yes.

24       Q.  Okay.

25       A.  Yes.  Also -- yes, also, he showed me the -- I
```

Page 38

1   got the -- the salesperson did the actual thing.  Our

2   first PO was on -- January 22nd.  Okay?  Did you catch

3   that?

4        Q.  No.  You said January 22nd --

5        A.  2014 was -- the first PO was issued from

6   Limited group to us.

7        Q.  Okay.  And so it's fair to say you weren't

8   doing any business with The Limited whatsoever in 2011,

9   correct?

10       A.  Correct.

11       Q.  And The Limited didn't owe you any money in

12  2011, correct?

13       A.  Correct.

14       Q.  Okay.

15           About -- about how much in sales did Arden

16  do with The Limited in 2014, if you know?

17       A.  I would think it had to be less than

18  $1 million.

19       Q.  Okay.

20           And as we stated earlier, those invoices

21  were fully paid, correct?

22       A.  Yes.

23       Q.  And in 2015, do you recall how much business

24  Arden did with The Limited?

25       A.  Again, it was less than $1 million.

1          Q.   Okay.

2                And -- and those invoices would have been

3     paid in full in a timely fashion, correct?

4          A.   Yes.

5          Q.   Okay.

6                And up and until about August of 2016, I

7     think, your testimony was that The Limited was paying

8     its bills to Arden in a timely fashion, correct?

9          A.   Yes.

10         Q.   Okay.

11               Yeah.  Do you -- do you know if --

12    generally speaking if your sales were increasing from

13    2014 to 2016 on a year-over-year basis?

14         A.   Yes, they were increasing.

15         Q.   Okay.  And why was that?

16         A.   The designs we were generating must have been

17    selling.  So as they sold more, it sort of snowballed

18    into more business.

19         Q.   Okay.

20               And -- and I wasn't clear in my question

21    earlier, but the -- but the sales that you -- that Arden

22    was making to The Limited --

23         A.   Yes.

24         Q.   -- between 2014 and 2016 were increasing,

25    correct?

Page 40

1        A.   Yes.

2             Not in a direct line, but, you know,

3   overall increasing, yes.

4        Q.   Okay.  Great.

5             I'm going to ask you:  Do you -- and

6   hopefully, I can get through this quickly, Mr. Abrams.

7        A.   Yes.

8        Q.   Did you have any sense of The Limited business

9   going back to 2007?

10       A.   I just heard that it was very good.  It was

11   very healthy.

12       Q.   Okay.

13            Do you know anything whatsoever about my

14   client, Sun Capital's purchase of a 75 percent interest

15   in The Limited in 2007?

16       A.   No, I didn't.

17       Q.   Okay.

18            You didn't become aware of that at the

19   time?

20       A.   No.

21       Q.   Okay.

22            What was your general impression of The

23   Limited in 2007?

24       A.   I just thought they were a good company, and we

25   wanted to sell them.

Page 41

1       Q.  Okay.

2            What was your sense of -- of the, I think,

3  you called it specialty retail earlier of that industry

4  in general in 2007?  Was it strong?  Was it weak?

5  How --

6       A.  I think it was healthy.  I thought it was

7  healthy.

8       Q.  And -- and does the same go for 2008?

9       A.  Yes.

10      Q.  Okay.  Now --

11      A.  Except -- or at the end -- except for -- at the

12  end, it had a blip when the financial markets did a

13  nosedive.

14      Q.  Okay.  And then did that impact Arden's

15  business?

16      A.  Just for a second, really.  Not -- not

17  long-term.

18      Q.  Okay.  Do you have any recollection of -- of

19  what impact the great recession, I would call it; the

20  downturn in the economy had on The Limited --

21      A.  Okay.  I'm sorry, Michael.  You -- you just

22  froze out for a second.  I -- I missed what you said.

23      Q.  Do you have any recollection or impression of

24  what -- of how the great recession that began in '08 and

25  extended into '09, what that had on The Limited's

1  business?

2      A.  Here it goes.  I'm sorry, Michael.  It's

3  freezing.  It just froze and it just releases, so I

4  just --

5      Q.  Yeah.

6      A.  I didn't catch what you said.  I apologize.

7      Q.  All right.

8          Do you have any recollection or -- or

9  impression in your mind as to the impact of the great

10 recession on The Limited's business?

11     A.  No.

12     Q.  Okay.

13         Do you have any knowledge whatsoever of new

14 management coming into The Limited in 2007?

15     A.  No, I didn't.

16     Q.  All right.

17         And -- and the same goes for the period

18 between 2007 when you started doing business with The

19 Limited in 2014, do you have -- I'm sorry -- 2014.

20         Do you have any firsthand knowledge

21 whatsoever of how the company was run?

22     A.  No.

23     Q.  Do you have a general impression about whether

24 or not The Limited was operating successfully

25 between 2007 and 2014?

Page 43

1       A.   I thought it was.   That's just my opinion.

2       Q.   Okay.

3            And why do you say that?

4       A.   Because they were still buying a lot of goods

5    around the city of Providence, and people talked about

6    the health of companies, and no one ever mentioned

7    anything about them.   I have competitors who are

8    friends.

9       Q.   Okay.

10           Was the impression that The Limited was

11   growing between 2007 and 2014?

12      A.   I think it was pretty flat.

13      Q.   Was there any impression with -- with you or as

14   you said with people that you know in the industry, the

15   specialty sales industry that The Limited was failing at

16   that time?

17      A.   Not that I recall.

18      Q.   Would you have been anxious to get into

19   business with a company that you knew was failing at the

20   time?

21      A.   I'm sorry, Michael.   It's starting to...

22      Q.   Do you have any knowledge of a second

23   transaction that occurred in 2010 by which my client Sun

24   Capital purchased a 25 percent interest and became the

25   whole owner of The Limited?

Page 44

1       A.  No.

2       Q.  Okay.  You didn't read anything about that in

3  the trade press?

4       A.  Not that I recall, no.

5       Q.  Now, Mr. Madden asked you a question about a

6  dividend.

7            Do you recall that?

8       A.  Yes.

9       Q.  Do you have any firsthand knowledge about the

10  dividend that was paid on December 20th, 2011, by The

11  Limited to a Sun Capital entity?

12       A.  No.

13       Q.  When was the first time you became aware of

14  that transaction?

15       A.  After the bankruptcy.

16       Q.  Okay.

17            And when you say after the bankruptcy, you

18  mean after January, I think, it was 17th --

19       A.  Correct.

20       Q.  -- of 2017, correct?

21       A.  Correct.  It was --

22       Q.  And how did you -- how did you come to know

23  about that dividend after the bankruptcy?

24       A.  I was contacted by an attorney with -- I'm

25  sorry -- who contacted my attorney because we were -- he

                                            Page 45

1  was the guy of record and explained to him what happened

2  about the dividend.  I had never heard about it before.

3      Q.  All right.

4           And it's your testimony that you were

5  not -- you had no ability to reach out to any employee

6  or officer of The Limited to inquire what -- in any way

7  about that dividend back in 2011; is that right?

8      A.  No, we weren't doing business then.

9      Q.  And to be clear, once you did start doing

10  business -- well, strike that.

11          MR. MCCUTCHEON:  Let's go off the record

12  for just a couple of minutes, so I can look at my notes.

13          MR. MADDEN:  Okay.  Okay.

14          THE CERTIFIED STENOGRAPHER:  We're off the

15  record.

16          (A break was taken from 10:15 a.m. to

17  10:17 a.m.)

18          THE CERTIFIED STENOGRAPHER:  We're back on

19  the record.

20      Q.  (BY MR. MCCUTCHEON)  Mr. Abrams, who was your

21  main point of contact at The Limited?

22      A.  It would have been the buyer.  I did not talk

23  to them on a day-to-day basis.  That was the

24  salesperson's --

25      Q.  I'm not sure that came clear -- came through

Page 46

A230

1    clearly, Mr. Abrams.

2              Can you repeat -- can you repeat your

3    answer?

4         A.   Yes.

5              We would speak with the buyer.

6         Q.   And who was that?

7         A.   I would have to check with the salesperson.  I

8    don't remember who it was at the time.

9         Q.   Okay.  Okay.

10             Did you have any access to any of the

11   management at The Limited directly?

12        A.   Except for the product line, we would talk to

13   merchandise managers, things like that, but not in terms

14   of the financial people.  We didn't have any contact --

15   financial management.

16        Q.   And had you asked for any financial information

17   from The Limited at any time between 2014 and 2016, do

18   you know whether or not they would have provided it to

19   you?

20        A.   I don't know.

21        Q.   Okay.  When -- when you do business with other

22   customers, do you ever ask for financial information

23   from them to -- to assure Arden that they will be able

24   to get paid?

25        A.   I'm embarrassed to say no.

Page 47

A231

1          Q.   Okay.

2               And why is that?

3          A.   Again, being a small industry that we are and

4     knowing competitors, I think I get more better -- I get

5     more accurate information from those people than I do

6     from -- than I would from the company.

7          Q.   And these are just some -- somewhat we call

8     sort of closing-out questions, okay?

9          A.   Sure.

10         Q.   I just have to ask these.  They may sound silly

11    to you, but --

12         A.   No, no, no.

13         Q.   Do -- do you or Arden have any interest in Sun

14    Capital Partners V?

15         A.   No.

16         Q.   And the same question for Sun Mod Fashions IV,

17    LLC?

18         A.   Nope.

19         Q.   Okay.

20              Do you have any interest in any Sun Capital

21    portfolio company?

22         A.   No.

23         Q.   Okay.  Do you know if Arden has any interest

24    financially or otherwise in any of the Sun Capital

25    entities?

                                        Page 48

1      A.   They do not.   Arden does not.

2      Q.   Okay.   Are you aware of any instances of fraud

3  being perpetrated by anybody at The Limited?

4      A.   No.

5      Q.   Are you aware of any instances of fraud, as you

6  would define it, by anybody in -- within the Sun Capital

7  organization?

8      A.   No.

9      Q.   So if called to testify at a trial, you would

10  not offer any testimony related to your belief that a

11  fraud had been committed against you or Arden; is that

12  correct?

13      A.   I guess the answer is no.

14      Q.   All right.

15      A.   I mean, I -- I learned about the alleged --

16  alleged fraud after the fact, but I did not know

17  anything before.

18      Q.   Okay.   And what do you understand the alleged

19  fraud to be?

20      A.   That Sun Capital took a dividend, paid

21  themselves back using liquidity that was in -- in

22  Limited, which contributed to making them a little bit

23  more cash-strapped, and then the way things ended up,

24  who knows.

25      Q.   Okay.   And that -- that dividend occurred as

Veritext Legal Solutions
800-336-4000

1    we've established in December of 2011, correct?

2         A.   Yes.

3         Q.   But we've also established that when you

4    started doing business with The Limited in 2014, you

5    were paid on time throughout your relationship until

6    about August of 2016; is that correct?

7         A.   Yes.

8              MR. MCCUTCHEON:   I'm going to pass the

9    witness.   I don't think I have any more questions right

10   now.

11                    FURTHER EXAMINATION

12   BY MR. MADDEN:

13        Q.   Mr. Abrams, I have just a couple of follow-ups,

14   and we may be done.

15        A.   Okay.

16        Q.   I know you're busy.

17              The first set of questions related to the

18   financial reporting that Michael asked you about.

19        A.   Yes.

20        Q.   I just want to make sure we're clear about

21   that.

22              So Arden never received any financial

23   reporting from Limited Stores; is that right?

24        A.   Yes.

25        Q.   And Arden never requested any financial

1   reporting from Limited Stores, correct?

2       A.  Yes.

3       Q.  And I think you gave me three reasons for that,

4   and let me make sure I summarize these accurately.

5           One reason that Arden never requested

6   financial reporting is because that's not something

7   Arden normally does with its customers; is that right?

8       A.  Yes.

9       Q.  Another reason is Arden had been paid timely by

10  Limited Stores all the way up until about August 2016?

11      A.  Yes.

12      Q.  And then the third reason I heard you give as

13  to why Arden never requested any financial reporting

14  from any Limited Stores was that word in the industry

15  was, at least by all outward appearances, Limited Stores

16  was in good shape; is that right?

17      A.  Yes.

18      Q.  Okay.

19          You were also asked about, well, what would

20  have happened if you had asked for financial reporting

21  from Limited Stores, and I think you said you didn't

22  know if you would have received that reporting, right?

23      A.  Yes.

24      Q.  Okay.

25          Are you aware of anything in a -- in a

Page 51

1  written contract or -- or otherwise that would give

2  Arden a right to receive financial reporting from

3  Limited Stores?

4      A.  No.

5      Q.  Okay.

6          Was Limited Stores a significant customer

7  for Arden?

8      A.  Yes.

9          They were one -- they were in our Top 10.

10     Q.  Okay.

11         And when Limited Stores filed bankruptcy,

12  they owed Arden over $360,000, right?

13     A.  Correct.

14     Q.  What effect did The Limited Stores bankruptcy

15  have on Arden?

16     A.  It hurts.  It set us back financially.  We had

17  to dip into retained earnings to pay some bills, and it

18  wasn't good.

19     Q.  How long did it take Arden to recover from

20  that?

21     A.  About six months to a year.

22     Q.  And you said that Arden eventually learned

23  about this $42 million dividend after Limited Stores had

24  filed bankruptcy, right?

25     A.  Yes.

Page 52

1      Q.   What was your reaction to that?

2      A.   Not good.

3      Q.   What do you mean?

4      A.   The fact that they -- again, I'm not saying I

5   know everything, but it seems like it's sort of these

6   MOs of some of these hedge fund kind of people that they

7   go in, they buy a store, and that they take the cash out

8   at certain times to pay themselves back.  And when

9   business is going good, it's fine.  But as business

10  starts to contract or -- or whatever happens, I don't

11  know, it hurts.

12     Q.   And that kind of MO, as you described it hurts

13  companies like Arden?

14     A.   Yes, it does.

15              MR. MADDEN:   Okay.  I'll pass the witness.

16                 FURTHER EXAMINATION

17  BY MR. MCCUTCHEON:

18     Q.   Mr. Abrams, do you know one way or another if

19  you had asked for financial information from The

20  Limited, they would have provided it to you?

21     A.   No, I don't.

22     Q.   You don't know?

23     A.   No.

24     Q.   So they may have provided it to you had you

25  asked?

                                        Page 53

1          A.   Might have.

2          Q.   Okay.

3               Do you know anything in particular about

4     the Sun Capital entities, as you said, MO in terms of

5     taking cash out of companies that -- that they owe?  Do

6     you have -- do you have firsthand knowledge of that?

7          A.   No.

8               But I've -- not just necessarily Sun

9     Capital, but I've read of other companies.

10         Q.   So is it fair to say that your opinion is -- is

11    about private equity or as you said hedge funds, is

12    based on generalities about what you know or believed

13    generally about that industry?

14         A.   Yeah.  I mean -- I also think they do good

15    things, too.  I'm not saying this is -- they just go

16    into, you know, crap or burn and -- and just loot but...

17         Q.   Okay.

18              Are you going to offer any testimony about

19    your experience with other Sun Capital transactions

20    besides the one -- the dividend at issue in this case?

21         A.   I don't know of any other Sun Capital

22    transactions, to be honest with you.

23         Q.   So your answer is "no" you won't be able to

24    offer --

25         A.   No.

Veritext Legal Solutions
800-336-4000

