# **EXHIBIT H**

```
 1
                IN THE UNITED STATES BANKRUPTCY COURT
 2                  FOR THE DISTRICT OF DELAWARE
 3    In re:                     )
                                 ) Chapter 11
 4    LSC WIND DOWN, LLC, et al   )
                                 ) Case No. 17-10124 (KBO)
 5       Debtors                 )
      _____   ) (Jointly Administered)
 6                               )
      UMB BANK, N.A., as Plan     )
 7    Trustee of The Limited      )
      Creditors Liquidating       ) Adversary Proceeding
 8    Trust                       ) No. 19-50272 (KBO)
                                 )
 9       Plaintiff,              )
                                 )
10    v.                         )
                                 )
11    SUN CAPITAL PARTNERS V,     )
      LP,                        )
12    SUN MOD FASHIONS IV, LLC,   )
      SUN MOD FASHIONS V, LLC,    )
13    AND                        )
      H.I.G. SUN PARTNERS, LLC    )
14                               )
         Defendants.             )
15
16
17
18    ********************************************************
19                     ORAL DEPOSITION OF
20                       ERIC SOLOFF
21                    January 28, 2021
22                        Volume 1
23    ********************************************************
24
25

                                               Page 1
```

1

2

3          ORAL DEPOSITION OF ERIC JOHN SOLOFF, produced as a

4     witness at the instance of the Plaintiff, and duly

5     sworn, was taken in the above-styled and numbered cause

6     on the 28th day of January, 2021, from 1:18 p.m. to

7     2:20 p.m., via videoconference, before Abigail Guerra,

8     CSR, in and for the State of Texas, reported by machine

9     shorthand, via Zoom where all attendees appeared at

10    their respective locations, pursuant to the Federal

11    Rules of Civil Procedure and the provisions stated on

12    the record or attached hereto.