```
 1        Q.  -- any testimony?

 2        A.  No.

 3              MR. MCCUTCHEON:  I don't have anything

 4   else, Eric.

 5              MR. MADDEN:  Okay.  Mr. Abrams, we thank

 6   you for your time today.

 7              THE WITNESS:  Thank you, guys.

 8              THE CERTIFIED STENOGRAPHER:  Before --

 9   before the attorneys log out, I just have some

10   housekeeping matters.  Since this is Federal, are there

11   any other stipulations you, guys, want to put on the

12   record?

13              MR. MADDEN:  Nope.  I don't have any,

14   Michael?

15              MR. MCCUTCHEON:  I didn't understand the

16   question.  I'm sorry, Ms. Guerra.

17              THE CERTIFIED STENOGRAPHER:  Since this is

18   Federal, the Federal rules require me to ask:  Are there

19   any other stipulations you want to put on the record?

20   So I'm just asking both parties, are there anything else

21   they want to stipulate to?

22              MR. MCCUTCHEON:  No, no.

23              MR. MADDEN:  No.

24              THE CERTIFIED STENOGRAPHER.  Okay.

25              And, Michael McCutcheon, did you want to
```

Page 55

```
 1   purchase a copy of the transcript?

 2               MR. MCCUTCHEON:  Eric, are you going to get

 3   one?