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                Page  2

A329

```
 1              A P P E A R A N C E S
 2
    FOR THE PLAINTIFF:
 3
 4  Mr. Leo Oppenheimer (Via Videoconference)
    REID COLLINS & TSAI LLP
 5  1601 Elm Street
    Suite 4200
 6  Dallas, Texas 75201
    Phone:  (214) 420-8900
 7  Email:  Loppenheimer@reidcollins.com
 8
    FOR THE DEFENDANT:
 9
    Mr. Michael Lehrman (Via Videoconference)
10  BAKER MCKENZIE LLP
    300 East Randolph Street
11  Suite 5000
    Chicago, Illinois 60601
12  Phone:  (312) 861-8000
    Email:  Michael.lehrman@bakermckenzie.com
13
14  ALSO PRESENT:
         Mr. Neil Martin, Veritext Host
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                           INDEX

2

3    Appearances.......................................    3

4    ERIC JOHN SOLOFF

5         Examination by Mr. Oppenheimer...............    5

6         Examination by Mr. Lehrman...................   18

7    Signature and Changes...........................   51

8    Reporter's Certificate..........................   53

9

10

11                         EXHIBITS

12    NO.              DESCRIPTION                    PAGE

13    Exhibit 1       Subpoena                          6

14    Exhibit 2       Master Sourcing Agreement         8

15    Exhibit 3       Email from Helen Ormond          10

16    Exhibit 4       Proof of Claim                   13

17    Exhibit 5       Complaint                        33

18

19

20

21

22

23

24

25

                                            Page  4

A331

1                        ERIC JOHN SOLOFF,

2    having been first duly sworn, testified as follows:

3                        DIRECT EXAMINATION

4    BY MR. OPPENHEIMER:

5         Q.  Good afternoon, Mr. -- can you please state

6    your name for the record?

7         A.  Eric John Soloff.

8         Q.  Mr. Soloff, my name is Leo Oppenheimer.  I

9    represent the UMB Bank, which is the plan trustee of The

10   Limited Stores Creditors' Liquidation Trust.  The

11   Liquidating Trust is a successor to Limited Stores, LLC.

12              Do you understand all that?

13        A.  Yes.

14        Q.  Okay.  And you're here on behalf of Kenilworth

15   Creations, Incorporated; is that correct?

16        A.  Yes.

17        Q.  What is your position with Kenilworth?

18        A.  Right now, I'm CEO.

19        Q.  How long have you held that position?

20        A.  A year.

21        Q.  Great.

22              Let's turn to Exhibit 1.  It should be in

23   your marked exhibits folder.

24        A.  Yep.

25        Q.  Do you recognize this document?

                                                    Page 5

1           (Exhibit 1 marked.)

2      A.   Yes.

3      Q.   (BY MR. OPPENHEIMER)   Can you read the title

4  there?

5      A.   "United States Bankruptcy Court."

6      Q.   A little further down.

7      A.   Oh, okay.

8      Q.   What is this?

9      A.   (As read):  "Subpoena to testify at a

10  deposition in a bankruptcy case for advisory

11  proceeding."

12     Q.   Thank you.

13          Have you been deposed before, Mr. Soloff?

14     A.   No, I have not.

15     Q.   Okay.

16          Quick ground rules.  We are being recorded

17  right now by the court reporter.  So it's important that

18  we let each other speak.  We cannot speak over each

19  other, so that she can get everything down.  So either I

20  or Mr. Lehrman over here will ask you a question.  Let

21  us finish, and then provide your answer.  It's just hard

22  for her to track what's going on if we're talking over

23  each other.

24          Okay.  And you're here today to testify on

25  behalf of -- as Kenilworth's designated representative;

                                        Page 6

1    is that correct?

2         A.  Yes.

3         Q.  Okay.  So please scroll to Page 2 of the

4    subpoena -- I'm sorry.  It's actually Exhibit A, the

5    attachment; so Page 4.  It should say "Matters."

6         A.  Okay.  Yep.

7         Q.  Okay.

8              You see there under -- it says "Matters,"

9    there are two numbers listed.

10             Can you read that first one for me?

11        A.  (As read):  "The nature, basis, and validity of

12   any claims filed by or scheduled on behalf of Kenilworth

13   in the bankruptcy case including Claim No. 16."

14        Q.  Right.

15             These are the two things we're going to

16   talk about today, and what you've just read is the first

17   one.

18             But before we get into that, I'd like to

19   hear a little more about Kenilworth.  Can you tell me

20   about the company?

21        A.  Sure.  We're a fashion jewelry company located

22   in Warwick, Rhode Island.  I'm the second-generation

23   owner.  I've basically run the company since 1998.  We

24   supply -- we design and supply and manufacture jewelry

25   for a bunch of retailers, national retailers.

Page 7

A334

1      Q.   And you said second generation.

2               How long has Kenilworth been around?

3      A.   My mom actually started it in 1974.

4      Q.   So one of --

5      A.   So since 1974.

6      Q.   Okay.   Thank you.

7               One of Kenilworth's customers was Limited

8    Stores, LLC; is that correct?

9      A.   That is correct.

10     Q.   Okay.

11              I'm going to refer to Limited Stores, LLC

12   as just Limited Stores; is that okay?

13     A.   Yes.

14     Q.   Okay.   Did Kenilworth have a contract or

15   written agreement with Limited Stores?

16     A.   No contract.

17     Q.   No contract.

18              Okay.   I'm going to bring up an Exhibit 2

19   here.   Hopefully, it will refresh your recollection.

20   Bear with me.   It takes a second to upload these.   Okay.

21              (Exhibit 2 marked.)

22     A.   Are you referring to a Master Sourcing

23   Agreement?

24     Q.   (BY MR. OPPENHEIMER)   I am.

25     A.   Okay.   I wouldn't call that a contract, but,

                                                  Page 8

1    yes, we -- we have a Master Sourcing Agreement.

2         Q.  So you should see in your Exhibit Share folder

3    an Exhibit 2.  Might have to refresh the browser.

4              Do you recognize this document?

5         A.  I only -- I only have Exhibit 1.  I don't --

6    let me -- let me refresh.

7         Q.  It might take a moment.

8         A.  Okay.

9         Q.  Okay.  It's popped up on my side.

10        A.  Yes.

11        Q.  Okay.  You see Exhibit 2 here?

12        A.  Yes.

13        Q.  Okay.

14              And you've seen this document before?

15        A.  Yes.

16        Q.  And what is it?

17        A.  It's a Master Sourcing Agreement.

18        Q.  Okay.

19              And this is the agreement that governs your

20   relationship with The Limited Stores, right?

21        A.  Yes.

22        Q.  Okay.

23              Now, there's a -- do you recall when

24   this -- when you signed this agreement?

25        A.  I'm not exactly sure.

                                              Page 9

1      Q.  Let's go -- let's go to the first page here.

2      A.  What's that?

3      Q.  First page -- on the first page, that's your

4  signature there, correct?

5      A.  Yes, yes, yes.

6      Q.  Okay.  And do you recall when you signed this

7  agreement?

8      A.  Not off the top of my head.  Probably 2011,

9  maybe.

10          (Exhibit 3 marked.)

11      Q.  (BY MR. OPPENHEIMER)  Okay.  I'm going to

12  introduce another exhibit that just might help you

13  remember.

14      A.  Okay.  Yeah, because I do not remember.

15      Q.  Sure.

16          Okay.  That should populate for you guys

17  here momentarily.

18      A.  Okay.

19      Q.  Okay.  Do you see Exhibit 3?

20      A.  I do.

21      Q.  Okay.

22          Let's go to the bottom of the first page.

23  You see that it's an email from Helen Ormond, which is a

24  part of your organization.

25          Who's Helen?

Page 10

1       A.   Helen is the office manager.

2       Q.   Okay.

3            So can you read the date there from that

4    email?

5       A.   Oh my god.

6            Sorry.   My computer is very slow today.   I

7    just...

8       Q.   It's okay.

9       A.   The date is Friday, April 17th, 2009.

10      Q.   Okay.

11           And this email has attached to it the

12   signed MSA?

13      A.   Yes.

14      Q.   Does that refresh your recollection of about

15   when you probably executed this?

16      A.   Sure.   That makes sense, yes.

17      Q.   Around, you would say, April 17th, 2009?

18      A.   Yes.

19      Q.   Okay.   Great.

20           Now, the MSA contains a number of pages and

21   provisions, but in layman's terms, could you just

22   summarize how the agreement worked and how your

23   relationship with Limited Stores worked?

24      A.   I mean, really, I looked at the MSA as just

25   making sure that we follow rules in regards to sourcing

                                             Page 11

1    and factories overseas.  That's pretty much what I focus

2    on -- on there.  So that is -- when I'm looking at an

3    MSA, that is what I'm looking at.

4         Q.  Okay.

5              But let's talk a little more about just

6    your trade relationship.

7         A.  Okay.

8         Q.  Would Limited issue a purchase order to

9    Kenilworth?

10        A.  Yes.

11        Q.  And Kenilworth would then manufacture, design

12   the products, and deliver the products, and then issue

13   an invoice?

14        A.  Yes.

15        Q.  Okay.  So Kenilworth would issue an invoice to

16   Limited?

17        A.  Yes.

18        Q.  Okay.

19             And usually Limited would pay that invoice?

20        A.  Yes.

21        Q.  Right.  Okay.

22             Now, you're aware that Limited Stores filed

23   bankruptcy in January 2017, correct?

24        A.  Yes.

25        Q.  Okay.  Specifically filed bankruptcy on

1   January 17th, 2017, correct?

2       A.  Okay.  Yes.

3       Q.  Okay.

4           And when Limited Stores filed bankruptcy,

5   did it owe any amounts to Kenilworth for outstanding

6   invoices?

7       A.  Yes, it did.

8       Q.  Did Kenilworth file a claim for those

9   outstanding amounts in Limited Stores bankruptcy case?

10      A.  Yes, we did.

11          (Exhibit 4 marked.)

12      Q.  (BY MR. OPPENHEIMER)  Okay.

13          I'm going to pull up Exhibit 4.  This one

14  might take a second to load.  Let me know when it's

15  popped up for you, Mr. Soloff.

16      A.  Okay.  I have it right now.

17      Q.  Okay.  Do you recognize this document?

18      A.  I do.

19      Q.  Is this the claim that Kenilworth filed in The

20  Limited Stores bankruptcy case?

21      A.  Yes, it is.

22      Q.  Okay.  Now, I see here that the claim was

23  signed by Helen Ormond, and -- is that the Helen that

24  you spoke about earlier?

25      A.  Yes, same Helen, yes.

Page 13

1        Q.   Okay.  So she's a member of Kenilworth

2   Creations?

3        A.   She is.

4        Q.   Okay.  Did you direct Helen to file this

5   bankruptcy -- this proof of claim?

6        A.   Yes, I did.

7        Q.   Okay.  Great.

8             Now, the -- this proof of claim, if you

9   scroll down, touches many, many invoices; is that

10  correct?

11       A.   That is correct.

12       Q.   And these are invoices that have gone unpaid by

13  The Limited Stores?

14       A.   Yes.

15       Q.   And the information contained in this claim is

16  true and correct to the best of your knowledge?

17       A.   Yes, it is.

18       Q.   Okay.  So as indicated on Page 2 of the proof

19  of claim, Kenilworth is owed $1,351,000 -- $1,351,176;

20  is that correct?

21       A.   Yes.

22       Q.   Now, this claim is for goods sold; is that

23  correct?

24       A.   Yes, it is.

25       Q.   So all of these invoices at the bottom of this

                                              Page 14

1    claim are the goods sold that have not been paid for?

2        A.  Yes.

3        Q.  Okay.  Great.

4            So these unpaid invoices are the basis of

5    Kenilworth's claim for $1,351,176?

6        A.  Yes, correct.

7        Q.  Thank you.

8            Has Kenilworth received any payment on any

9    of these invoices?

10       A.  No, we have not.

11       Q.  Okay.  Great.

12           Okay.  Let's shift back to the Exhibit 1,

13   the subpoena, if you would.

14       A.  Okay.

15       Q.  And if you could scroll down to Page 4 again.

16       A.  Okay.

17       Q.  And could you read No. 2 for me?

18       A.  (As read):  "The facts relevant to whether

19   Kenilworth had discovered or could reasonably have

20   discovered the existence of fraudulent nature of the

21   transfer prior to one year before the petition date."

22       Q.  Thank you.

23           Now, we're going to shift in to talking

24   about that question; is that okay?

25       A.  Yes.

Page 15

A342

1      Q.   Okay.   Great.

2              So the transfer is defined in the subpoena

3   as the transfer of $42,158,299.47 by Limited Stores, LLC

4   to an account held in the name of Sun Capital Partners V

5   on or about December 20th, 2011.

6              Now, had you ever heard about that transfer

7   before January 17th, 2016?

8      A.   No.

9      Q.   Had you heard of Sun Capital Partners V before

10  January 17th, 2016?

11     A.   I'm sorry.   Could -- could you repeat that?   I

12  apologize.

13     Q.   Sure.

14              Had you -- had you heard of the entity Sun

15  Capital Partners V before January 17th, 2016?

16     A.   Yes.

17     Q.   You had?

18     A.   Of Sun Capital?

19     Q.   This specific entity, Sun Capital Partners V?

20     A.   Oh, no.

21     Q.   No?

22     A.   No.

23     Q.   So you had not heard of Sun Capital Partners V

24  before January 17th, 2016?

25     A.   No.

                                          Page 16

1       Q.   Okay.

2                Had Kenilworth discovered this transfer

3    before January 17th, 2016?

4       A.   No.

5       Q.   Had Kenilworth discovered that The Limited

6    Stores transferred this amount to anyone before

7    January 17th, 2016?

8       A.   No.

9       Q.   Had Kenilworth discovered that The Limited

10   Stores had paid a dividend or a distribution to anyone

11   before -- had you discovered that before January 17th,

12   2016?

13      A.   No.

14      Q.   Okay.

15               So we just talked about whether Kenilworth

16   had actually discovered the transfer.  Now, let's talk

17   about whether Kenilworth reasonably could have

18   discovered the transfer.

19               Did Kenilworth have any access to Limited

20   Stores' bank records?

21      A.   No.

22      Q.   Did Kenilworth have any access to Limited

23   Stores' board minutes?

24      A.   No.

25      Q.   Did Kenilworth have access to Limited Stores'

Page 17

1    board presentations?

2        A.  No.

3        Q.  What about access to Limited Stores' written

4    agreements with its ownership group?

5        A.  No.

6        Q.  How about Limited Stores' communications with

7    its ownership group?

8        A.  No.

9        Q.  So Kenilworth didn't have access to any of

10   those things before January 17th, 2016?

11              MR. LEHRMAN:  Objection.  Form.

12       A.  No.

13       Q.  (BY MR. OPPENHEIMER)  So how could Kenilworth

14   have possibly known that Limited Stores paid a $42

15   million distribution in December of 2011?

16       A.  I am not sure.

17       Q.  That's okay.

18       A.  I don't know how we could have known.

19              MR. OPPENHEIMER:  Pass the witness.

20              Thank you, Mr. Soloff.

21                  FURTHER EXAMINATION

22   BY MR. LEHRMAN:

23       Q.  Hi, Mr. Soloff.  My name Mike Lehrman, and I

24   represent the defendants in the -- in the case that is

25   captioned on the subpoena that you see here on

Veritext Legal Solutions
800-336-4000

1   Exhibit 1.  Thank you for taking time to talk to us

2   today.  We are hopeful that you should be done hopefully

3   not -- not for another hour, under -- under an hour, I

4   would say.  Hopefully now.

5       A.  Okay.

6       Q.  All right.  I want to back up and ask you some

7   general questions about Kenilworth's business a little

8   bit.

9           So you mentioned that it's been around

10  since 1974.  I want to focus on sort of like the last 10

11  to 15 years though.  Can you -- starting in, let's say,

12  2008, can you give me an overview of what Kenilworth's

13  annual sales are?  And a rough number is fine.

14      A.  2008, maybe 25 million or so.

15      Q.  Okay.

16          And what about 2009?  2010?

17      A.  I would -- I would say between 2008 and 2010,