 4               MR. MADDEN:  I am.

 5               MR. MCCUTCHEON:  Yes, please.

 6               THE CERTIFIED STENOGRAPHER:  Okay.

 7               And, Michael, can you tell me the parties

 8   that you represent?

 9               MR. MCCUTCHEON:  Yes.  They are all of the

10   defendants.  So Sun Capital Partners V, LP.

11               THE CERTIFIED STENOGRAPHER:  Uh-huh.

12               MR. MCCUTCHEON:  V being a Roman Numeral.

13               THE CERTIFIED STENOGRAPHER:  Okay.

14               MR. MCCUTCHEON:  Sun MOD, two different

15   words --

16               THE CERTIFIED STENOGRAPHER:  Okay.

17               MR. MCCUTCHEON:  -- Fashions IV, LLC.

18               THE CERTIFIED STENOGRAPHER:  Can I stop

19   you?  Are they on the notice?

20               MR. MCCUTCHEON:  I believe they are.

21               THE CERTIFIED STENOGRAPHER:  Okay.  So you

22   don't have to go through all of them.

23               Okay.  Thank you, guys.  That's it.

24               (Proceedings concluded at 10:28 a.m.)

25
```

Page 56

A240

1              CHANGES AND SIGNATURE

2       WITNESS NAME:   STEVEN MICHAEL ABRAMS

3       DATE OF DEPOSITION: January 28, 2021

4

5          PAGE       LINE       CHANGE        REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Veritext Legal Solutions
800-336-4000

A241

1           I, STEVEN MICHAEL ABRAMS, have read the

2     foregoing deposition and hereby affix my signature that

3     same is true and correct, except as noted above.

4

5                    _____

      STEVEN MICHAEL ABRAMS

6

7

8

9     THE STATE OF_____   )

10    COUNTY OF _____   )

11           Before me, _____, on

12    this day personally appeared STEVEN MICHAEL ABRAMS,

13    known to me (or proved to me under oath or through

14    _____) (description of identity card or

15    other document) to be the person whose name is

16    subscribed to the foregoing instrument and acknowledged

17    to me that they executed the same for the purposes and

18    consideration therein expressed.

19           Given under my hand and seal of office this

20    _____ day of _____, 2021.

21

22

23

                     _____

24    NOTARY PUBLIC IN AND FOR

      THE STATE OF _____

25    Commission Expires: _____

                                                 Page 58

```
1              IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF DELAWARE
2
       In re:                      )
3                                  ) Chapter 11
       LSC WIND DOWN, LLC, et al   )
4                                  ) Case No. 17-10124 (KBO)
          Debtors                  )
5      _____    ) (Jointly Administered)
                                   )
6      UMB BANK, N.A., as Plan     )
       Trustee of The Limited      )
7      Creditors Liquidating       ) Adversary Proceeding
       Trust                       ) No. 19-50272 (KBO)
8                                  )
          Plaintiff,               )
9                                  )
       v.                          )
10                                 )
       SUN CAPITAL PARTNERS V,     )
11     LP,                         )
       SUN MOD FASHIONS IV, LLC,   )
12     SUN MOD FASHIONS V, LLC,    )
       AND                         )
13     H.I.G. SUN PARTNERS, LLC    )
                                   )
14        Defendants.              )
15
16
17                  REPORTER'S CERTIFICATION
              DEPOSITION OF STEVEN MICHAEL ABRAMS
18                     January 28, 2021
19          That the deposition transcript was delivered
20     to Mr. Eric D. Madden.
21          That a copy of this certificate was served on
22     all parties and/or the witness shown herein on
23     _____.
24          I further certify that pursuant to FRCP
25     Rule 30(f)(1) that the signature of the deponent:
```

                                                    Page 59

1          _____ was requested by the deponent or a party

2    before the completion of the deposition and that

3    signature is to be before any notary public and returned

4    within 30 days from date of receipt of the transcript.

5          If returned, the attached Changes and

6    Signature Page contains any changes and the reasons

7    therefore:

8          _____ was not requested by the deponent or a

9    party before the completion of the deposition.

10          I certify that I am neither counsel for,

11    related to, nor employed by any of the parties or

12    attorneys in the action in which this proceeding was

13    taken, and further that I am not financially or

14    otherwise interested in the outcome of the action.

15          Certified to by me this 4th day of February,

16    2021.

17

18

19

20

21

                    ABIGAIL GUERRA, Texas CSR 9059

22                  Expiration Date:  12/31/22

                    VERITEXT LEGAL SOLUTIONS

23                  Firm Registration No. 571

                    300 Throckmorton Street

24                  Suite 1600

                    Fort Worth, Texas 76102

25                  Phone:  (817) 336-3042

                                              Page 60

A244

```
 1    COUNTY OF _____      )

      STATE OF TEXAS          )

 2

 3           I hereby certify that the witness was notified

 4    on_____, that the witness has 30 days or

 5    (_____days per agreement of counsel) after being

 6    notified by the officer that the transcript is available

 7    for review by the witness and if there are changes in

 8    the form or substance to be made, then the witness shall

 9    sign a statement reciting such changes and the reasons

10    given by the witness for making them;

11         That the witness' signature was/was not returned as

12    of _____.

13              Subscribed and sworn to on this, the _____

14    day of _____, 2021.