18  maybe 25 to 30 million, somewhere in that range.

19      Q.  Okay.

20          And -- and how about -- you don't have to

21  do every year, but can you give a general sense for how

22  that number has evolved in the -- in the subsequent

23  years until 2017?

24      A.  Sure.

25          It -- it got up to about 35 million or so

Page 19

1   in 2017 or so, and then since then it's -- it's

2   declined.

3       Q.   Okay.  Since 2017 it's declined, you said?

4       A.   Yes, yes.

5       Q.   Okay.  What do you attribute that decline to?

6       A.   Well, last year, obviously, was COVID.  The

7   three years before that, just a change in the, you know,

8   retail space with our customers.  Just business is just

9   as not as good for mall-based retailers.

10      Q.   Is your main -- your main customer base is

11  mall-based retailers; is that right?

12      A.   Yes.

13      Q.   Can you give me an overview of, sort of, your

14  top ten customers right now?  I've been on your website,

15  but --

16      A.   Sure.

17      Q.   -- what are your top ten customers right now?

18      A.   Chico's, White House Black Market, Express, Ann

19  Taylor, Ann Taylor LOFT or actually LOFT, LOFT Outlet,

20  Lane Bryant.  Those are the main customers.

21      Q.   With -- with the downturn in -- in, I'll say

22  brick-and-mortar retail -- does that offend if I say

23  brick-and-mortar retail stores to you?

24      A.   Yeah, that's fine.

25      Q.   Okay.

Page 20

A347

1    A.   That's all right.

2    Q.   With the downturn in -- in sales

3    brick-and-mortar retail in the last couple of years,

4    have you, as a -- as a business, pursued any strategies

5    to make up those sales in any other segments?

6    A.   In any other segments outside of jewelry?

7    Q.   No.  I mean, in any other segments of the

8    market outside of brick-and-mortar retail.

9    A.   Not -- not until this year actually.  So this

10   year, we're trying to expand a little bit, but for the

11   most part, we've stayed in our lane.  Yeah.  Most of our

12   customers are -- are similar, and, you know, that's kind

13   of what we do best so...

14   Q.   Now, you mentioned that you -- obviously,

15   there's been a downturn.  Have you had relationships --

16   other than The Limited, have you had relationships with

17   any customers which have ended because the -- that

18   customer has filed bankruptcy?

19   A.   Yes.

20   Q.   What customers are those?

21   A.   Ascena, just this year.  Christopher & Banks

22   also just very recently.  Those are the two.

23   Q.   Any others?

24   A.   Oh, sorry.  There is one more.  Charming

25   Charlie.  That would be a third.

1     Q.  Let's talk about Ascena.  Now --

2     A.  Sure.

3     Q.  -- when Ascena went bankrupt, is it safe to

4  assume that Ascena owed money to your company,

5  Kenilworth, pursuant to invoices that had -- had gone

6  unpaid just up until the bankruptcy had filed?

7     A.  Yes.

8     Q.  Okay.  How -- how much did that --

9     A.  Yes.

10    Q.  -- how much did that amount to?

11    A.  It's -- it's around 850,000.

12    Q.  Okay.

13         Do you know how long of a time period that

14  850,000 in invoices covers, if that makes sense?

15    A.  Yes.

16    Q.  What is it?

17    A.  It's possibly around six months or so.

18    Q.  The same question for Christopher & -- is it

19  Black?  Christopher --

20    A.  Banks.

21         Christopher & Banks, yes.

22    Q.  It's tough when you have bad handwriting to be

23  able to read your handwriting.

24         So, Christopher & Banks, what -- same

25  question.  How much and over what time frame?

                                        Page 22

1    A.  They're a very small account.  It's maybe only

2  50,000 and that would be perhaps four months' worth of

3  invoices.

4    Q.  Okay.

5        What about Charming Charlie?

6    A.  Charming Charlie was about 75,000, and

7  honestly, I don't remember how long those invoices are

8  for, but it was -- it was a while.  If I had to guess, I

9  would say close to a year or so.

10   Q.  All right.  All right.

11       Well, suffice it to say that when a

12 retailer is having difficulty in approaching bankruptcy

13 and eventually filing bankruptcy, that retailer

14 typically has difficulty paying its vendors, like

15 yourself, the -- on the invoices that are owed; is that

16 right?

17   A.  Yes.

18   Q.  Okay.  So it wouldn't surprise you that a

19 company that, you know, subsequently files bankruptcy

20 does have that -- that difficulty, right?

21   A.  Absolutely, yes.  I -- I was not surprised by

22 any of those three.

23   Q.  Okay.

24   A.  Ascena, Christopher & Banks, and Charming

25 Charlie, yes.

Page 23

1      Q.   Okay.

2           Let's talk a little bit about The Limited

3  specifically.

4      A.   Okay.

5      Q.   Now, I want to kind of go in time to do a

6  little bit like what we just did with your general

7  business.

8           Do you remember when Kenilworth began its

9  relationship with The Limited?

10     A.   It was actually before me, before my time.  My

11 mom started it.  I would guess -- I don't have exact,

12 but I would say 1980, 1981?  Somewhere in there.

13     Q.   Okay.

14          Let's focus on sort of the last sort of

15 15 years.

16     A.   Sure.

17     Q.   And -- and to be clear, when did you assume

18 your role with the company?

19     A.   I started in 1998 and -- and basically ran the

20 company a year in from that -- from that time.

21     Q.   Okay.

22     A.   My parents were both involved before, and they

23 retired.  So they just kind of left it.

24     Q.   Okay.

25          So let's start in -- in 2007, do you -- or

                                             Page 24

1    let's -- yeah, let's start in 2007.  Do -- do you have,

2    sitting here today, sort of an understanding of the

3    annual business that Kenilworth did with The Limited in

4    calendar year 2007?

5        A.  I can't remember exact, but I would guess 4 to

6    5 million in -- in sales.

7        Q.  Okay.

8            Where did that rank at the time in terms of

9    your size -- size of accounts?

10       A.  Good question.

11           I would say probably No. 4.

12       Q.  Okay.

13           Who were the other three at the time?  Do

14   you know?

15       A.  Express would be one.  2007, New York &

16   Company, which I didn't mention before, but we don't

17   work with them anymore, and Chico's would be the third.

18       Q.  All right.  Now, talking just about Limited.

19       A.  Uh-huh.

20       Q.  Limited, what about 2008?  Did -- do you have a

21   sense of what your sales were in that year?

22       A.  I would say it would be roughly the same.

23       Q.  Okay.

24           Did that remain consistent in -- from 2009

25   until 2017, or was there sort of any growth during that

1    time period in the sales that you were making to The

2    Limited?

3         A.  It was up and down a little bit, but -- but

4    pretty consistent I would say.

5         Q.  Okay.

6              Would you -- as the sort of manager, I

7    would say, and owner of Kenilworth, do you make it part

8    of your practice to become aware of sort of how the

9    businesses that you sell products to, how those

10   businesses are performing in the marketplace?

11        A.  I do now.  That's for sure.  At -- at that

12   point, you know, early in my career, probably

13   between 2007 up until 2015 or '16, I would get most of

14   my information from the merchants that I worked with.

15   You know, I had a really good relationship with a lot of

16   people that were not high up the food chain so to speak.

17   So -- so of course, we would talk business, our

18   business, and overall business, but strictly at that

19   level.  I didn't really go much higher than that.  It's

20   just to me wasn't really done.

21        Q.  So you mentioned that you -- you were aware of

22   the entity Sun Capital?

23        A.  Yep.

24        Q.  Maybe not Sun Capital V, but you were aware of

25   Sun Capital prior to the bankruptcy; is that right?

1      A.   Yes.

2      Q.   How did you become aware of Sun Capital?

3      A.   Well, I -- I knew that they -- you know, that

4  they bought The Limited so --

5      Q.   Okay.

6      A.   -- s I would have heard that, you know, from

7  again my partner at The Limited, a merchant or a

8  sourcing person.

9      Q.   Okay.  And do you ever read sort of industry

10  trades that -- that may give you information about

11  acquisitions that occur in the retail industry?

12      A.   Again, I do now.  At that point, not as much.

13      Q.   Okay.  Let's talk about -- a little bit about

14  the -- the relationship that -- that Kenilworth had with

15  The Limited, and I want to pull up -- or you can -- I

16  won't pull it up, but you can navigate to Exhibit 2,

17  which Mr. Oppenheimer had previously shown you.

18      A.   Okay.

19      Q.   Now, when you were first asked about this

20  agreement or at least any -- any contractual agreement,

21  your answer was you didn't have a contract with Limited

22  and I guess my -- my question is:  Do you view this

23  Master Services {sic} Agreement as a contract with The

24  Limited?

25      A.   I guess when I -- when I think of a contract, I

                                               Page 27

1   think of it more as relations to sales.  You know, there

2   aren't any guarantees here.  This is a -- yes, in the

3   true sense of the word, this is a contract between us.

4   There are things that I initialized and signed.  Rules I

5   have to follow.  Rules that they follow.

6             But, again, when I -- in my mind, when I

7   think of contract, which is probably incorrect, I think

8   of okay, this is a five-year term, we will do X amount

9   of business.  So there isn't any of that.

10  Q.  Would -- would you keep a copy of a fully

11  executed contract like this as part of your files?

12  A.  Yes, I would.

13  Q.  Okay.  I want to direct you to Page 2 of this

14  contract.  This is the reason why I ask.

15  A.  Okay.

16  Q.  It doesn't appear to me that this contract is

17  fully executed.

18             Do you agree with me on that point?

19  A.  I mean, I see a blank page here.

20  Q.  Do you have any -- so was that a -- do you

21  agree then that it did not appear to be a fully executed

22  contract?

23  A.  It does not appear to be a fully executed

24  contract.

25  Q.  Do you know whether or not Kenilworth -- do you

1   know whether or not this agreement itself was ever fully

2   executed?

3        A.  I mean, I'm sure that it was, but I

4   don't -- you know, I don't remember specifically, you

5   know, receiving whatever it was that The Limited would

6   have had to sign.  So...

7        Q.  If it was fully executed --

8        A.  Yeah.

9        Q.  -- you would expect that you would have a copy

10  of it somewhere in your files; is that right?

11       A.  I would.  I mean, it was a long time ago, but

12  certainly we -- yes, we don't typically throw anything

13  away so, yes.

14       Q.  Then this contract and, I guess, others as

15  well, nowadays it would be -- the way that you would

16  receive a copy of it, it would be emailed to you, right?

17       A.  Yes.  Electronically some way, either a portal

18  or -- yeah.

19       Q.  Okay.  So then would you also expect that if

20  there were such a fully executed contract that it would

21  also be in the emails of The Limited, as well, because

22  they would have eventually at some point sent it to you,

23  right?

24       A.  I'm not positive.  I -- I don't think at that

25  time they would have sent it via email.  I think

Veritext Legal Solutions
800-336-4000

A356

1  everything was still FedEx'ed, if I recall correctly.  I

2  don't...

3      Q.  Okay.  But in --

4      A.  Go ahead.

5      Q.  -- but in Exhibit 3, if you -- if you go over

6  to Exhibit 3.

7      A.  Okay.

8      Q.  A copy of this contract was, in fact -- it

9  appears at least a copy was, in fact, emailed on -- in

10  2009, right?

11      A.  I mean, we -- it looked like we emailed.

12  That's -- that's how I see this.

13      Q.  Okay.

14          Do you -- it looks like Exhibit 3 is

15  actually a printout of an email.  You don't have any --

16  this isn't a printout of an email that was collected

17  from you, was it?

18      A.  No.

19      Q.  Okay.

20          Let's talk about the practices of The

21  Limited with respect to -- and Kenilworth with respect

22  to invoicing and payment.

23      A.  Okay.

24      Q.  Starting in -- let's start in 2008.  I -- I

25  recognize that, you know, there was a longer

Page 30

1 relationship, based on your representation, than that.

2 Let's start in 2008.

3     At that time, how did the parties operate

4 in terms of -- of ordering product and paying invoices?

5 Were invoices sent by you to The Limited and Limited

6 would subsequently pay them?

7  A. Yes.

8  Q. Okay.

9     Prior to 2008, during the entirety of the

10 relationship, were you aware of any invoices sent from

11 Kenilworth to The Limited that were not paid?

12  A. No.

13  Q. Okay.

14  A. Not aware.

15  Q. After 2008, until, let's say, January 1st,

16 2016, are you aware of any invoices that were sent from

17 Kenilworth to The Limited that were not paid?

18  A. No.

19  Q. Okay.  And just to be clear, during those years

20 from 2008 until January 1st of 2016, we're talking about

21 annually 4 to $5 million in business --

22  A. Yes.

23  Q. -- in that range?

24  A. Yes.

25  Q. Okay.

Page 31

1         How many invoices typically would -- would

2    it take for Kenilworth to accrue 5 million in sales?

3         A.  Let me try and quickly do the math.  I mean,

4    hundreds for sure.

5         Q.  Okay.

6              Was your practice in -- in invoicing The

7    Limited, would you mail them or email them to The

8    Limited?  Or what -- what was your practice with respect

9    to sending them invoices?

10        A.  I -- I know, you know, there was a point where

11   we were mailing them.  I'm not exactly sure when we

12   would have switched to email.  That's...

13        Q.  Okay.

14        A.  You know, my -- a bookkeeper obviously would

15   have took care of that.  So...

16        Q.  Did you have a contact at The Limited who you

17   personally interacted with to manage the relationship?

18        A.  Yes.

19              Over the years, a lot of contacts.  I

20   don't -- it wouldn't necessarily be one person.  You

21   know, they changed buyers so frequently.  So it would

22   have been a bunch.

23        Q.  Would it have been at the buyer level, someone

24   at the buyer level, who would have been your main point

25   of contact?

                                              Page 32

1      A.   Yes.

2      Q.   Okay.

3           Did you ever have contact with -- with the

4  management of The Limited as part of your relationship?

5      A.   No, no.

6      Q.   Okay.  All right.

7      A.   Accessories vendors are usually pretty small.

8  We're usually a very small part of the business.  So,

9  you know, kind of on the outsides a little bit.

10     Q.   I want to show you -- now it's going to -- I'm

11 working on my own here.  So please bear with me.

12     A.   No problem.

13     Q.   I want to show you a copy of the complaint in

14 this matter.  So if you give me a minute --

15     A.   No problem.

16     Q.   -- while I put it in there.  It'll be

17 Exhibit 5.

18     A.   I think my Internet is from '07 probably.

19 That's why it's taking so long.

20     Q.   Well --

21     A.   I don't have it yet.

22     Q.   That's because I am still figuring this out.

23     A.   Okay.

24          (Exhibit 5 marked.)

25     Q.   (BY MR. LEHRMAN)  Okay.  It is loading now.

Page 33

1                    I've still got a progress bar happening.

2        A.  Okay.

3        Q.  So hopefully it's done soon.

4        A.  Okay.

5                    MR. LEHRMAN:  You know, Neil, I wonder if

6        maybe you could assist with this.

7                    MR. MARTIN:  Yeah.  I'm -- I'm actually

8        watching you.  But if you have a progress bar, I'm

9        guessing -- do you have an estimate on how many pages

10       that PDF is?

11                   MR. LEHRMAN:  It shouldn't be that.  No.

12       It's only about 25 pages, so...

13                   MR. MARTIN:  Okay.  Which -- which one are

14       you trying to introduce?

15                   MR. LEHRMAN:  Yeah.  It's -- if you go in

16       the Baker McKenzie folder.

17                   MR. MARTIN:  Okay.

18                   MR. LEHRMAN:  It's numbered 010201917

19       complaint.