15

16

17

18

19

      ABIGAIL GUERRA, Texas CSR 9059

20    Expiration Date:  12/31/22

      VERITEXT LEGAL SOLUTIONS

21    Firm Registration No. 571

      300 Throckmorton Street

22    Suite 1600

      Fort Worth, Texas 76102

23    Phone:  (817) 336-3042

24

25
```

Page 61

A245

1    Michael.mccutcheon@bakermckenzie.com

2                        February 4, 2021

3    RE: UMB Bank, N.A., Et Al. v. Sun Capital Partnerships V, Et Al.

4    DEPOSITION OF: Steven Michael Abrams (# 4411772)

5        The above-referenced witness transcript is

6    available for read and sign.

7        Within the applicable timeframe, the witness

8    should read the testimony to verify its accuracy. If

9    there are any changes, the witness should note those

10   on the attached Errata Sheet.

11       The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14       According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                        Yours,

19                        Veritext Legal Solutions

20

21

22

23

24

25

                                        Page 62

**[& - adversary]**

| & | | | |
|---|---|---|---|
| **&**   3:4 | | | |

**0**

**08**   42:24
**09**   42:25

**1**

**1**   1:21 4:14 7:1,3
7:22 8:6,25 20:13
21:7 22:17,19
23:12 39:18,25
59:25
**10**   52:9
**100**   31:16
**10:04**   38:11,12
**10:15**   46:16
**10:17**   46:17
**10:28**   56:24
**10:38**   2:5
**11**   1:3 4:15 59:3
**12/31/22**   60:22
61:20
**12604**   60:21 61:19
**14**   4:16
**16**   24:5
**1600**   60:24 61:22
**1601**   3:5
**17**   22:9 23:16 24:5
25:7,12,17
**17-10124**   1:4 59:4
**17th**   23:12 24:14
45:18
**18**   4:17
**19-50272**   1:7 59:7

**2**

**2**   4:15 11:8,9 12:4
12:5,6,9 16:1,4
19:20 28:23,23,24
30:19
**20**   10:10 23:24

**2007**   41:9,15,23
42:4 43:14,18,25
44:11
**2008**   42:8
**2010**   31:25 44:23
**2011**   23:24 32:5
39:8,12 45:10
46:7 50:1
**2013**   15:17,24
30:23 31:1,12,21
33:17 34:2,3,5
35:10,23 37:5
**2014**   35:13 36:2
39:5,16 40:13,24
43:19,19,25 44:11
47:17 50:4
**2015**   36:5 39:23
**2016**   23:16 24:5,15
25:7,12,17 36:8,21
37:5,10 40:6,13,24
47:17 50:6 51:10
**2017**   17:14 22:9
23:12 45:20
**2021**   1:20 2:4 57:3
58:20 59:18 60:16
61:14 62:2
**20th**   32:5 45:10
**214**   3:6
**21st**   15:17
**22nd**   39:2,4
**25**   44:24
**27**   4:5
**28**   1:20 57:3 59:18
**28th**   2:4

**3**

**3**   4:16 14:11,13,15
14:16 21:17
**30**   10:14 35:16,21
59:25 60:4 61:4
**300**   3:11 60:23
61:21

**312**   3:13
**336-3042**   60:25
61:23
**360,000**   52:12
**361,000**   22:5
**361,386**   20:21 22:5
22:11

**4**

**4**   4:17 18:4,6,8,13
18:18 19:8 29:7
36:12 62:2
**42**   24:16,25 27:6
52:23
**42,158,299.47**
23:22
**420-8900**   3:6
**4200**   3:5
**4411772**   62:4
**4th**   60:15

**5**

**5**   4:4
**50**   4:6
**5000**   3:12
**53**   4:7
**57**   4:8
**571**   60:23 61:21
**59**   4:9

**6**

**60601**   3:12

**7**

**7**   4:14
**75**   41:14
**75201**   3:6
**76102**   60:24 61:22

**8**

**817**   60:25 61:23
**83**   9:25
**861-8000**   3:13

**9**

**9059**   60:21 61:19
**9:22**   2:5
**9:55**   32:24
**9:56**   32:25

**a**

**a.m.**   2:5,5 32:24
32:25 38:11,12
46:16,17 56:24
**abigail**   2:6 60:21
61:19
**ability**   34:15 37:9
46:5
**able**   7:12,15 47:23
54:23
**abrams**   1:19 2:1
4:3 5:4,5 18:7
27:16,20 33:3,21
37:24 38:22 41:6
46:20 47:1 50:13
53:18 55:5 57:2
58:1,5,12 59:17
62:4
**access**   26:6,9,22
26:25 34:14 47:10
**account**   23:23
**accuracy**   62:8
**accurate**   48:5
**accurately**   51:4
**acknowledged**
58:16
**action**   34:25 60:12
60:14
**actual**   39:1
**adams**   35:17
**additional**   28:9
**administered**   1:5
59:5
**adversary**   1:7
59:7

[affix - capital]

**affix** 58:2
**ago** 5:6 14:5
**agreed** 35:14,14
  35:15 37:14
**agreement** 4:15
  11:3,4 12:15
  13:23 14:3 16:9
  28:16,21 30:20
  31:11 33:20 61:5
**agreements** 62:14
**ahead** 11:25
**al** 1:3 59:3 62:3,3
**alleged** 49:15,16
  49:18
**allotted** 62:15
**amount** 20:5,12,21
  20:25 24:19,22
**amounts** 17:18,20
  18:1
**answer** 6:13,18
  33:10 47:3 49:13
  54:23
**anthony** 13:4
**anthropologie**
  10:9
**anxious** 44:18
**anybody** 30:15
  49:3,6
**apologize** 11:24
  31:6 32:1 43:6
**apparel** 12:15
**appearances**
  51:15
**appeared** 2:8
  58:12
**appears** 14:18
**applicable** 62:7,14
**arden** 5:19,22 8:15
  9:21 10:11,16
  11:2 12:19,25
  13:3,24 14:2 15:2

15:6 16:21,23
  17:1,18,21,25
  19:14,17 21:14
  22:10,13 23:5
  24:3,15,18,21,24
  25:7,12,17,22,25
  26:6,9,22,25 27:5
  27:11,11 31:20,20
  31:24 32:4 33:5
  33:25 34:20 36:14
  37:5,22 39:15,24
  40:8,21 47:23
  48:13,23 49:1,11
  50:22,25 51:5,7,9
  51:13 52:2,7,12,15
  52:19,22 53:13
**arden's** 8:21 9:11
  10:7,20 20:1,25
  22:3 30:14 36:25
  37:17 42:14
**asked** 33:3 45:5
  47:16 50:18 51:19
  51:20 53:19,25
**asking** 24:3 32:21
  55:20
**asks** 21:7
**associates** 33:8
**assure** 47:23
**attached** 2:10
  21:16 36:11 60:5
  62:10,12
**attendees** 2:8
**attention** 30:18
**attorney** 19:18
  28:1 29:16 45:24
  45:25
**attorneys** 30:1
  55:9 60:12
**august** 36:21 37:5
  40:6 50:6 51:10

**authorized** 19:25
**available** 61:6
  62:6
**aware** 17:11 41:18
  45:13 49:2,5
  51:25
**awkward** 31:4

**b**

**back** 12:1 15:18
  16:1,3 18:15
  22:16 33:1 38:3
  38:13,18,20 41:9
  46:7,18 49:21
  52:16 53:8
**baker** 3:11
**bakermckenzie....**
  3:13,14 62:1
**bank** 1:6 5:9 26:7
  59:6 62:3
**bankruptcy** 1:1
  17:12,14,17 18:1
  19:13,15 22:10
  29:6 37:1 45:15
  45:17,23 52:11,14
  52:24 59:1
**based** 54:12
**basically** 16:11
  19:12
**basis** 21:8 22:2
  34:7,11 40:13
  46:23
**bear** 11:15,15
**began** 33:5 42:24
**behalf** 5:19 20:1
**belief** 49:10
**believe** 15:7,11
  56:20
**believed** 54:12
**best** 13:19 20:4,8
  21:1,11,23 35:5
  36:14

**better** 48:4
**bills** 35:8,12 40:8
  52:17
**bit** 30:5 49:22
**blank** 18:12,13
**blip** 42:12
**board** 26:10,12,14
**bottom** 8:3 20:13
  21:6
**break** 32:24 38:11
  46:16
**briefly** 28:1
**bring** 16:3
**broke** 30:5 35:17
**buell** 13:16
**bunch** 21:16
**burn** 54:16
**business** 10:2
  31:19,20,24 32:4