20                   MR. MARTIN:  Okay.  So what I'm going to

21       for now is I'm just going to copy it in there so you

22       guys can get the ball rolling, and then I'll introduce

23       it as Exhibit 5.  And then once it's there, I'll -- I'll

24       delete it at the end of the depo.

25                   MR. LEHRMAN:  Okay.

                                                    Page 34

1          MR. MARTIN:  Just so guys can kind of start

2     your questioning.

3               So it is in the marked exhibits now.

4          THE WITNESS:  I see.  And -- and mine is

5     still kind of loading, and eventually will get in there

6     is the point?

7          MR. MARTIN:  Yeah, that's the point.  There

8     we go.

9          MR. LEHRMAN:  Okay.

10     Q.  (BY MR. LEHRMAN)  All right.  So if you pull up

11     the complaint that was just added to the shared exhibit

12     folder -- do you -- are you seeing that, Mr. Soloff?

13     A.  It's spinning.  Hopefully, in one second.

14     Sorry.

15     Q.  Okay.  No, no, problem.

16     A.  Yes, I see it.

17     Q.  Okay.

18          Have you ever seen this document before

19     today?

20     A.  Sorry.  I just want to make sure.  Sorry.

21     Q.  Yeah.

22     A.  Yes.

23     Q.  Okay.

24          When was that?

25     A.  I mean, I can't remember for sure.  I...

Veritext Legal Solutions
800-336-4000

1          Q.  Would it have been --

2          A.  I'll wait until you ask.

3          Q.  Would it have been before or after it was

4     publicly filed on January 17th, 2017?

5          A.  It would -- it would have been after, yeah.

6          Q.  Okay.  All right.

7                So you didn't have any input into the

8     drafting of this document at all, did you?

9          A.  No.

10         Q.  Okay.

11               Are you aware that you -- that Kenilworth

12    is listed on a pending stay as a predicate creditor by

13    this document?

14         A.  I mean, yes, yes.

15         Q.  Okay.

16               When did you become aware of that?

17         A.  I would say around the same time.

18         Q.  Okay.

19               Did you have any contact at all with the

20    Reid Collins law firm with regards to the subject of

21    this lawsuit?

22         A.  Yes.

23         Q.  Who at Reid Collins did you have contact with?

24         A.  I can't remember.  Eric.

25         Q.  Eric Madden?

                                            Page 36

1          A.  Yes, thank you.

2              Eric Madden.  I apologize.  He -- on the

3     call, he was --

4          Q.  What -- what was your contact with Mr. Madden?

5          A.  They explained -- or Eric explained, you know,

6     what was happening and, you know, asked -- just asked

7     for my involvement, I guess, I would say.

8          Q.  When was that?

9          A.  That was maybe a month ago.

10         Q.  Okay.

11             What specifically did he -- did he explain?

12         A.  He explained that Sun Capital took a -- a

13    transfer and -- yeah, that was pretty much it.

14         Q.  Okay.

15             Prior to him explaining about the transfer,

16    as you described, were you aware of the transfer that

17    took place?

18         A.  No.  No.

19         Q.  Okay.

20             Did he tell you how much the transfer --

21    what the transfer was?  What -- what details did he give

22    you about the transfer?

23         A.  He told me the amount.  I -- unfortunately, I

24    don't remember exactly what it was, but he said what the

25    amount was and when it was, and I also don't remember

Page 37

A364

1    that exact detail also.  And that was basically it.

2        Q.  And when -- when did the transfer take place?

3    Do you know?

4        A.  I -- I know it was -- I don't remember exactly,

5    but it was -- I'm sorry.  I -- I don't remember when it

6    was.

7        Q.  Okay.  Let's --

8        A.  All I remember is -- sorry.  I'm sorry.

9        Q.  I was just going to say, if you want, we can go

10   back to Exhibit 1, which is the subpoena, and I think

11   it's a defined term in there.

12       A.  Okay.

13       Q.  Why don't you take a look at it, and then --

14       A.  Okay.

15       Q.  -- and then we can ask you the same question

16   again.  Page 4.

17       A.  Yep, just looking through it.  Okay.

18       Q.  So I'll ask again:  When did this transfer take

19   place?

20       A.  December 20th, 2011.

21       Q.  Okay.

22            And how much was the transfer?

23       A.  $42,158,299.47.

24       Q.  And that is a matter that you have prepared, I

25   guess, to -- to testify about today?

                                            Page 38

1        A.   Yeah, that's why -- yeah.  Sure.

2        Q.   How -- how did you prepare to testify today?

3        A.   Oh, prepare?  I -- honestly, as you may tell, I

4    really didn't.

5        Q.   That's fine.

6             So did you -- did you look at any documents

7    at all?

8        A.   The only documents I had looked at were what is

9    up here, what the -- the exhibits.

10       Q.   And did you have any conversations with anyone,

11   other than Mr. Madden, to prepare for this deposition?

12       A.   Mr. Oppenheimer and I talked, but only to set

13   me up for the call today.  Just to make sure that I was,

14   you know, ready from a -- you know, just so I could log

15   in and kind of all that stuff, which apparently I -- I

16   failed, but -- but yeah.

17       Q.   That's fine.  This is a -- a new world.  So no

18   problem.

19             In the conversation you had a month ago

20   with Mr. Madden, who else was on that -- was -- was a

21   part of that conversation?  Do you know?

22       A.   I -- I know Mr. Oppenheimer was, and I -- and I

23   think there was a third person on the call from the

24   firm, but also, I don't remember his name offhand.

25       Q.   Okay.

                                                Page 39

1      A.   I believe he told me.

2      Q.   Only the four of you were on the call?

3      A.   And then my new business partner was also on --

4   on the call.

5      Q.   Okay.  Okay.

6           Why was your new business partner on the

7   call?

8      A.   I didn't know what the call was about.  He is a

9   lawyer or was a lawyer in Houston.  So I figured, you

10  know, whatever they had to say, it would be nice to, you

11  know, have his opinion or, you know, just -- yeah, try

12  to get his advice as to what was said.

13     Q.   What is your understanding of what will occur

14  with regards to the claim that Kenilworth submitted in

15  the bankruptcy if the plaintiffs are successful in their

16  lawsuit?

17     A.   What do I think will -- will happen --

18     Q.   Yeah.

19     A.   -- for Kenilworth?

20     Q.   Yeah.

21     A.   Not much.  I -- I think if anything, we'll get

22  a very small settlement if -- if that's what you would

23  call it or -- yeah, I -- I honestly don't expect really

24  anything to be honest.

25     Q.   You've testified that you were -- you sort of

Page 40

A367

1    first became aware of the -- the transfer, the dividend

2    sort of -- as of a month ago; is that right?

3         A.  Yes, on the phone call.

4         Q.  Okay.

5              Is it your testimony that in -- in December

6    of 2011, you were made aware that Sun Capital made this

7    transfer.  You were made aware contemporaneously with

8    the transfer.  Is it your testimony that -- that

9    Kenilworth would have not provided 4 to 5 million in

10   goods to The Limited with having had that knowledge?

11             MR. OPPENHEIMER:  Objection.  Form.

12        Q.  (BY MR. LEHRMAN)  You can answer.

13        A.  Oh, sorry.  I -- I was confused.  I thought --

14        Q.  Do you -- do you understand the question?

15        A.  I just want to make sure I understand you.

16   You're asking me would I not have gone forward with --

17   with a business with The Limited if I -- if I had known

18   about this transfer?

19        Q.  Yeah.

20        A.  I still would have gone forward with -- with

21   it.

22        Q.  Okay.

23             Let's go back to 2011.  Prior to

24   December 20th, 2011, I am correct that it was The

25   Limited's practice to receive invoices from Kenilworth

                                          Page 41

1    and pay them in a timely fashion; is that correct?

2         A.   That is correct.

3         Q.   Okay.

4              That practice didn't change at all up until

5    the year 2016; isn't that right?

6         A.   It did not change at all.

7         Q.   Okay.

8              When in 2016 did you -- well, let's --

9    let's go back.  Do you recall at any time during 2016

10   having discussions with anyone from The Limited

11   concerning The Limited's ability to pay its invoices

12   from Kenilworth?

13        A.   No.

14        Q.   Okay.

15             When did you first become aware that The

16   Limited was struggling, I'll say, to pay its invoices

17   from Kenilworth in 2016?

18        A.   I first became aware maybe four days before

19   they actually filed.  I received a phone call from my

20   contact, said there were some potential issues.  They

21   were trying to work it out, and then shortly thereafter,

22   you know, the bankruptcy.  So up until that point, I --

23   I really had no idea.  It blindsided us.

24        Q.   Okay.

25             Let's go to the claim notice that was

                                              Page 42

1    No. 4, I think.

2         A.   Exhibit 4 or on this --

3         Q.   Yeah, Exhibit 4.

4              I'm going to summarize this.

5         A.   Okay.

6         Q.   But what this notice sort of evinces is a

7    series of invoices starting in August of 2016 all the

8    way up through October, I believe.

9         A.   That -- yeah.

10        Q.   Okay.

11             And -- and these invoices appear to be,

12   based on the claim notice that you submitted in the

13   bankruptcy, they were unpaid by The Limited, correct?

14        A.   Correct.

15        Q.   Okay.

16             And actually, I want to correct the record.

17   It's -- they're through November 17th of 2016; is that

18   correct?

19        A.   That would be correct, yeah.

20        Q.   Okay.

21             We're talking about -- like about three

22   months of unpaid invoices.  Is that something that --

23   that would have raised -- that would have raised some

24   concern from you contemporaneously to not receiving

25   payment for these invoices?

Veritext Legal Solutions
800-336-4000

1          A.   No, not really.

2               This -- you know, obviously, there was a

3     time when they were quicker with a payment, but this

4     feels about right.

5          Q.   So, I guess, my general question is it's not

6     uncommon for a retailer to go maybe two months without

7     paying invoices and then kind of catching up; is that

8     right?

9          A.   Yes.

10         Q.   All right.  Particularly in the last maybe

11    three to five years?

12         A.   Exactly, yes.

13         Q.   Okay.  And why has that increased over the last

14    three to five years?

15         A.   Obviously, business is not as good.  I mean, I

16    don't -- I can't really speak for why it would have

17    increased, but my guess would be that, you know, a cash

18    flow is more of an issue, you know, for -- for some of

19    these retailers.

20         Q.   Is it your understanding that every invoice

21    that Kenilworth submitted to The Limited from

22    August 5th, 2016, through November 17th, 2016, is it

23    your understanding that all of those invoices went

24    unpaid?

25         A.   Anything on this list, you know, that we've

                                             Page 44

1   submitted would have been unpaid, yes.

2       Q.  My question was a little bit different, and

3   I'll -- maybe I'll give you some -- some more details --

4       A.  Okay.

5       Q.  -- so that -- so that you can kind of see where

6   I'm getting at.

7                If you look on the first page of -- it's

8   actually Page 3 of the exhibit, and if you see, there

9   are dates to the -- to the first, you know, several

10  invoices in there.  There's a bunch dated August 5th,

11  and then it jumps to August 11th.  All of the invoices

12  on August 5th are dated sequentially, and then there

13  are -- excuse me -- they're numbered sequentially.  If

14  you see Invoice No. 102065 through 73.

15               Do you see that?

16      A.  I do.

17      Q.  Is it Kenilworth's practice to number invoices

18  with a specific vendor sequentially, or -- or does it

19  number all of its invoices and -- and some get assigned

20  to some vendor and others go to other vendors.

21               Does that make sense?

22      A.  It does make sense, and that's actually a good

23  question that I'm not positive of the answer.

24      Q.  Okay.

25      A.  Sorry.  My bookkeeper -- I don't know how she

                                              Page 45

A372

1   sends out invoices.

2      Q.  Okay.

3          Do you have reason to believe that there --

4   there may be sometimes, and we can go through, you know,

5   the list here.  There are some gaps, even on the second

6   page from August until -- you know, August 18th to 22nd.

7      A.  Uh-huh.

8      Q.  And you testified that there would be hundreds

9   of -- of invoices that would make up, you know, 4 or 5

10  million in sales.

11         So do you think it's possible that

12  Limited -- that The Limited was paying some invoices and

13  not all of them, or -- or what is your -- what is your

14  take on that?  Do you have -- do you have any insight

15  into that?

16     A.  My guess is they were not paying any, but,

17  again, I'm not positive on that.  But I would guess that

18  they were not.

19     Q.  Okay.  Okay.

20     A.  It wouldn't make sense for them to jump around.

21     Q.  Okay.

22         Give me a second here.

23     A.  Sure.  No problem.

24     Q.  During Mr. Oppenheimer's questioning, he asked

25  you about access to certain information, presentations,

Page 46

1    board minutes, stuff like that.

2         A.  Yes.

3         Q.  And -- and your response was that you,

4    Kenilworth, did not get access to that series of

5    information, and I'm summarizing here.  But --

6         A.  Right.

7         Q.  -- that's all meant to preface my question,

8    which is did Kenilworth ever ask for access to -- to

9    board minutes or presentations or financial information

10   from The Limited?

11        A.  No.

12        Q.  Is that something that Kenilworth typically

13   does with its customers?

14        A.  Typically, again, I keep it usually at the

15   buyer level.  There are some cases, you know, in -- in

16   regards to Ascena where before this happened, I reached

17   out and had some conversations with -- more at the

18   executive level.  But usually and especially at this

19   time, no, that would not be something I would do.

20        Q.  Why not?

21        A.  Now, that I look at these invoices, it's a good

22   question, but -- but I think, you know, there's -- when

23   you're -- again, when you're an accessories vendor, as I

24   mentioned, it's a very small part.  So these are apparel

25   stores, for the most part, that sell accessories.

                                              Page  47

1    There's a lot of companies just like us, and we think

2    the best way to go about our business is to -- just to

3    not make waves.  Just, you know, I'm -- I don't want to

4    ask too many questions.

5              Again, I want to keep it at the level.  You

6    know, I want to keep my relationships at a certain level

7    only.  That has worked well for us.  I usually don't try

8    to dig any deeper than that.  I just -- I could be

9    wrong, but my sense is that is not usually well-received

10   unless you're a major apparel vendor that has 40 or

11   50 percent of their business.  We just don't feel like

12   we have that kind of partnership with a lot of these

13   retailers.

14        Q.  When did the Ascena brand go bankrupt?  Do you

15   know?

16        A.  That was this summer.

17        Q.  This summer?

18        A.  Yeah, July of 2020, I believe.

19        Q.  Okay.

20              Prior to Ascena going bankrupt, did you

21   modify at all your practices with respect to extending

22   trade credit to Ascena?

23        A.  We -- everyone had to extend trade credit, yes,

24   yes.  So we modified.  We went from 60 days to perhaps

25   six months' terms, but that's -- you know, that's COVID

Page 48