  33:5 34:1,6,10,20
  34:23 35:1 39:8
  39:23 40:18 41:8
  42:15 43:1,10,18
  44:19 46:8,10
  47:21 50:4 53:9,9
**busy** 50:16
**buy** 10:4 53:7
**buyer** 46:22 47:5
**buying** 44:4

**c**

**c** 3:1,10
**call** 42:19 48:7
**called** 42:3 49:9
**calls** 26:19
**canceled** 17:23
**cap** 34:25 37:17
**capital** 1:10 23:24
  24:16,19 25:9,14
  28:1 44:24 45:11
  48:14,20,24 49:6
  49:20 54:4,9,19,21

**[capital - determine]**

56:10 59:10 62:3
**capital's** 41:14
**card** 58:14
**case** 1:4 8:12
19:15 29:19 30:14
35:10 54:20 59:4
**cash** 49:23 53:7
54:5
**catch** 39:2 43:6
**cause** 2:4
**ceo** 13:6
**certain** 53:8
**certainty** 33:11
**certificate** 4:9
59:21
**certification** 59:17
**certified** 33:1 38:2
38:5,10 46:14,18
55:8,17,24 56:6,11
56:13,16,18,21
60:15 62:16
**certify** 59:24
60:10 61:3
**cfo** 13:17
**change** 57:5
**changes** 4:8 57:1
60:5,6 61:7,9 62:9
**chapter** 1:3 59:3
**charger** 11:11
**check** 32:22 33:7
47:7
**chicago** 3:12
**chico's** 10:8
**city** 44:5
**civil** 2:9
**claim** 4:17 17:25
19:5,14,17 20:3,16
20:25 21:8,17
22:3,5,13 29:6
30:14 36:12,20,25

**clear** 24:10 33:25
40:20 46:9,25
50:20
**clearly** 47:1
**click** 7:21,22 12:4
**clicked** 7:19 12:9
18:12
**client** 41:14 44:23
**close** 24:25
**closely** 36:20
**closing** 48:8
**colleague** 6:12
**collins** 3:4 29:21
30:15
**come** 12:6,7 14:14
16:4 18:10,11
22:18 45:22
**coming** 7:13 16:6
18:11,22 43:14
**commission** 58:25
**committed** 49:11
**communications**
26:23
**companies** 44:6
53:13 54:5,9
**company** 5:20
9:23 41:24 43:21
44:19 48:6,21
**competitors** 44:7
48:4
**complaint** 29:18
**complete** 6:22
**completion** 60:2,9
**concerned** 37:8
**concluded** 56:24
**consent** 26:16
**consideration**
58:18
**contact** 46:21
47:14

**contacted** 45:24
45:25
**contains** 16:7 60:6
**contract** 11:2
12:19,25 52:1
53:10
**contributed** 49:22
**copy** 56:1 59:21
62:16
**correct** 5:7 8:23
15:25 17:3,12,21
20:4,5,8 21:3,11
21:22 22:11 31:1
34:7 36:9,10,17
37:2 39:9,10,12,13
39:21 40:3,8,25
45:19,20,21 49:12
50:1,6 51:1 52:13
58:3
**costume** 9:25
10:17
**counsel** 60:10 61:5
**country** 10:18
**county** 58:10 61:1
**couple** 28:10
46:12 50:13
**court** 1:1 6:21
31:7 38:17 59:1
**crap** 54:16
**creditors** 1:7 5:10
59:7
**csr** 2:6 60:21
61:19
**customer** 52:6
**customers** 10:7,18
10:20 31:13 34:24
37:23 47:22 51:7

**d**

**d** 3:3 59:20
**dallas** 3:6

**date** 14:5,9 15:16
23:8,11 57:3 60:4
60:22 61:20
**day** 2:4 46:23,23
58:12,20 60:15
61:14
**days** 35:16,21,22
60:4 61:4,5
**debtors** 1:4 59:4
**december** 23:24
32:5 45:10 50:1
**defendants** 1:14
3:9 56:10 59:14
**define** 49:6
**defined** 23:12,20
**definitely** 20:5
**definitions** 24:9
**degree** 33:11
**delaware** 1:1 59:1
**delivered** 59:19
**depending** 16:12
**deponent** 59:25
60:1,8
**deposed** 6:2
**deposition** 1:18
2:1 6:17 7:2 8:11
28:14 29:2,9,15,19
29:22 36:13 57:3
58:2 59:17,19
60:2,9 62:4
**described** 10:16
53:12
**description** 4:13
58:14
**design** 10:2
**designated** 8:22
9:11
**designs** 40:16
**determine** 34:15
34:19

[different - following]

**different** 56:14
**digits** 22:7
**dip** 52:17
**direct** 5:1 30:18
  41:2
**directly** 47:11
**discovered** 23:6,6
  24:3,4,15,18,21,24
  25:8,13,18,23,25
  26:1
**discussed** 24:5
**discussion** 30:4,7
**distribution** 25:6
  25:8,13,18,24 26:2
  27:7
**distributions** 27:3
**district** 1:1 59:1
**dive** 9:19
**dividend** 25:5,9,14
  25:19,24 26:1
  27:6 45:6,10,23
  46:2,7 49:20,25
  52:23 54:20
**dividends** 27:1
**document** 8:8,18
  12:17,23 19:7
  20:8 29:1 58:15
**documents** 25:4
  28:5 29:14 30:11
**doing** 31:19,20,24
  32:4 33:5 34:6,10
  39:8 43:18 46:8,9
  50:4
**download** 7:21
**downturn** 42:20
**due** 34:16 35:20
**duly** 2:3

**e**

**e** 3:1,1
**earlier** 37:16
  39:20 40:21 42:3

**earnings** 52:17
**easier** 31:7
**east** 3:11
**economy** 42:20
**effect** 52:14
**either** 25:5
**elm** 3:5
**emadden** 3:7
**email** 3:7,13 4:16
  14:17,18 15:5,16
  15:19
**emails** 26:23
**embarrassed**
  47:25
**employed** 60:11
**employee** 46:5
**employees** 10:13
**ended** 49:23
**entities** 48:25 54:4
**entity** 24:19 25:14
  45:11
**equity** 54:11
**eric** 3:3 5:5 7:14
  32:15 55:4 56:2
  59:20
**errata** 62:10,12,13
**especially** 6:16
  34:23 35:1
**established** 30:25
  50:1,3
**et** 1:3 59:3 62:3,3
**eventually** 52:22
**exactly** 14:6 15:8
  33:4
**examination** 4:4,5
  4:6,7 5:1 27:18
  50:11 53:16
**example** 16:21
**excellent** 27:24
**excuse** 11:10

**executed** 15:20
  30:20,25 33:20
  58:17
**exhibit** 4:14,15,16
  4:17 7:1,3,16,22
  8:2,6,25,25 9:4
  11:8,9 12:4,5,6,9
  14:8,11,13,15,16
  16:1,4 18:4,6,8,13
  18:18 19:8 22:17
  22:19,22 23:12
  28:21 29:7 30:19
  36:12
**exhibits** 4:12 7:13
  7:18,23 11:8 12:2
  14:12 18:5 22:16
**existence** 23:7
  24:4
**experience** 54:19
**expiration** 60:22
  61:20
**expires** 58:25
**explained** 46:1
**express** 10:8
**expressed** 58:18
**extended** 42:25

**f**

**f** 59:25
**fact** 49:16 53:4
**facts** 23:5
**failing** 44:15,19
**fails** 62:15
**fair** 10:18 37:4
  39:7 54:10
**familiar** 13:7,21
  16:17
**fashion** 40:3,8
**fashions** 1:11,12
  48:16 56:17 59:11
  59:12

**feather** 34:25
  37:17
**february** 60:15
  62:2
**federal** 2:9 55:10
  55:18,18
**fi** 18:17
**file** 17:25 18:18
  19:17,25
**filed** 17:11,14,17
  19:14 22:10 29:19
  52:11,24
**files** 18:19
**filing** 19:13
**financial** 34:14,18
  34:19 37:8 42:12
  47:14,15,16,22
  50:18,22,25 51:6
  51:13,20 52:2
  53:19
**financially** 48:24
  52:16 60:13
**fine** 32:17,18
  38:16 53:9
**finish** 31:4
**firm** 29:22 30:15
  60:23 61:21
**first** 9:19 19:3
  33:5 39:2,5 45:13
  50:17
**firsthand** 43:20
  45:9 54:6
**five** 5:25 35:22
**flat** 44:12
**folder** 7:18,23
  12:2 14:12 18:5
  18:15 22:16
**follow** 21:18 28:4
  50:13
**following** 33:25

Veritext Legal Solutions
800-336-4000

A250

**[foregoing - january]**

**foregoing** 58:2,16
**form** 29:6 61:8
**fort** 60:24 61:22
**forty** 35:22
**forward** 34:5
**fourth** 8:25 22:22
**fraud** 49:2,5,11,16
  49:19
**fraudulent** 23:7
  24:4