```
 1   and just -- yeah.
 2       Q.  Okay.  Let me just review my notes for a minute
 3   here.
 4       A.  No problem.
 5       Q.  If you don't mind.
 6       A.  Of course.
 7           MR. LEHRMAN:  Okay.  I -- I don't have any
 8   -- anything else at this time, subject to
 9   Mr. Oppenheimer asking further questions.  But I will
10   pass the witness to the extent he needs -- he would like
11   to do that.
12           Thank you, Mr. Soloff.
13           THE WITNESS:  Thank you.
14           MR. OPPENHEIMER:  No more questions.
15           MR. LEHRMAN:  Did you say "no more
16   questions"?
17           MR. OPPENHEIMER:  I did.  Oh, I'm sorry.
18   Can you hear me?
19           MR. LEHRMAN:  Yeah.  Why don't we go off
20   the record?
21           MR. OPPENHEIMER:  Sure.
22           MR. LEHRMAN:  Sorry.  Go ahead.  I know the
23   court reporter probably has to --
24           THE CERTIFIED STENOGRAPHER:  It's okay.
25           MR. LEHRMAN:  Go ahead.  Sorry.
```

Page 49

A376

1          THE CERTIFIED STENOGRAPHER:  Since this is

2   Federal, I have to ask about any further stipulations.

3   Are there any further stipulations you guys would like

4   to put on the record?

5          MR. OPPENHEIMER:  Not on behalf of the

6   Trust.

7          MR. LEHRMAN:  None for the defendants, as

8   well.

9          THE CERTIFIED STENOGRAPHER:  And did you

10  want to keep your same -- orders as earlier today?

11         MR. LEHRMAN:  Yes.

12         MR. OPPENHEIMER:  Yes, please.

13         THE CERTIFIED STENOGRAPHER:  Okay.  That's

14  all I have.  Thank you, guys.

15         MR. OPPENHEIMER:  Thank you.

16         MR. LEHRMAN:  Thank you.

17         (Proceedings concluded at 2:20 p.m.)

18

19

20

21

22

23

24

25

Veritext Legal Solutions
800-336-4000

A377

1                    CHANGES AND SIGNATURE

2          WITNESS NAME:   ERIC JOHN SOLOFF

3          DATE OF DEPOSITION: January 28, 2021

4

5          PAGE        LINE        CHANGE        REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Page 51

A378

1        I, ERIC JOHN SOLOFF, have read the

2   foregoing deposition and hereby affix my signature that

3   same is true and correct, except as noted above.

4

5                    _____

                     ERIC JOHN SOLOFF

6

7

8

9   THE STATE OF_____   )

10  COUNTY OF _____   )

11          Before me, _____, on

12  this day personally appeared Eric John Soloff,

13  known to me (or proved to me under oath or through

14  _____) (description of identity card or

15  other document) to be the person whose name is

16  subscribed to the foregoing instrument and acknowledged

17  to me that they executed the same for the purposes and

18  consideration therein expressed.

19          Given under my hand and seal of office this

20  _____ day of _____, 2021.

21

22

23

                     _____

24                   NOTARY PUBLIC IN AND FOR

                     THE STATE OF _____

25                   Commission Expires: _____

                                              Page 52