**frcp** 59:24
**freezing** 43:3
**friends** 44:8
**froze** 42:22 43:3
**frozen** 37:25
**full** 5:3 40:3
**fully** 15:20 39:21
**fund** 53:6
**funds** 54:11
**further** 27:18
  50:11 53:16 59:24
  60:13

**g**

**gears** 23:1
**general** 41:22 42:4
  43:23
**generalities** 54:12
**generally** 6:8
  16:16 17:7 40:12
  54:13
**generating** 40:16
**generations** 10:1
**give** 6:13 7:5 11:13
  51:12 52:1
**given** 58:19 61:10
**giving** 29:22
**go** 11:11,22,24
  12:1,5 16:1 18:15
  22:16 32:12,20
  38:3 42:8 46:11
  53:7 54:15 56:22

**god** 14:4
**goes** 12:7 18:24
  43:2,17
**going** 11:11 14:6
  28:4 41:5,9 50:8
  53:9 54:18 56:2
**good** 37:20,21
  41:10,24 51:16
  52:18 53:2,9
  54:14
**goods** 16:23 17:2
  17:23 21:8,14
  37:19 44:4
**grandfather** 10:2
**great** 37:19 41:4
  42:19,24 43:9
**greg** 32:11
**ground** 6:9
**group** 26:17,20,23
  39:6
**growing** 44:11
**guerra** 2:6 55:16
  60:21 61:19
**guess** 14:20 15:13
  16:11,12 49:13
**guy** 46:1
**guys** 7:21 11:10,15
  11:18 33:15 55:7
  55:11 56:23

**h**

**h.i.g.** 1:13 59:13
**hand** 58:19
**hang** 7:20 12:5,6
  16:3 18:11 22:18
**happened** 46:1
  51:20
**happens** 53:10
**hate** 31:22
**health** 44:6
**healthy** 34:24 35:2
  35:6 41:11 42:6,7

**hear** 11:18,19
  12:22 27:22 33:15
  33:16,23 38:14
**heard** 41:10 46:2
  51:12
**heart** 24:12
**hedge** 53:6 54:11
**held** 5:24 23:23
**hello** 11:17 12:21
**hereto** 2:10
**hold** 32:10
**honest** 16:15
  54:22
**hook** 11:16
**hopefully** 10:3
  41:6
**host** 3:16
**housekeeping**
  55:10
**huh** 8:7 9:22 13:14
  14:10 19:21 20:14
  33:9 56:11
**hurts** 52:16 53:11
  53:12

**i**

**identity** 58:14
**illinois** 3:12
**impact** 42:14,19
  43:9
**important** 6:17
**importer** 10:1
**impression** 41:22
  42:23 43:9,23
  44:10,13
**include** 35:2
**increasing** 40:12
  40:14,24 41:3
**index** 4:1
**indicates** 20:19
  21:6

**industry** 42:3
  44:14,15 48:3
  51:14 54:13
**information** 20:3
  20:7 26:25 34:15
  34:18 47:16,22
  48:5 53:19
**inquire** 46:6
**instance** 2:2
**instances** 49:2,5
**instrument** 58:16
**interest** 41:14
  44:24 48:13,20,23
**interested** 60:14
**internal** 25:4
**interruption** 7:7
**introduce** 18:18
  18:20
**introduced** 28:22
**invoice** 17:1,5 34:7
**invoiced** 17:24
**invoices** 17:21
  21:16,21,22,25
  22:2 28:18 34:13
  34:16 35:20 36:8
  36:11,13,19,20
  37:4,10 39:20
  40:2
**island** 10:12
**issuance** 35:21
**issue** 16:20 17:1
  32:22 54:20
**issued** 8:15 37:5
  39:5
**iv** 1:11 48:16
  56:17 59:11

**j**

**january** 1:20 2:4
  17:14 22:9 23:12
  23:16 24:5,14
  25:7,12,17 39:2,4

[january - meet]

45:18 57:3 59:18
**jewelry** 5:20 8:16
  9:25 10:2,17,17
**john** 13:16
**johnston** 10:12
**jointly** 1:5 59:5

**k**

**kbo** 1:4,7 59:4,7
**kind** 9:23 19:3
  53:6,12
**knew** 27:8 33:4
  44:19
**know** 7:9 13:24
  14:23 16:13 18:8
  31:4,15,24 39:16
  40:11 41:2,13
  44:14 45:22 47:18
  47:20 48:23 49:16
  50:16 51:22 53:5
  53:11,18,22 54:3
  54:12,16,21
**knowing** 48:4
**knowledge** 13:18
  13:19 20:4,9 21:1
  21:12,23 35:5
  36:14 43:13,20
  44:22 45:9 54:6
**known** 27:5,9,12
  58:13
**knows** 49:24
**kohl's** 10:9

**l**

**large** 18:19
**law** 29:22
**layman's** 16:8
**learned** 49:15
  52:22
**learning** 9:20
**legal** 60:22 61:20
  62:19

**lehrman** 3:10 6:12
**leo** 3:4 7:15 11:7
  18:4 29:23
**limited** 1:6 5:10,15
  10:21,23,24 11:3
  12:20 13:1,15,17
  13:24 15:6,12
  16:10,17,20,24
  17:2,4,11,17,25
  19:12,15 21:14
  22:3,9 23:23
  24:15,18,21,24
  25:4,8,13,18 26:6
  26:9,16,19,22 27:1
  27:3,6 31:19,20,25
  32:4 33:5 34:1,11
  34:25 35:2,12,23
  36:15,16 37:1,6,9
  37:16,19 39:6,8,11
  39:16,24 40:7,22
  41:8,15,23 42:20
  43:14,19,24 44:10
  44:15,25 45:11
  46:6,21 47:11,17
  49:3,22 50:4,23
  51:1,10,14,15,21
  52:3,6,11,14,23
  53:20 59:6
**limited's** 34:14,19
  42:25 43:10
**line** 41:2 47:12
  57:5
**liquidating** 1:7
  5:10,14 59:7
**liquidity** 49:21
**listed** 23:4
**lists** 9:7
**little** 7:20 9:20
  30:5 31:4 49:22
**llc** 1:3,11,12,13
  5:15 10:21,24

23:23 48:17 56:17
  59:3,11,12,13
**llp** 3:4,11
**loading** 18:18
**located** 10:11
**locations** 2:8
**log** 55:9
**logs** 38:3
**long** 5:24 42:17
  52:19
**longer** 18:19
**look** 11:6 14:8
  22:17 46:12
**looked** 36:19,19
**looking** 6:25 8:3,6
  15:16
**looks** 14:17 37:25
**loot** 54:16
**loppenheimer** 3:7
**lot** 10:8 22:7 24:9
  24:9 44:4
**low** 11:12
**lp** 1:11 56:10
  59:11
**lsc** 1:3 59:3

**m**

**machine** 2:7
**madden** 3:3 4:4,6
  5:2,5 7:5,8,11,15
  7:22,25 8:5 11:7
  11:14,17,19,23
  12:1 14:16 18:4,7
  27:15 28:7 32:17
  32:20 38:4,6 45:5
  46:13 50:12 53:15
  55:5,13,23 56:4
  59:20
**main** 46:21
**making** 40:22
  49:22 61:10

**management**
  43:14 47:11,15
**managers** 47:13
**manufacturer**
  10:1
**manufacturing**
  5:20
**marino** 13:4
**marino's** 13:7
**mark** 7:1
**marked** 7:3,13,18
  7:23 11:8,9 12:2
  14:11,13 18:5,6,15
  22:16 29:6
**markets** 42:12
**martin** 3:16 37:25
**mary** 4:16 14:19
  14:21,23 15:18
**master** 4:15 11:4
  12:15 14:2 28:15
  28:20 30:19 31:10
  31:11 33:19
**matter** 9:19 23:2,4
  23:20 24:2,10,12
**matters** 9:7,10,16
  55:10
**mccutcheon** 3:10
  4:5,7 6:11 27:19
  27:25 32:12,15,19
  33:3 38:1,8,14,17
  38:21 46:11,20
  50:8 53:17 55:3
  55:15,22,25 56:2,5
  56:9,12,14,17,20
**mckenzie** 3:11
**mean** 35:7 37:18
  45:18 49:15 53:3
  54:14
**means** 23:22
**meet** 29:21

Page 6

[meetings - paid]

| | | | |
|---|---|---|---|
| **meetings**  26:10 | **n** | **office**  58:19 | 56:21,23 |

**meetings**  26:10
**mentioned**  20:12
  44:6
**merchandise**
  47:13
**met**  5:6
**michael**  1:19 2:1
  3:10,10 4:3 5:4
  6:11,12 27:25
  30:6 32:21 38:7
  42:21 43:2 44:21
  50:18 55:14,25
  56:7 57:2 58:1,5
  58:12 59:17 62:4
**michael.lehrman**
  3:14
**michael.mccutc...**
  3:13 62:1
**million**  24:16,25
  27:6 39:18,25
  52:23
**mind**  43:9
**minute**  7:6
**minutes**  26:12
  46:12
**missed**  42:22
**mo**  53:12 54:4
**mod**  1:11,12 48:16
  56:14 59:11,12
**moment**  7:5 32:13
**moments**  5:6
**money**  19:12
  39:11
**months**  52:21
**morrow**  4:16
  14:19,21,23
**mos**  53:6
**msa**  14:2 15:6,11
  15:20,23 16:2,7