```
1
                IN THE UNITED STATES BANKRUPTCY COURT
2                    FOR THE DISTRICT OF DELAWARE
3       In re:                     )
                                   ) Chapter 11
4       LSC WIND DOWN, LLC, et al   )
                                   ) Case No. 17-10124 (KBO)
5          Debtors                 )
        _____  ) (Jointly Administered)
6                                  )
        UMB BANK, N.A., as Plan    )
7       Trustee of The Limited     )
        Creditors Liquidating      ) Adversary Proceeding
8       Trust                      ) No. 19-50272 (KBO)
                                   )
9          Plaintiff,              )
                                   )
10      v.                         )
                                   )
11      SUN CAPITAL PARTNERS V,    )
        LP,                        )
12      SUN MOD FASHIONS IV, LLC,  )
        SUN MOD FASHIONS V, LLC,   )
13      AND                        )
        H.I.G. SUN PARTNERS, LLC   )
14                                 )
           Defendants.             )
15
16
                    REPORTER'S CERTIFICATION
17             DEPOSITION OF ERIC JOHN SOLOFF
                       January 28, 2021
18
19             That the deposition transcript was delivered
20      to Mr. Leo Oppenheimer.
21             That a copy of this certificate was served on
22      all parties and/or the witness shown herein on
23      _____.
24             I further certify that pursuant to FRCP Rule
25      30(f)(1) that the signature of the deponent:
```

Page 53

1          ____ was requested by the deponent or a party

2     before the completion of the deposition and that

3     signature is to be before any notary public and returned

4     within 30 days from date of receipt of the transcript.

5          If returned, the attached Changes and

6     Signature Page contains any changes and the reasons

7     therefore:

8          ____ was not requested by the deponent or a

9     party before the completion of the deposition.

10          I certify that I am neither counsel for,

11     related to, nor employed by any of the parties or

12     attorneys in the action in which this proceeding was

13     taken, and further that I am not financially or

14     otherwise interested in the outcome of the action.

15          Certified to by me this 4th day of February,

16     2021.

17

18

19

20

21

                ABIGAIL GUERRA, Texas CSR 9059

22              Expiration Date:  12/31/22

                VERITEXT LEGAL SOLUTIONS

23              Firm Registration No. 571

                300 Throckmorton Street

24              Suite 1600

                Fort Worth, Texas 76102

25              Phone:  (817) 336-3042

                                        Page 54

```
 1    COUNTY OF _____     )

      STATE OF TEXAS          )

 2

 3           I hereby certify that the witness was notified

 4    on_____, that the witness has 30 days or

 5    (_____days per agreement of counsel) after being

 6    notified by the officer that the transcript is available

 7    for review by the witness and if there are changes in

 8    the form or substance to be made, then the witness shall

 9    sign a statement reciting such changes and the reasons

10    given by the witness for making them;

11         That the witness' signature was/was not returned as

12    of _____.

13           Subscribed and sworn to on this, the _____

14    day of _____, 2021.