  30:22

**n**

**n**  3:1
**n.a.**  1:6 59:6 62:3
**name**  5:3,5 23:23
  27:25 37:21 57:2
  58:15
**named**  14:18
**nature**  23:7 24:4
**necessarily**  54:8
**neil**  3:16
**neither**  60:10
**never**  16:15,15
  17:23 27:8 46:2
  50:22,25 51:5,13
**new**  43:13
**non**  12:15
**nope**  29:20,20
  48:18 55:13
**normally**  51:7
**nosedive**  42:13
**notarize**  62:11
**notary**  58:24 60:3
**note**  62:9
**noted**  58:3
**notes**  46:12
**notice**  56:19
**notified**  61:3,6
**november**  15:17
  15:17,24 30:21,25
  31:11
**number**  16:7
**numbered**  2:4
**numeral**  56:12

**o**

**oath**  58:13
**occurred**  44:23
  49:25
**october**  36:21
**offer**  49:10 54:18
  54:24

**office**  58:19
**officer**  46:6 61:6
**oh**  8:3 14:4 17:13
  18:18,22,24 31:6
**okay**  5:5,13,18,22
  5:24 6:1,4,10,25
  7:4,8,10,11,15,19
  7:24,25 8:3,5,8,20
  8:24 9:3,7,18 10:6
  10:11,23,25 11:6
  11:14,16,24 12:1,9
  12:10,16 13:5,7,12
  13:17,20,23 14:1,8
  14:14,15 15:4,9,23
  16:1,3,4,5,14,16
  16:20,23 17:4,7,10
  18:3,7,11,17,17,21
  18:24 19:2,10
  20:6,11,24 21:22
  22:9,15,18,19,20
  22:25 23:3,11,15
  23:19 24:2,8,13,18
  25:3,11,16,21 26:5
  27:22,24 28:8,17
  29:5,13,17,25 30:2
  30:10 32:8,12,19
  33:18,24,24 34:4,9
  35:9,23 36:1,7,18
  37:15 38:5,6,10,17
  38:24 39:2,7,14,19
  40:1,5,10,15,19
  41:4,12,17,21 42:1
  42:10,14,18,21
  43:12 44:2,9 45:2
  45:16 46:13,13
  47:9,9,21 48:1,8
  48:19,23 49:2,18
  49:25 50:15 51:18
  51:24 52:5,10
  53:15 54:2,17
  55:5,24 56:6,13,16

56:21,23
**old**  9:25
**once**  6:6 46:9
**ones**  28:9
**open**  7:20,21
  12:10,11 18:18
**operating**  31:14
  43:24
**opinion**  44:1 54:10
**oppenheimer**  3:4
  7:17 29:23,25
  30:8,14
**options**  8:2
**oral**  1:18 2:1
**order**  16:21 34:7
  34:20
**orders**  16:13
**organization**  49:7
**outcome**  60:14
**outstanding**  17:20
**outward**  51:15
**overall**  41:3
**owe**  17:18 39:11
  54:5
**owed**  17:20 19:13
  52:12
**owner**  5:23 44:25
**ownership**  26:17
  26:20,23

**p**

**p**  3:1,1
**page**  4:13 8:25
  13:13 19:4,20
  20:13 21:7,17
  22:22 57:5 60:6
**pages**  16:7 21:18
  62:12
**paid**  25:8,13,18
  27:1,3,6 35:23
  36:9 37:6 39:21
  40:3 45:10 47:24

Veritext Legal Solutions
800-336-4000

A253

**[paid - regarding]**

49:20 50:5 51:9
**parameter** 35:24
  36:2,4
**part** 18:13
**particular** 54:3
**parties** 55:20 56:7
  59:22 60:11
**partner** 24:16
**partners** 1:10,13
  23:24 25:9 28:1
  48:14 56:10 59:10
  59:13
**partnerships** 62:3
**party** 60:1,9
**pass** 27:15 50:8
  53:15
**pause** 6:13
**pauses** 6:18 31:5
**pay** 17:4 34:15
  36:1,4 37:9 52:17
  53:8
**paying** 35:8,12
  37:13 40:7
**payment** 22:10,13
  35:20 36:15
**people** 10:10 44:5
  44:14 47:14 48:5
  53:6
**percent** 31:16
  41:14 44:24
**period** 43:17
**perpetrated** 49:3
**person** 58:15
**personally** 58:12
**petition** 23:8,11
**phone** 3:6,13
  11:12 60:25 61:23
**place** 31:11
**plaintiff** 1:8 2:2
  3:2 30:1 59:8

**plan** 1:6 5:9 59:6
**please** 5:3 11:8
  18:22 28:6 38:19
  56:5
**po** 39:2,5
**point** 10:20 27:7
  34:5 46:21
**portfolio** 48:21
**portion** 38:20
**position** 5:22,24
**possibly** 27:5
**preliminary** 28:11
**preparation** 29:15
  29:19
**prepare** 28:14
**prepared** 9:15
  29:15
**preparing** 29:2
**present** 3:15
**presentations**
  26:14
**president** 5:23
**press** 45:3
**pretty** 37:13 44:12
**prior** 23:7,15
  24:14 25:7,12,17
  29:9,22 31:11,20
  34:1 37:10
**private** 54:11
**probably** 31:13
**procedure** 2:9
  31:14
**proceeding** 1:7
  59:7 60:12
**proceedings** 56:24
**process** 6:8
**produced** 2:2
**producing** 10:4
**product** 47:12
**proof** 4:17 19:5
  20:3 21:17 36:12

36:20
**proud** 37:22
**proved** 58:13
**provided** 47:18
  53:20,24
**providence** 44:5
**provisions** 2:10
  16:8
**public** 58:24 60:3
**pulled** 18:8
**purchase** 16:20
  34:6 41:14 56:1
**purchased** 44:24
**purposes** 58:17
**pursuant** 2:9
  59:24
**put** 11:7 14:11
  18:4 55:11,19

**q**

**quantities** 37:20
**question** 6:12
  12:22 20:15 21:7
  27:11 31:3 33:11
  38:19,22 40:20
  45:5 48:16 55:16
**questions** 6:11
  28:4,11 48:8 50:9
  50:17
**quickly** 28:15 29:4
  41:6
**quite** 38:8

**r**

**r** 3:1
**randolph** 3:11
**reach** 46:5
**reaction** 53:1
**read** 15:19 16:15
  18:19 20:15 21:7
  23:5,21 38:18,20
  45:2 54:9 58:1

62:6,8
**reads** 23:5
**real** 11:12 12:7
**really** 42:16
**reason** 51:5,9,12
  57:5
**reasonable** 33:11
**reasonably** 23:6
  26:1 27:9,12
**reasons** 51:3 60:6
  61:9
**recall** 39:23 44:17
  45:4,7
**receipt** 60:4
**receive** 36:15 52:2
**received** 22:13
  50:22 51:22
**recession** 42:19,24
  43:10
**reciting** 61:9
**recognize** 8:8
  12:17,23 13:10
  19:7,23
**recollection** 14:9
  15:5,23 32:3
  42:18,23 43:8
**record** 2:10 5:3
  6:22 28:2 32:13
  32:21 33:2,4,7
  38:3 46:1,11,15,19
  55:12,19
**records** 26:7
**recover** 52:19
**refer** 10:23 25:5
  32:2
**referenced** 62:5
**referring** 28:21
**refresh** 14:9 15:5
  32:3
**regarding** 18:1
  29:23

[registration - sourcing]

**registration** 60:23
61:21
**reid** 3:4 29:21
30:15
**reidcollins.com**
3:7,7
**related** 28:5 49:10
50:17 60:11
**relationship** 16:17
17:7 36:16 50:5
**releases** 43:3
**relevant** 23:5
**relying** 34:13,13
**remember** 14:6
15:7 17:16 47:8
**remotely** 6:17
**renae** 32:11
**repeat** 47:2,2
**reported** 2:7
**reporter** 6:21 31:7
38:18
**reporter's** 4:9
59:17
**reporting** 50:18
50:23 51:1,6,13,20
51:22 52:2
**represent** 5:9
36:13 56:8
**representative**
8:22 9:12
**represented** 28:19
**requested** 38:20
50:25 51:5,13
60:1,8
**require** 55:18
**respective** 2:8
**retail** 10:18 42:3
**retained** 52:17
**return** 62:12
**returned** 60:3,5
61:11

**review** 6:9 29:5,5
29:18 61:7
**reviewed** 29:1
**rhode** 10:12
**right** 5:20 6:7 8:4
8:5,13,22 9:10
10:14,15,21 11:2
12:12 15:13 19:6
21:5 22:10 23:13
27:14 30:17 31:18
32:23 34:2 35:24
36:24 38:9,14
43:7,16 46:3,7
49:14 50:9,23
51:7,16,22 52:2,12
52:24
**roman** 56:12
**rosenbaum** 19:18
19:25
**rosenbaum's**
19:23
**roughly** 35:15
**rule** 59:25
**rules** 2:9 6:9 55:18
62:14