15

16

17

18

19

                     ABIGAIL GUERRA, Texas CSR 9059

20                   Expiration Date:  12/31/22

                     VERITEXT LEGAL SOLUTIONS

21                   Firm Registration No. 571

                     300 Throckmorton Street

22                   Suite 1600

                     Fort Worth, Texas 76102

23                   Phone:  (817) 336-3042

24

25

                                                    Page 55
```

A382

 1   Michael.lehrman@bakermckenzie.com

 2                         February 4, 2021

 3   RE: UMB Bank, N.A., Et Al. v. Sun Capital Partnerships V, Et Al.

 4   DEPOSITION OF: Eric John Soloff (# 4411772)

 5        The above-referenced witness transcript is

 6   available for read and sign.

 7        Within the applicable timeframe, the witness

 8   should read the testimony to verify its accuracy. If

 9   there are any changes, the witness should note those

10   on the attached Errata Sheet.

11        The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14        According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                         Yours,

19                         Veritext Legal Solutions

20

21

22

23

24

25

                                        Page 56

| & | | | |
|---|---|---|---|
| **&**   3:4 21:21 22:18 22:21,24 23:24 25:15 | **1st**   31:15,20 | **30**   19:18 53:25 54:4 55:4 | **60601**   3:11 |

**2**

**2**   4:14 7:3 8:18,21 9:3,11 14:18 15:17 27:16 28:13
**2007**   24:25 25:1,4 25:15 26:13
**2008**   19:12,14,17 25:20 30:24 31:2 31:9,15,20
**2009**   11:9,17 19:16 25:24 30:10
**2010**   19:16,17
**2011**   10:8 16:5 18:15 38:20 41:6 41:23,24
**2015**   26:13
**2016**   16:7,10,15,24 17:3,7,12 18:10 31:16,20 42:5,8,9 42:17 43:7,17 44:22,22
**2017**   12:23 13:1 19:23 20:1,3 25:25 36:4
**2020**   48:18
**2021**   1:21 2:6 51:3 52:20 53:17 54:16 55:14 56:2
**20th**   16:5 38:20 41:24
**214**   3:6
**22nd**   46:6
**25**   19:14,18 34:12
**28**   1:21 51:3 53:17
**28th**   2:6
**2:20**   2:7 50:17

**3**

**3**   4:3,15 10:10,19 30:5,6,14 45:8

**0**

**010201917**   34:18
**07**   33:18

**1**

**1**   1:22 4:13 5:22 6:1 9:5 15:12 19:1 38:10 53:25
**1,351,000**   14:19
**1,351,176**   14:19 15:5
**10**   4:15 19:10
**102065**   45:14
**11**   1:3 53:3
**11th**   45:11
**12/31/22**   54:22 55:20
**12604**   54:21 55:19
**13**   4:16
**15**   19:11 24:15
**16**   7:13 26:13
**1600**   54:24 55:22
**1601**   3:5
**17-10124**   1:4 53:4
**17th**   11:9,17 13:1 16:7,10,15,24 17:3 17:7,11 18:10 36:4 43:17 44:22
**18**   4:6
**18th**   46:6
**19-50272**   1:8 53:8
**1974**   8:3,5 19:10
**1980**   24:12
**1981**   24:12
**1998**   7:23 24:19
**1:18**   2:6

**30**   19:18 53:25 54:4 55:4
**300**   3:10 54:23 55:21
**312**   3:12
**33**   4:17
**336-3042**   54:25 55:23
**35**   19:25

**4**

**4**   4:16 7:5 13:11 13:13 15:15 25:5 25:11 31:21 38:16 41:9 43:1,2,3 46:9 56:2
**40**   48:10
**42**   18:14
**42,158,299.47**   16:3
**42,158,299.47.**   38:23
**420-8900**   3:6
**4200**   3:5
**4411772**   56:4
**4th**   54:15

**5**

**5**   4:5,17 25:6 31:21 32:2 33:17 33:24 34:23 41:9 46:9
**50**   48:11
**50,000**   23:2
**5000**   3:11
**51**   4:7
**53**   4:8
**571**   54:23 55:21
**5th**   44:22 45:10,12

**6**

**6**   4:13
**60**   48:24

**60601**   3:11

**7**

**73**   45:14
**75,000**   23:6
**75201**   3:6
**76102**   54:24 55:22

**8**

**8**   4:14
**817**   54:25 55:23
**850,000**   22:11,14
**861-8000**   3:12

**9**

**9059**   54:21 55:19

**a**

**abigail**   2:7 54:21 55:19
**ability**   42:11
**able**   22:23
**absolutely**   23:21
**access**   17:19,22,25 18:3,9 46:25 47:4 47:8
**accessories**   33:7 47:23,25
**account**   16:4 23:1
**accounts**   25:9
**accrue**   32:2
**accuracy**   56:8
**acknowledged**   52:16
**acquisitions**   27:11
**action**   54:12,14
**added**   35:11
**administered**   1:5 53:5
**adversary**   1:7 53:7
**advice**   40:12

[advisory - certificate]

**advisory**  6:10
**affix**  52:2
**afternoon**  5:5
**ago**  29:11 37:9
  39:19 41:2
**agree**  28:18,21
**agreement**  4:14
  8:15,23 9:1,17,19
  9:24 10:7 11:22
  27:20,20,23 29:1
  55:5
**agreements**  18:4
  56:14
**ahead**  30:4 49:22
  49:25
**al**  1:4 53:4 56:3,3
**allotted**  56:15
**amount**  17:6
  22:10 28:8 37:23
  37:25
**amounts**  13:5,9
**ann**  20:18,19
**annual**  19:13 25:3
**annually**  31:21
**answer**  6:21 27:21
  41:12 45:23
**anymore**  25:17
**apologize**  16:12
  37:2
**apparel**  47:24
  48:10
**apparently**  39:15
**appear**  28:16,21
  28:23 43:11
**appearances**  4:3
**appeared**  2:9
  52:12
**appears**  30:9
**applicable**  56:7,14
**approaching**
  23:12

**april**  11:9,17
**ascena**  21:21 22:1
  22:3,4 23:24
  47:16 48:14,20,22
**asked**  27:19 37:6,6
  46:24
**asking**  41:16 49:9
**assigned**  45:19
**assist**  34:6
**assume**  22:4 24:17
**attached**  2:12
  11:11 54:5 56:10
  56:12
**attachment**  7:5
**attendees**  2:9
**attorneys**  54:12
**attribute**  20:5
**august**  43:7 44:22
  45:10,11,12 46:6,6
**available**  55:6
  56:6
**aware**  12:22 26:8
  26:21,24 27:2
  31:10,14,16 36:11
  36:16 37:16 41:1
  41:6,7 42:15,18

**b**

**back**  15:12 19:6
  38:10 41:23 42:9
**bad**  22:22
**baker**  3:10 34:16
**bakermckenzie....**
  3:12 56:1
**ball**  34:22
**bank**  1:6 5:9 17:20
  53:6 56:3
**bankrupt**  22:3
  48:14,20
**bankruptcy**  1:1
  6:5,10 7:13 12:23
  12:25 13:4,9,20

  14:5 21:18 22:6
  23:12,13,19 26:25
  40:15 42:22 43:13
  53:1
**banks**  21:21 22:20
  22:21,24 23:24
**bar**  34:1,8
**base**  20:10
**based**  20:9,11 31:1
  43:12
**basically**  7:23
  24:19 38:1
**basis**  7:11 15:4
**bear**  8:20 33:11
**began**  24:8
**behalf**  5:14 6:25
  7:12 50:5
**believe**  40:1 43:8
  46:3 48:18
**best**  14:16 21:13
  48:2
**bit**  19:8 21:10 24:2
  24:6 26:3 27:13
  33:9 45:2
**black**  20:18 22:19
**blank**  28:19
**blindsided**  42:23
**board**  17:23 18:1
  47:1,9
**bookkeeper**  32:14
  45:25
**bottom**  10:22
  14:25
**bought**  27:4
**brand**  48:14
**brick**  20:22,23
  21:3,8
**bring**  8:18
**browser**  9:3
**bryant**  20:20

**bunch**  7:25 32:22
  45:10
**business**  19:7 20:8
  21:4 24:7 25:3
  26:17,18,18 28:9
  31:21 33:8 40:3,6
  41:17 44:15 48:2
  48:11
**businesses**  26:9,10
**buyer**  32:23,24
  47:15
**buyers**  32:21

**c**

**c**  3:1
**calendar**  25:4
**call**  8:25 37:3
  39:13,23 40:2,4,7
  40:8,23 41:3
  42:19
**capital**  1:11 16:4,9
  16:15,18,19,23
  26:22,24,25 27:2
  37:12 41:6 53:11
  56:3
**captioned**  18:25
**card**  52:14
**care**  32:15
**career**  26:12
**case**  1:4 6:10 7:13
  13:9,20 18:24
  53:4
**cases**  47:15
**cash**  44:17
**catching**  44:7
**cause**  2:5
**ceo**  5:18
**certain**  46:25 48:6
**certainly**  29:12
**certificate**  4:8
  53:21

[certification - document]

certification 53:16
certified 49:24
  50:1,9,13 54:15
  56:16
certify 53:24
  54:10 55:3
chain 26:16
change 20:7 42:4,6
  51:5
changed 32:21
changes 4:7 51:1
  54:5,6 55:7,9 56:9
chapter 1:3 53:3
charlie 21:25 23:5
  23:6,25
charming 21:24
  23:5,6,24
chicago 3:11
chico's 20:18
  25:17
christopher 21:21
  22:18,19,21,24
  23:24
civil 2:11
claim 4:16 7:13
  13:8,19,22 14:5,8
  14:15,19,22 15:1,5
  40:14 42:25 43:12
claims 7:12
clear 24:17 31:19
close 23:9
collected 30:16
collins 3:4 36:20
  36:23
commission 52:25
communications
  18:6
companies 48:1
company 7:20,21
  7:23 22:4 23:19
  24:18,20 25:16

complaint 4:17
  33:13 34:19 35:11
completion 54:2,9
computer 11:6
concern 43:24
concerning 42:11
concluded 50:17
confused 41:13
consideration
  52:18
consistent 25:24
  26:4
contact 32:16,25
  33:3 36:19,23
  37:4 42:20
contacts 32:19
contained 14:15
contains 11:20
  54:6
contemporaneou...
  41:7 43:24
contract 8:14,16
  8:17,25 27:21,23
  27:25 28:3,7,11,14
  28:16,22,24 29:14
  29:20 30:8
contractual 27:20
conversation
  39:19,21
conversations
  39:10 47:17
copy 11:10 29:9
  29:16 30:8,9
  33:13 34:21 53:21
  56:16
correct 5:15 7:1
  8:8,9 10:4 12:23
  13:1 14:10,11,16
  14:20,23 15:6
  41:24 42:1,2
  43:13,14,16,18,19

52:3
correctly 30:1
counsel 54:10 55:5
county 52:10 55:1
couple 21:3
course 26:17 49:6
court 1:1 6:5,17
  49:23 53:1
covers 22:14
covid 20:6 48:25
creations 5:15
  14:2
credit 48:22,23
creditor 36:12
creditors 1:7 5:10
  53:7
csr 2:8 54:21
  55:19
customer 20:10
  21:18
customers 8:7
  20:8,14,17,20
  21:12,17,20 47:13

d

dallas 3:6
date 11:3,9 15:21
  51:3 54:4,22
  55:20
dated 45:10,12
dates 45:9
day 2:6 52:12,20
  54:15 55:14
days 42:18 48:24
  54:4 55:4,5
debtors 1:5 53:5
december 16:5
  18:15 38:20 41:5
  41:24
decline 20:5
declined 20:2,3

deeper 48:8
defendant 3:8
defendants 1:14
  18:24 50:7 53:14
defined 16:2 38:11
delaware 1:2 53:2
delete 34:24
deliver 12:12
delivered 53:19
depo 34:24
deponent 53:25
  54:1,8
deposed 6:13
deposition 1:19
  2:3 6:10 39:11
  51:3 52:2 53:17
  53:19 54:2,9 56:4
described 37:16
description 4:12
  52:14
design 7:24 12:11
designated 6:25
detail 38:1
details 37:21 45:3
different 45:2
difficulty 23:12,14
  23:20
dig 48:8
direct 5:3 14:4
  28:13
discovered 15:19
  15:20 17:2,5,9,11
  17:16,18
discussions 42:10
distribution 17:10
  18:15
district 1:2 53:2
dividend 17:10
  41:1
document 5:25 9:4
  9:14 13:17 35:18

**[document - go]**

| | | | |
|---|---|---|---|

36:8,13 52:15
**documents** 39:6,8
**downturn** 20:21
  21:2,15
**drafting** 36:8
**duly** 2:4 5:2

**e**

**e** 3:1,1
**earlier** 13:24
  50:10
**early** 26:12
**east** 3:10
**either** 6:19 29:17
**electronically**
  29:17
**elm** 3:5
**email** 3:7,12 4:15
  10:23 11:4,11
  29:25 30:15,16
  32:7,12
**emailed** 29:16
  30:9,11
**emails** 29:21
**employed** 54:11
**ended** 21:17
**entirety** 31:9
**entity** 16:14,19
  26:22
**eric** 1:20 2:3 4:4
  5:1,7 36:24,25
  37:2,5 51:2 52:1,5
  52:12 53:17 56:4
**errata** 56:10,12,13
**especially** 47:18
**estimate** 34:9
**et** 1:4 53:4 56:3,3
**eventually** 23:13
  29:22 35:5
**evinces** 43:6
**evolved** 19:22

**exact** 24:11 25:5
  38:1
**exactly** 9:25 32:11
  37:24 38:4 44:12
**examination** 4:5,6
  5:3 18:21
**excuse** 45:13
**executed** 11:15
  28:11,17,21,23
  29:2,7,20 52:17
**executive** 47:18
**exhibit** 4:13,14,15
  4:16,17 5:22 6:1
  7:4 8:18,21 9:2,3
  9:5,11 10:10,12,19
  13:11,13 15:12
  19:1 27:16 30:5,6
  30:14 33:17,24
  34:23 35:11 38:10
  43:2,3 45:8
**exhibits** 4:11 5:23
  35:3 39:9
**existence** 15:20
**expand** 21:10
**expect** 29:9,19
  40:23
**expiration** 54:22
  55:20
**expires** 52:25
**explain** 37:11
**explained** 37:5,5
  37:12
**explaining** 37:15
**express** 20:18
  25:15
**expressed** 52:18
**extend** 48:23
**extending** 48:21
**extent** 49:10

**f**

**f** 53:25
**fact** 30:8,9
**factories** 12:1
**facts** 15:18
**failed** 39:16
**fails** 56:15
**fashion** 7:21 42:1
**fashions** 1:12,12
  53:12,12
**february** 54:15
  56:2
**federal** 2:10 50:2
**fedex'ed** 30:1
**feel** 48:11
**feels** 44:4
**figured** 40:9
**figuring** 33:22
**file** 13:8 14:4
**filed** 7:12 12:22,25
  13:4,19 21:18
  22:6 36:4 42:19
**files** 23:19 28:11
  29:10
**filing** 23:13
**financial** 47:9
**financially** 54:13
**fine** 19:13 20:24
  39:5,17
**finish** 6:21
**firm** 36:20 39:24
  54:23 55:21
**first** 5:2 7:10,16
  10:1,3,3,22 27:19
  41:1 42:15,18
  45:7,9
**five** 28:8 44:11,14
**flow** 44:18
**focus** 12:1 19:10
  24:14

**folder** 5:23 9:2
  34:16 35:12
**follow** 11:25 28:5
  28:5
**follows** 5:2
**food** 26:16
**foregoing** 52:2,16
**form** 18:11 41:11
  55:8
**fort** 54:24 55:22
**forward** 41:16,20
**four** 23:2 40:2
  42:18
**frame** 22:25
**fraudulent** 15:20
**frcp** 53:24
**frequently** 32:21
**friday** 11:9
**fully** 28:10,17,21
  28:23 29:1,7,20
**further** 6:6 18:21
  49:9 50:2,3 53:24
  54:13

**g**

**gaps** 46:5
**general** 19:7,21
  24:6 44:5
**generation** 7:22
  8:1
**getting** 45:6
**give** 19:12,21
  20:13 27:10 33:14
  37:21 45:3 46:22
**given** 52:19 55:10
**go** 10:1,1,22 24:5
  26:19 30:4,5
  34:15 35:8 38:9
  41:23 42:9,25
  44:6 45:20 46:4
  48:2,14 49:19,22
  49:25

Page 4

[god - know]

**god** 11:5
**going** 6:22 7:15
  8:11,18 10:11
  13:13 15:23 33:10
  34:20,21 38:9
  43:4 48:20
**good** 5:5 20:9
  25:10 26:15 44:15
  45:22 47:21
**goods** 14:22 15:1
  41:10
**governs** 9:19
**great** 5:21 11:19
  14:7 15:3,11 16:1
**ground** 6:16
**group** 18:4,7
**growth** 25:25
**guarantees** 28:2
**guerra** 2:7 54:21
  55:19
**guess** 23:8 24:11
  25:5 27:22,25
  29:14 37:7 38:25
  44:5,17 46:16,17
**guessing** 34:9
**guys** 10:16 34:22
  35:1 50:3,14

**h**

**h.i.g.** 1:13 53:13
**hand** 52:19
**handwriting**
  22:22,23
**happen** 40:17
**happened** 47:16
**happening** 34:1
  37:6
**hard** 6:21
**head** 10:8
**hear** 7:19 49:18
**heard** 16:6,9,14,23
  27:6

**held** 5:19 16:4
**helen** 4:15 10:23
  10:25 11:1 13:23
  13:23,25 14:4
**help** 10:12
**hereto** 2:12
**hi** 18:23
**high** 26:16
**higher** 26:19
**honest** 40:24
**honestly** 23:7 39:3
  40:23
**hopeful** 19:2
**hopefully** 8:19
  19:2,4 34:3 35:13
**host** 3:14
**hour** 19:3,3
**house** 20:18
**houston** 40:9
**huh** 25:19 46:7
**hundreds** 32:4
  46:8

**i**

**idea** 42:23
**identity** 52:14
**illinois** 3:11
**important** 6:17
**including** 7:13
**incorporated** 5:15
**incorrect** 28:7
**increased** 44:13
  44:17
**index** 4:1
**indicated** 14:18
**industry** 27:9,11
**information** 14:15
  26:14 27:10 46:25
  47:5,9
**initialized** 28:4
**input** 36:7

**insight** 46:14
**instance** 2:4
**instrument** 52:16
**interacted** 32:17
**interested** 54:14
**internet** 33:18
**introduce** 10:12
  34:14,22
**invoice** 12:13,15
  12:19 44:20 45:14
**invoices** 13:6 14:9
  14:12,25 15:4,9
  22:5,14 23:3,7,15
  31:4,5,10,16 32:1
  32:9 41:25 42:11
  42:16 43:7,11,22
  43:25 44:7,23
  45:10,11,17,19
  46:1,9,12 47:21
**invoicing** 30:22
  32:6
**involved** 24:22
**involvement** 37:7
**island** 7:22
**issue** 12:8,12,15
  44:18
**issues** 42:20
**it'll** 33:16
**iv** 1:12 53:12

**j**

**january** 1:21 2:6
  12:23 13:1 16:7
  16:10,15,24 17:3,7
  17:11 18:10 31:15
  31:20 36:4 51:3
  53:17
**jewelry** 7:21,24
  21:6
**john** 2:3 4:4 5:1,7
  51:2 52:1,5,12
  53:17 56:4

**jointly** 1:5 53:5
**july** 48:18
**jump** 46:20
**jumps** 45:11

**k**

**kbo** 1:4,8 53:4,8
**keep** 28:10 47:14
  48:5,6 50:10
**kenilworth** 5:14
  5:17 7:12,19 8:2
  8:14 12:9,11,15
  13:5,8,19 14:1,19
  15:8,19 17:2,5,9
  17:15,17,19,22,25
  18:9,13 22:5 24:8
  25:3 26:7 27:14
  28:25 30:21 31:11
  31:17 32:2 36:11
  40:14,19 41:9,25
  42:12,17 44:21
  47:4,8,12
**kenilworth's** 6:25
  8:7 15:5 19:7,12
  45:17
**kind** 21:12 24:5,23
  33:9 35:1,5 39:15
  44:7 45:5 48:12
**knew** 27:3
**know** 13:14 18:18
  20:7 21:12 22:13
  23:19 25:14 26:12
  26:15 27:3,6 28:1
  28:25 29:1,4,5
  30:25 32:10,10,14
  32:21 33:9 34:5
  37:5,6 38:3,4
  39:14,14,21,22
  40:8,10,11,11
  42:22 44:2,17,18
  44:25 45:9,25
  46:4,6,9 47:15,22

**[know - name]**

48:3,6,15,25 49:22
**knowledge** 14:16
  41:10
**known** 18:14,18
  41:17 52:13

**l**

**lane** 20:20 21:11
**law** 36:20
**lawsuit** 36:21
  40:16