**run** 11:13 43:21
**running** 12:7
18:17

**s**

**s** 3:1
**sales** 33:8 39:15
40:12,21 44:15
**salesperson** 32:7
39:1 47:7
**salesperson's**
46:24
**saying** 19:12 53:4
54:15
**says** 8:2,25 9:4
13:16 14:4,4
15:17,19 18:18,19

21:8 22:22 23:21
**scanned** 28:15
29:3,4
**screen** 8:1 12:11
14:16 18:9,25
**scroll** 8:24 12:10
13:12 19:20 20:12
21:17 22:21
**seal** 58:19
**second** 7:20 11:11
11:13 12:5,7
13:13 16:3 22:18
23:2,4 32:10
42:16,22 44:22
**see** 7:12,14 9:4,8
11:20,23 15:21
20:15,17,22 21:9
21:20 23:9,11,13
23:21,25
**seen** 8:18 36:8
**sell** 34:25 41:25
**selling** 40:17
**sells** 10:16
**sense** 36:22 41:8
42:2
**sent** 15:18
**served** 59:21
**services** 28:20
31:10
**set** 50:17 52:16
**seven** 14:5
**shape** 51:16
**share** 30:11
**sheet** 62:10
**shift** 23:1
**ship** 10:4 16:23
**shipped** 17:2
**shorthand** 2:7
**show** 7:16 28:9
**showed** 38:25

**shown** 28:7 59:22
**sic** 28:21 35:17
**sign** 14:2 61:9 62:6
62:11
**signature** 4:8 13:8
13:10,21 19:23
57:1 58:2 59:25
60:3,6,21 61:11,19
**signed** 11:5 13:3
13:15 15:6,11,24
26:16 62:17
**significant** 52:6
**silly** 48:10
**sir** 22:19 27:21
**situations** 16:13
**six** 14:5 52:21
**sixty** 35:22
**slide** 12:6
**slow** 7:20 12:7
18:17
**small** 48:3
**snowballed** 40:17
**sold** 21:8,14 40:17
**solely** 34:13
**solutions** 60:22
61:20 62:19
**somewhat** 48:7
**sorry** 7:8 15:15
22:8 30:5 31:10
31:17 32:11 33:22
35:19 36:12 38:18
42:21 43:2,19
44:21 45:25 55:16
**sort** 31:14 34:25
40:17 48:8 53:5
**sound** 48:10
**source** 34:23 35:1
**sourcing** 4:15 11:4
12:15 14:3 15:3
28:15 30:19 31:11
33:20

Veritext Legal Solutions
800-336-4000

**[span - true]**

span 36:20
speak 47:5
speaking 40:12
specialty 10:3,8
   42:3 44:15
spinning 14:14
   18:11
spoke 28:1 29:23
stamped 8:2
standard 31:14
   35:18
start 6:25 9:20
   46:9
started 10:2 34:3
   43:18 50:4
starting 44:21
starts 53:10
state 2:6 5:3 58:9
   58:24 61:1
stated 2:10 39:20
statement 61:9
states 1:1 59:1
stenographer 33:1
   38:2,5,10 46:14,18
   55:8,17,24 56:6,11
   56:13,16,18,21
stephen 19:18
steven 1:19 2:1 4:3
   5:4 57:2 58:1,5,12
   59:17 62:4
stipulate 55:21
stipulations 55:11
   55:19
stop 56:18
store 10:3 36:15
   53:7
stores 5:15 10:8,21
   10:23,24 11:3
   12:20 13:1,15,17
   13:24 15:6,12
   16:10,18,20,24

17:2,4,11,17,25
   19:12,15 21:14
   22:3,10 23:23
   24:15,18,21,24
   25:5,8,13,18 26:7
   26:9,17,20,22 27:1
   27:3,6 50:23 51:1
   51:10,14,15,21
   52:3,6,11,14,23
strapped 49:23
street 3:5,11 60:23
   61:21
strike 46:10
strong 42:4
stuff 29:24
styled 2:3
subpoena 4:14 7:1
   8:4,14,15
subscribed 58:16
   61:13
substance 30:3,7
   30:13 61:8
successfully 43:24
successor 5:14
suite 3:5,12 60:24
   61:22
sum 36:25
summarize 16:9
   24:2 51:4
summer 37:10
sun 1:10,11,12,13
   23:24 24:16,19
   25:9,14 28:1
   41:14 44:23 45:11
   48:13,16,20,24
   49:6,20 54:4,8,19
   54:21 56:10,14
   59:10,11,12,13
   62:3
sure 6:21 28:12,18
   31:15,22 32:1

46:25 48:9 50:20
   51:4
sworn 2:3 61:13
system 31:5

**t**

take 11:6 15:10
   18:19 31:5 52:19
   53:7
taken 2:3 32:24
   38:11 46:16 60:13
takes 7:6
talk 23:1 25:25
   28:20 30:13 46:22
   47:12
talked 25:22 44:5
talking 23:19
   24:11
telephone 26:19
tell 9:23 56:7
term 42:17
terms 16:8 35:20
   37:14 47:13 54:4
testified 34:6
testify 8:21 9:11
   9:15 49:9
testifying 8:11
testimony 6:22
   40:7 46:4 49:10
   54:18 55:1 62:8
texas 2:6 3:6 60:21
   60:24 61:1,19,22
thank 27:15,17
   55:5,7 56:23
thing 10:5 39:1
things 16:13 47:13
   49:23 54:15
think 10:16 30:24
   32:21 34:5 39:17
   40:7 42:2,6 44:12
   45:18 48:4 50:9
   51:3,21 54:14

third 51:12
thirty 5:25
thought 41:24
   42:6 44:1
three 10:1 51:3
throckmorton
   60:23 61:21
time 13:6 19:13
   27:7 29:23 30:9
   33:19 34:23 35:8
   35:12 36:4 37:6
   41:19 44:16,20
   45:13 47:8,17
   50:5 55:6 62:15
timeframe 62:7
timely 40:3,8 51:9
times 6:5 35:14,15
   53:8
title 12:13
today 5:19 8:18
   9:11 18:17 55:6
top 9:1,5 12:13
   22:23 52:9
total 36:25
trade 10:3 45:3
transaction 44:23
   45:14
transactions 54:19
   54:22
transcript 56:1
   59:19 60:4 61:6
   62:5,16
transfer 23:7,19
   23:22,22 24:5
   25:5
transferred 24:16
   24:19,22,25
transfers 25:23
trial 49:9
true 20:4,8 21:3
   21:11,22 58:3

Veritext Legal Solutions
800-336-4000   A256

[trust - zoom]

**trust** 1:7 5:10,14
 29:16 59:7
**trustee** 1:6 5:9
 59:6
**try** 18:14,15,16
**tsai** 3:4
**turn** 13:12
**turning** 12:8
**two** 9:7,9,10,15
 23:20 24:2 56:14
**tx** 62:13
**types** 10:17

**u**

**uh** 8:7 9:22 13:14
 14:10 19:21 20:14
 33:9 56:11
**umb** 1:6 5:9 59:6
 62:3
**understand** 5:11
 5:16 6:8,14,19,23
 9:13 17:15 23:17
 24:6 26:3 38:21
 49:18 55:15
**united** 1:1 59:1
**unpaid** 21:25 22:2
**unsecured** 34:11
**ups** 50:13
**use** 37:20
**user** 37:19

**v**

**v** 1:9,10,12 23:24
 24:16 25:9 48:14
 56:10,12 59:9,10
 59:12 62:3,3
**vague** 15:15
**verify** 62:8
**veritext** 3:16
 18:13 60:22 61:20
 62:12,19

**veritext.com.**
 62:13
**video** 5:6 6:16
 31:4
**videoconference**
 2:5 3:3,4,10,10
**volume** 1:21

**w**

**wait** 18:12,22
**waiting** 18:10
**want** 6:21,25 23:1
 24:10 25:25 38:2
 50:20 55:11,19,21
 55:25
**wanted** 11:13
 41:25
**way** 31:16,25 46:6
 49:23 51:10 53:18
**we've** 10:9 14:11
 30:24 36:8 50:1,3
**weak** 42:4
**went** 28:2 33:4,7
**whatsoever** 34:1
 39:8 41:13 43:13
 43:21
**wheel** 12:8
**wherewithal**
 34:19 37:9
**wi** 18:17
**wind** 1:3 59:3
**witness** 2:2 7:19
 7:24 11:10,15,18
 11:21,24 27:15,17
 32:14,16,23 38:13
 38:16 50:9 53:15
 55:7 57:2 59:22
 61:3,4,7,8,10,11
 62:5,7,9,11,15
**wondering** 16:8
**word** 51:14

**words** 24:9 56:15
**work** 16:11,12
**worked** 16:9,17
 17:8
**works** 15:1
**worried** 11:12
**worth** 60:24 61:22
**write** 31:8
**written** 11:3 12:19
 12:25 13:23 26:16
 52:1

**y**

**yeah** 7:14 10:1
 11:19,21 12:12
 16:4 18:15 22:8
 29:3 30:24 31:7
 32:14,17,20 33:21
 35:6,19 38:1
 40:11 43:5 54:14
**year** 9:25 23:8,15
 40:13,13 52:21
**years** 5:25 14:5
**yep** 12:3,9 21:19

**z**

**zoom** 2:7

Veritext Legal Solutions
800-336-4000

A257

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

A259