**lawyer** 40:9,9
**layman's** 11:21
**left** 24:23
**legal** 54:22 55:20
  56:19
**lehrman** 3:9 4:6
  6:20 18:11,22,23
  33:25 34:5,11,15
  34:18,25 35:9,10
  41:12 49:7,15,19
  49:22,25 50:7,11
  50:16
**leo** 3:4 5:8 53:20
**level** 26:19 32:23
  32:24 47:15,18
  48:5,6
**limited** 1:7 5:10,11
  8:7,11,12,15 9:20
  11:23 12:8,16,19
  12:22 13:4,9,20
  14:13 16:3 17:5,9
  17:19,22,25 18:3,6
  18:14 21:16 24:2
  24:9 25:3,18,20
  26:2 27:4,7,15,21
  27:24 29:5,21
  30:21 31:5,5,11,17
  32:7,8,16 33:4
  41:10,17 42:10,16
  43:13 44:21 46:12
  46:12 47:10 53:7

**limited's** 41:25
  42:11
**line** 51:5
**liquidating** 1:7
  5:11 53:7
**liquidation** 5:10
**list** 44:25 46:5
**listed** 7:9 36:12
**little** 6:6 7:19 12:5
  19:7 21:10 24:2,6
  26:3 27:13 33:9
  45:2
**llc** 1:4,12,12,13
  5:11 8:8,11 16:3
  53:4,12,12,13
**llp** 3:4,10
**load** 13:14
**loading** 33:25 35:5
**located** 7:21
**locations** 2:10
**loft** 20:19,19,19
**log** 39:14
**long** 5:19 8:2
  22:13 23:7 29:11
  33:19
**longer** 30:25
**look** 38:13 39:6
  45:7 47:21
**looked** 11:24
  30:11 39:8
**looking** 12:2,3
  38:17
**looks** 30:14
**loppenheimer** 3:7
**lot** 26:15 32:19
  48:1,12
**lp** 1:11 53:11
**lsc** 1:4 53:4

**m**

**machine** 2:8
**madden** 36:25
  37:2,4 39:11,20
**mail** 32:7
**mailing** 32:11
**main** 20:10,10,20
  32:24
**major** 48:10
**making** 11:25 26:1
  55:10
**mall** 20:9,11
**manage** 32:17
**management** 33:4
**manager** 11:1
  26:6
**manufacture** 7:24
  12:11
**marked** 5:23 6:1
  8:21 10:10 13:11
  33:24 35:3
**market** 20:18 21:8
**marketplace**
  26:10
**martin** 3:14 34:7
  34:13,17,20 35:1,7
**master** 4:14 8:22
  9:1,17 27:23
**math** 32:3
**matter** 33:14
  38:24
**matters** 7:5,8
**mckenzie** 3:10
  34:16
**mean** 11:24 21:7
  28:19 29:3,11
  30:11 32:3 35:25
  36:14 44:15
**meant** 47:7
**member** 14:1

**mention** 25:16
**mentioned** 19:9
  21:14 26:21 47:24
**merchant** 27:7
**merchants** 26:14
**michael** 3:9
**michael.lehrman**
  3:12 56:1
**mike** 18:23
**million** 18:15
  19:14,18,25 25:6
  31:21 32:2 41:9
  46:10
**mind** 28:6 49:5
**mine** 35:4
**minute** 33:14 49:2
**minutes** 17:23
  47:1,9
**mod** 1:12,12 53:12
  53:12
**modified** 48:24
**modify** 48:21
**mom** 8:3 24:11
**moment** 9:7
**momentarily**
  10:17
**money** 22:4
**month** 37:9 39:19
  41:2
**months** 22:17 23:2
  43:22 44:6 48:25
**mortar** 20:22,23
  21:3,8
**msa** 11:12,20,24
  12:3

**n**

**n** 3:1
**n.a.** 1:6 53:6 56:3
**name** 5:6,8 16:4
  18:23 39:24 51:2
  52:15

Page 6

national  7:25
nature  7:11 15:20
navigate  27:16
necessarily  32:20
needs  49:10
neil  3:14 34:5
neither  54:10
new  25:15 39:17
  40:3,6
nice  40:10
notarize  56:11
notary  52:24 54:3
note  56:9
noted  52:3
notes  49:2
notice  42:25 43:6
  43:12
notified  55:3,6
november  43:17
  44:22
nowadays  29:15
number  11:20
  19:13,22 45:17,19
numbered  2:5
  34:18 45:13
numbers  7:9

**o**

oath  52:13
objection  18:11
  41:11
obviously  20:6
  21:14 32:14 44:2
  44:15
occur  27:11 40:13
october  43:8
offend  20:22
offhand  39:24
office  11:1 52:19
officer  55:6
oh  6:7 11:5 16:20
  21:24 39:3 41:13

49:17
okay  5:14 6:7,15
  6:24 7:3,6,7 8:6
  8:10,12,14,18,20
  8:25 9:8,9,11,13
  9:18,22 10:6,11,14
  10:16,18,19,21
  11:2,8,10,19 12:4
  12:7,15,18,21,25
  13:2,3,12,16,17,22
  14:1,4,7,18 15:3
  15:11,12,14,16,24
  16:1 17:1,14
  18:17 19:5,15,19
  20:3,5,25 22:8,12
  23:4,18,23 24:1,4
  24:13,21,24 25:7
  25:12,23 26:5
  27:5,9,13,18 28:8
  28:13,15 29:19
  30:3,7,13,19,23
  31:8,13,19,25 32:5
  32:13 33:2,6,23,25
  34:2,4,13,17,20,25
  35:9,15,17,23 36:6
  36:10,15,18 37:10
  37:14,19 38:7,12
  38:14,17,21 39:25
  40:5,5 41:4,22
  42:3,7,14,24 43:5
  43:10,15,20 44:13
  45:4,24 46:2,19,19
  46:21 48:19 49:2
  49:7,24 50:13
once  34:23
operate  31:3
opinion  40:11
oppenheimer  3:4
  4:5 5:4,8 6:3 8:24
  10:11 13:12 18:13
  18:19 27:17 39:12

39:22 41:11 49:9
  49:14,17,21 50:5
  50:12,15 53:20
oppenheimer's
  46:24
oral  1:19 2:3
order  12:8
ordering  31:4
orders  50:10
organization
  10:24
ormond  4:15
  10:23 13:23
outcome  54:14
outlet  20:19
outside  21:6,8
outsides  33:9
outstanding  13:5
  13:9
overall  26:18
overseas  12:1
overview  19:12
  20:13
owe  13:5
owed  14:19 22:4
  23:15
owner  7:23 26:7
ownership  18:4,7

**p**

p  3:1,1
p.m.  2:6,7 50:17
page  4:12 7:3,5
  10:1,3,3,22 14:18
  15:15 28:13,19
  38:16 45:7,8 46:6
  51:5 54:6
pages  11:20 34:9
  34:12 56:12
paid  15:1 17:10
  18:14 31:11,17

parents  24:22
part  10:24 21:11
  26:7 28:11 33:4,8
  39:21 47:24,25
particularly  44:10
parties  31:3 53:22
  54:11
partner  27:7 40:3
  40:6
partners  1:11,13
  16:4,9,15,19,23
  53:11,13
partnership  48:12
partnerships  56:3
party  54:1,9
pass  18:19 49:10
pay  12:19 31:6
  42:1,11,16
paying  23:14 31:4
  44:7 46:12,16
payment  15:8
  30:22 43:25 44:3
pdf  34:10
pending  36:12
people  26:16
percent  48:11
performing  26:10
period  22:13 26:1
person  27:8 32:20
  39:23 52:15
personally  32:17
  52:12
petition  15:21
phone  3:6,12 41:3
  42:19 54:25 55:23
place  37:17 38:2
  38:19
plaintiff  1:9 2:4
  3:2 53:9
plaintiffs  40:15

A390

| | | | |
|---|---|---|---|
| **plan** 1:6 5:9 53:6 | 49:4 | **r** | **refer** 8:11 |
| **please** 5:5 7:3 | **procedure** 2:11 | | **referenced** 56:5 |
| 33:11 50:12 | **proceeding** 1:7 | **r** 3:1 | **referring** 8:22 |
| **point** 26:12 27:12 | 6:11 53:7 54:12 | **raised** 43:23,23 | **refresh** 8:19 9:3,6 |
| 28:18 29:22 32:10 | **proceedings** 50:17 | **ran** 24:19 | 11:14 |
| 32:24 35:6,7 | **produced** 2:3 | **randolph** 3:10 | **regards** 11:25 |
| 42:22 | **product** 31:4 | **range** 19:18 31:23 | 36:20 40:14 47:16 |
| **popped** 9:9 13:15 | **products** 12:12,12 | **rank** 25:8 | **registration** 54:23 |
| **populate** 10:16 | 26:9 | **reached** 47:16 | 55:21 |
| **portal** 29:17 | **progress** 34:1,8 | **read** 6:3,9 7:10,11 | **reid** 3:4 36:20,23 |
| **position** 5:17,19 | **proof** 4:16 14:5,8 | 7:16 11:3 15:17 | **reidcollins.com** |
| **positive** 29:24 | 14:18 | 15:18 22:23 27:9 | 3:7 |
| 45:23 46:17 | **proved** 52:13 | 52:1 56:6,8 | **related** 54:11 |
| **possible** 46:11 | **provide** 6:21 | **ready** 39:14 | **relations** 28:1 |
| **possibly** 18:14 | **provided** 41:9 | **really** 11:24 26:15 | **relationship** 9:20 |
| 22:17 | **provisions** 2:11 | 26:19,20 39:4 | 11:23 12:6 24:9 |
| **potential** 42:20 | 11:21 | 40:23 42:23 44:1 | 26:15 27:14 31:1 |
| **practice** 26:8 32:6 | **public** 52:24 54:3 | 44:16 | 31:10 32:17 33:4 |
| 32:8 41:25 42:4 | **publicly** 36:4 | **reason** 28:14 46:3 | **relationships** |
| 45:17 | **pull** 13:13 27:15 | 51:5 | 21:15,16 48:6 |
| **practices** 30:20 | 27:16 35:10 | **reasonably** 15:19 | **relevant** 15:18 |
| 48:21 | **purchase** 12:8 | 17:17 | **remain** 25:24 |
| **predicate** 36:12 | **purposes** 52:17 | **reasons** 54:6 55:9 | **remember** 10:13 |
| **preface** 47:7 | **pursuant** 2:10 | **recall** 9:23 10:6 | 10:14 23:7 24:8 |
| **prepare** 39:2,3,11 | 22:5 53:24 | 30:1 42:9 | 25:5 29:4 35:25 |
| **prepared** 38:24 | **pursued** 21:4 | **receipt** 54:4 | 36:24 37:24,25 |
| **present** 3:14 | **put** 33:16 50:4 | **receive** 29:16 | 38:4,5,8 39:24 |
| **presentations** 18:1 | | 41:25 | **repeat** 16:11 |
| 46:25 47:9 | **q** | **received** 15:8 | **reported** 2:8 |
| **pretty** 12:1 26:4 | | 42:19 48:9 | **reporter** 6:17 |
| 33:7 37:13 | **question** 6:20 | **receiving** 29:5 | 49:23 |
| **previously** 27:17 | 15:24 22:18,25 | 43:24 | **reporter's** 4:8 |
| **printout** 30:15,16 | 25:10 27:22 38:15 | **reciting** 55:9 | 53:16 |
| **prior** 15:21 26:25 | 41:14 44:5 45:2 | **recognize** 5:25 9:4 | **represent** 5:9 |
| 31:9 37:15 41:23 | 45:23 47:7,22 | 13:17 30:25 | 18:24 |
| 48:20 | **questioning** 35:2 | **recollection** 8:19 | **representation** |
| **probably** 10:8 | 46:24 | 11:14 | 31:1 |
| 11:15 25:11 26:12 | **questions** 19:7 | **record** 2:12 5:6 | **representative** |
| 28:7 33:18 49:23 | 48:4 49:9,14,16 | 43:16 49:20 50:4 | 6:25 |
| **problem** 33:12,15 | **quick** 6:16 | **recorded** 6:16 | **requested** 54:1,8 |
| 35:15 39:18 46:23 | **quicker** 44:3 | **records** 17:20 | |
| | **quickly** 32:3 | | |

respect  30:21,21
  32:8 48:21
respective  2:10
response  47:3
retail  20:8,22,23
  21:3,8 27:11
retailer  23:12,13
  44:6
retailers  7:25,25
  20:9,11 44:19
  48:13
retired  24:23
return  56:12
returned  54:3,5
  55:11
review  49:2 55:7
rhode  7:22
right  5:18 6:17
  7:14 9:20 12:21
  13:16 19:6 20:11
  20:14,17 21:1
  23:10,10,16,20
  25:18 26:25 29:10
  29:16,23 30:10
  33:6 35:10 36:6
  41:2 42:5 44:4,8
  44:10 47:6
role  24:18
rolling  34:22
rough  19:13
roughly  25:22
rule  53:24
rules  2:11 6:16
  11:25 28:4,5
  56:14
run  7:23

**s**

s  3:1 27:6
safe  22:3
sales  19:13 21:2,5
  25:6,21 26:1 28:1

32:2 46:10
says  7:8
scheduled  7:12
scroll  7:3 14:9
  15:15
seal  52:19
second  7:22 8:1,20
  13:14 35:13 46:5
  46:22
see  7:8 9:2,11
  10:19,23 13:22
  18:25 28:19 30:12
  35:4,16 45:5,8,14
  45:15
seeing  35:12
seen  9:14 35:18
segments  21:5,6,7
sell  26:9 47:25
sending  32:9
sends  46:1
sense  11:16 19:21
  22:14 25:21 28:3
  45:21,22 46:20
  48:9
sent  29:22,25 31:5
  31:10,16
sequentially  45:12
  45:13,18
series  43:7 47:4
served  53:21
services  27:23
set  39:12
settlement  40:22
share  9:2
shared  35:11
sheet  56:10
shift  15:12,23
shorthand  2:9
shortly  42:21
show  33:10,13

shown  27:17 53:22
sic  27:23
side  9:9
sign  29:6 55:9 56:6
  56:11
signature  4:7 10:4
  51:1 52:2 53:25
  54:3,6,21 55:11,19
signed  9:24 10:6
  11:12 13:23 28:4
  56:17
similar  21:12
sitting  25:2
six  22:17 48:25
size  25:9,9
slow  11:6
small  23:1 33:7,8
  40:22 47:24
sold  14:22 15:1
soloff  1:20 2:3 4:4
  5:1,7,8 6:13 13:15
  18:20,23 35:12
  49:12 51:2 52:1,5
  52:12 53:17 56:4
solutions  54:22
  55:20 56:19
soon  34:3
sorry  7:4 11:6
  16:11 21:24 35:14
  35:20,20 38:5,8,8
  41:13 45:25 49:17
  49:22,25
sort  19:10 20:13
  24:14,14 25:2,25
  26:6,8 27:9 40:25
  41:2 43:6
sourcing  4:14 8:22
  9:1,17 11:25 27:8
space  20:8
speak  6:18,18
  26:16 44:16

specific  16:19
  45:18
specifically  12:25
  24:3 29:4 37:11
spinning  35:13
spoke  13:24
start  24:25 25:1
  30:24 31:2 35:1
started  8:3 24:11
  24:19
starting  19:11
  30:24 43:7
state  2:8 5:5 52:9
  52:24 55:1
stated  2:11
statement  55:9
states  1:1 6:5 53:1
stay  36:12
stayed  21:11
stenographer
  49:24 50:1,9,13
stipulations  50:2,3
stores  5:10,11 8:8
  8:11,12,15 9:20
  11:23 12:22 13:4
  13:9,20 14:13
  16:3 17:6,10,20,23
  17:25 18:3,6,14
  20:23 47:25
strategies  21:4
street  3:5,10 54:23
  55:21
strictly  26:18
struggling  42:16
stuff  39:15 47:1
styled  2:5
subject  36:20 49:8
submitted  40:14
  43:12 44:21 45:1
subpoena  4:13 6:9
  7:4 15:13 16:2

[subpoena - vendors]

18:25 38:10
**subscribed** 52:16
   55:13
**subsequent** 19:22
**subsequently**
   23:19 31:6
**substance** 55:8
**successful** 40:15
**successor** 5:11
**suffice** 23:11
**suite** 3:5,11 54:24
   55:22
**summarize** 11:22
   43:4
**summarizing** 47:5
**summer** 48:16,17
**sun** 1:11,12,12,13
   16:4,9,14,18,19,23
   26:22,24,25 27:2
   37:12 41:6 53:11
   53:12,12,13 56:3
**supply** 7:24,24
**sure** 7:21 9:25
   10:15 11:16,25
   16:13 18:16 19:24
   20:16 22:2 24:16
   26:11 29:3 32:4
   32:11 35:20,25
   39:1,13 41:15
   46:23 49:21
**surprise** 23:18
**surprised** 23:21
**switched** 32:12
**sworn** 2:5 5:2
   55:13

**t**

**take** 9:7 13:14
   32:2 38:2,13,18
   46:14
**taken** 2:5 54:13

**takes** 8:20
**talk** 7:16 12:5
   17:16 19:1 22:1
   24:2 26:17 27:13
   30:20
**talked** 17:15 39:12
**talking** 6:22 15:23
   25:18 31:20 43:21
**taylor** 20:19,19
**tell** 7:19 37:20
   39:3
**ten** 20:14,17
**term** 28:8 38:11
**terms** 11:21 25:8
   31:4 48:25
**testified** 5:2 40:25
   46:8
**testify** 6:9,24
   38:25 39:2
**testimony** 41:5,8
   56:8
**texas** 2:8 3:6 54:21
   54:24 55:1,19,22
**thank** 6:12 8:6
   15:7,22 18:20
   19:1 37:1 49:12
   49:13 50:14,15,16
**things** 7:15 18:10
   28:4
**think** 27:25 28:1,7
   28:7 29:24,25
   33:18 38:10 39:23
   40:17,21 43:1
   46:11 47:22 48:1
**third** 21:25 25:17
   39:23
**thought** 41:13
**three** 20:7 23:22
   25:13 43:21 44:11
   44:14

**throckmorton**
   54:23 55:21
**throw** 29:12
**time** 19:1 22:13,25
   24:5,10,20 25:8,13
   26:1 29:11,25
   31:3 36:17 42:9
   44:3 47:19 49:8
   56:15
**timeframe** 56:7
**timely** 42:1
**title** 6:3
**today** 6:24 7:16
   11:6 19:2 25:2
   35:19 38:25 39:2
   39:13 50:10
**told** 37:23 40:1
**top** 10:8 20:14,17
**touches** 14:9
**tough** 22:22
**track** 6:22
**trade** 12:6 48:22
   48:23
**trades** 27:10
**transcript** 53:19
   54:4 55:6 56:5,16
**transfer** 15:21
   16:2,3,6 17:2,16
   17:18 37:13,15,16
   37:20,21,22 38:2
   38:18,22 41:1,7,8
   41:18
**transferred** 17:6
**true** 14:16 28:3
   52:3
**trust** 1:8 5:10,11
   50:6 53:8
**trustee** 1:7 5:9
   53:7
**try** 32:3 40:11
   48:7

**trying** 21:10 34:14
   42:21
**tsai** 3:4
**turn** 5:22
**two** 7:9,15 21:22
   44:6
**tx** 56:13
**typically** 23:14
   29:12 32:1 47:12
   47:14

**u**

**uh** 25:19 46:7
**umb** 1:6 5:9 53:6
   56:3
**uncommon** 44:6
**understand** 5:12
   41:14,15
**understanding**
   25:2 40:13 44:20
   44:23
**unfortunately**
   37:23
**united** 1:1 6:5 53:1
**unpaid** 14:12 15:4
   22:6 43:13,22
   44:24 45:1
**upload** 8:20
**usually** 12:19 33:7
   33:8 47:14,18
   48:7,9

**v**

**v** 1:10,11,12 16:4,9
   16:15,19,23 26:24
   53:10,11,12 56:3,3
**validity** 7:11
**vendor** 45:18,20
   47:23 48:10
**vendors** 23:14
   33:7 45:20

**[verify - zoom]**

| | |
|---|---|
| **verify**  56:8 | **worth**  23:2 54:24 |
| **veritext**  3:14 | 55:22 |
| 54:22 55:20 56:12 | **written**  8:15 18:3 |
| 56:19 | **wrong**  48:9 |
| **veritext.com.** | **x** |
| 56:13 | **x**  28:8 |
| **videoconference** | **y** |
| 2:7 3:4,9 | **yeah**  10:14 20:24 |
| **view**  27:22 | 21:11 25:1 29:8 |
| **volume**  1:22 | 29:18 34:7,15 |
| **w** | 35:7,21 36:5 |
| **wait**  36:2 | 37:13 39:1,1,16 |
| **want**  19:6,10 24:5 | 40:11,18,20,23 |
| 27:15 28:13 33:10 | 41:19 43:3,9,19 |
| 33:13 35:20 38:9 | 48:18 49:1,19 |
| 41:15 43:16 48:3 | **year**  5:20 15:21 |
| 48:5,6 50:10 | 19:21 20:6 21:9 |
| **warwick**  7:22 | 21:10,21 23:9 |
| **watching**  34:8 | 24:20 25:4,21 |
| **waves**  48:3 | 28:8 42:5 |
| **way**  29:15,17 43:8 | **years**  19:11,23 |
| 48:2 | 20:7 21:3 24:15 |
| **we've**  21:11 44:25 | 31:19 32:19 44:11 |
| **website**  20:14 | 44:14 |
| **went**  22:3 44:23 | **yep**  5:24 7:6 26:23 |
| 48:24 | 38:17 |
| **white**  20:18 | **york**  25:15 |
| **wind**  1:4 53:4 | **z** |
| **witness**  2:4 18:19 | **zoom**  2:9 |
| 35:4 49:10,13 | |
| 51:2 53:22 55:3,4 | |
| 55:7,8,10,11 56:5 | |
| 56:7,9,11,15 | |
| **wonder**  34:5 | |
| **word**  28:3 | |
| **work**  25:17 42:21 | |
| **worked**  11:22,23 | |
| 26:14 48:7 | |
| **working**  33:11 | |
| **world**  39:17 | |

Veritext Legal Solutions
800-336-4000

A394

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.